## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LINWOOD ALLEN,
1129 8th St. NE
Washington, D.C., 20002,

        Plaintiff,

    v.

DISTRICT OF COLUMBIA,
via service on the Office of the Mayor,
1350 Pennsylvania Ave. NW
Suite 316
Washington, D.C., 20004;

METROPOLITAN POLICE DEPARTMENT,
300 Indiana Ave. NW
Washington, D.C., 20001;

PETER NEWSHAM,
in official and individual capacities,
300 Indiana Ave. NW
Washington, D.C., 20001;

COLIN HALL,
in official and individual capacities,
300 Indiana Ave. NW
Washington, D.C., 20001;

J. DOES, REPRESENTING
METROPOLITAN POLICE DEPARTMENT
EMPLOYEES WHO WILL BE NAMED
LATER ONCE THEIR IDENTITIES ARE
KNOWN,
in official and individual capacities,
300 Indiana Ave. NW
Washington, D.C., 20001;

CONCEALED PISTOL LICENSING
REVIEW BOARD,
1350 Pennsylvania Ave. NW
Suite 513
Washington, D.C., 20004;

**CIVIL RIGHTS COMPLAINT**

**JURY TRIAL DEMANDED**

Civil Action No. _____

EDWIN POWELL,
in official and individual capacities,
1350 Pennsylvania Ave. NW
Suite 513
Washington, D.C., 20004;

GARY ABRECHT,
in official and individual capacities,
1350 Pennsylvania Ave. NW
Suite 513
Washington, D.C., 20004;

and

DR. CHAD TILLBROOK,
in official and individual capacities,
1350 Pennsylvania Ave. NW
Suite 513
Washington, D.C., 20004

                    Defendants.

Plaintiff LINWOOD ALLEN alleges as follows against Defendants DISTRICT OF COLUMBIA, METROPOLITAN POLICE DEPARTMENT, CHIEF PETER NEWSHAM, LIEUTENANT COLIN HALL, J. DOES, REPRESENTING METROPOLITAN POLICE DEPARTMENT EMPLOYEES WHO WILL BE NAMED LATER ONCE THEIR IDENTITIES ARE KNOWN, CONCEALED PISTOL LICENSING REVIEW BOARD, EDWIN POWELL, GARY ABRECHT, and DR. CHAD TILLBROOK:

## OVERVIEW OF THE CASE

1.     In Summer 2019, Plaintiff Linwood Allen applied for a firearm registration certificate and a concealed pistol license in the District of Columbia.  He complied with every step of D.C.'s rigorous application process, and satisfied each of D.C.'s stringent statutory and regulatory requirements.  After reviewing his applications and all relevant facts, the D.C. Metropolitan Police Department (MPD) rightfully approved both applications.  Yet just six months later, MPD sent

Mr. Allen letters revoking both his firearm registration certificate and concealed pistol license.  MPD has since admitted that it revoked Mr. Allen's firearm registration certificate in "error," but refused to reinstate Mr. Allen's concealed pistol license, opting instead to continue violating his constitutional rights and statutory law.

2.      MPD did not base its revocations on any new or newly discovered facts, but on a supposedly new and still undisclosed policy that MPD adopted after it had already issued Mr. Allen's documents.  Apparently, under this new policy, a prior criminal charge—even absent a conviction or any underlying facts—is sufficient to deny a D.C. resident who otherwise complies with all application requirements of D.C. law a concealed pistol license.  As MPD admitted, its determination to revoke Mr. Allen's license "was based on the same set of incidents that had been available in the criminal history record search conducted during the initial licensing determination."  MPD Response to Order to Stay Appeal (Mar. 16, 2020).[1]  MPD simply changed, with almost no explanation, how it interpreted the fact of prior criminal charges against Mr. Allen.

3.      To this day, Mr. Allen knows almost nothing about the new policy that resulted in his concealed pistol license being revoked—because MPD has provided almost no information about it.  MPD's initial recommendation to revoke the license did not even mention the new policy, and only after the Concealed Pistol Licensing Review Board (CPLRB) required MPD to provide an explanation did MPD finally indicate its alleged existence.

4.      But, even after revealing the existence of its new policy, MPD continues to conceal its contours.  Mr. Allen knows only two things about this purported new policy.  First, the MPD Chief of Police (Chief) recently revised MPD's position on how it interprets regulations permitting it to

---

[1] Per the local rules, Mr. Allen has not attached the documents cited in the complaint, but stands ready to provide the Court with an appendix of all cited materials.  LCvR 5.1(e).  Relatedly, and also per the local rules, it is Defendants' responsibility to "file a certified list of the contents of the administrative record with the Court within 30 days following service of the answer to the complaint."  LCvR 7(n)(1).

deny, revoke, or suspend a concealed pistol license based on an applicant's "propensity for violence or instability." *Id.* Second, "[u]nder the Chief's new interpretation of the regulation, conduct that is violent or criminal demonstrating [sic] low self-control, regardless of whether it results in a criminal conviction, may be grounds for denial, revocation, or suspension of a [concealed pistol license] on the basis of unsuitability." *Id.*

5.     MPD has provided nothing more. As just a few examples of questions left unanswered by MPD's cryptic references to the new policy, there is no indication of the types of applicant "conduct" that will be deemed to demonstrate "low self-control" under the Chief's new interpretation, what evidence will be used to assess the applicant's purported conduct other than the fact that an arrest was made, the scope of investigation that will be conducted to identify and evaluate that evidence, or the level of evidence needed to establish that the purported conduct actually occurred.

6.     If Mr. Allen's experience with the new policy is any indicator, the answers to these questions are certain to reveal widespread constitutional and other legal violations by Defendants. For example, Defendants in this case have used the new policy as a justification for (1) revoking Mr. Allen's concealed pistol license despite possessing *no evidence* of his conduct besides the fact that he had been arrested in the past, (2) conducting *no investigation* into Mr. Allen's prior arrests—and even missing the fact that he had been exonerated of the most serious accusations, and (3) refusing to even hold a hearing during which Mr. Allen could present argument and evidence showing that the prior criminal charges did not warrant reversal of D.C.'s decision to grant his concealed pistol license.

7.     This lack of procedural safeguards has resulted in Mr. Allen, who is a law-abiding and hardworking member of the community, being denied his constitutional right to carry a firearm.

8.     It is true that Mr. Allen was previously arrested for two purported offenses involving a firearm—assault with a deadly weapon in 2006 and a fugitive arrest related to an armed robbery in 2014. But the authorities dropped the charges in both instances because further investigation—blood,

saliva, and hair samples in 2006 and, on information and belief, video footage in 2014—demonstrated that Mr. Allen had been wrongly identified.  Indeed, the 2014 arrest was expunged on Mr. Allen's motion.

9.      However, before Mr. Allen's name was cleared in those two cases, he served months in jail waiting for the government's investigation to prove what he already knew: that he was innocent. Defendants' conduct in this case resurfaced and compounded the pain, suffering, and anguish associated with languishing in jail for months for crimes Mr. Allen never committed.

10.     Mr. Allen was also arrested for two misdemeanor gambling incidents, but both were non-violent and neither resulted in a conviction.  He was arrested as a juvenile for possession with the intent to distribute cocaine, but these arrests occurred twenty years ago when Mr. Allen was a minor, and there is no indication that either incident involved any violence.  Nor did they result in a conviction.

11.     MPD has refused to look beyond the fact of Mr. Allen's arrests.  MPD has not indicated the existence of any underlying facts or evidence connected to those arrests establishing that he engaged in conduct showing a propensity for violence or instability.  It has not described any investigation it undertook to discover whether such facts existed.  And when Mr. Allen requested a hearing on these issues, or at least a more thorough explanation of MPD's decision, that request was denied.

12.     Allowing D.C. to make concealed pistol license determinations in this manner—based purely on arrests that did not result in any conviction—will result in minorities like Mr. Allen being more likely to have their legal rights violated.

13.     As a Black individual living in D.C., Mr. Allen was disproportionately likely to have encounters with the criminal justice system.  In May 2019, the American Civil Liberties Union published a study on D.C. that found "a pattern of disproportionate arrests of Black people that

persists across geographic areas and offense types."[2]  According to the study, Black people "were arrested *at 10 times the rate* of white people" between the period of 2013 and 2017.[3]  "Black individuals composed 47% of D.C.'s population, but 86% of its arrestees."[4]

14.    Black people are more likely to be wrongfully accused and convicted of crimes. "African Americans are only 13% of the American population but a majority of innocent defendants wrongfully convicted of crimes and later exonerated."[5]  A recent nationwide study found "this racial disparity for all major crime categories."[6]  Relatedly, science shows disturbingly high rates of misidentification of Black suspects when the eyewitness is of a different race.[7]

15.    Non-violent offenses, for which Black individuals are much more likely to be arrested than white individuals, "constituted a significant share of the overall arrest total for 2013-2017" and made up four of the top five offense categories by arrest during this period.[8]  The nonviolent offense with the largest disparity reported in the study was illegal gambling.  From 2013-2017, of the 667 people arrested for gambling in D.C., *ninety-nine percent were Black*.[9]  In that same time period in D.C., Black individuals accounted for 80% of the arrests for possessing an open container and 80% of the

---

[2] *See* Am. Civ. Liberties Union D.C., *Racial Disparities in D.C. Policing: Descriptive Evidence from 2013-2017*, (May 13, 2019), https://perma.cc/EL4C-BFNP (analyzing arrest data from 2013-2017).

[3] *Id.* (emphasis added).

[4] *Id.*

[5] Samuel R. Gross et al., *Race and Wrongful Convictions in the United States* at ii, Nat'l Registry of Exonerations (Mar. 7, 2017), https://perma.cc/3P2X-PT2Q.

[6] *Id.*

[7] *See* Thomas D. Albright, *Why Eyewitnesses Fail*, 114(30) Proc. Nat'l Acad. Sci. USA 7758 (July 25, 2017), https://perma.cc/R8Y5-2G3F.

[8] *See Racial Disparities in D.C. Policing: Descriptive Evidence from 2013-2017*, Am. Civ. Liberties Union D.C. (May 13, 2019), https://perma.cc/EL4C-BFNP.

[9] *See id.*

arrests for public marijuana consumption.[10]  Indeed, "[m]ore than one in four people arrested for drug

law violations in 2015 was black, although drug use rates do not differ substantially by race and

ethnicity and drug users generally purchase drugs from people of the same race or ethnicity."[11]  Black

individuals, like Mr. Allen, are more likely to be stopped or arrested by police, are more likely to be

wrongfully convicted, and thus are more likely to suffer any collateral consequences associated with

having a criminal record—even a record of unproven charges that the government itself decided not

to pursue.  Against that backdrop, Defendants' actions violated Mr. Allen's constitutional rights and

statutory law.

16.    In sum, and as explained in this complaint, Defendants violated the

**Fifth Amendment of the U.S. Constitution** by arbitrarily revoking Mr. Allen's firearm registration

certificate and concealed pistol license based on the mere fact of prior criminal charges and without

requiring evidence about the conduct underlying those charges or holding a hearing where Mr. Allen

and his counsel could present evidence showing that revocation would be inappropriate and illegal.

Defendants violated the **Second Amendment of the U.S. Constitution** by applying to Mr. Allen a

policy that apparently bars responsible, law-abiding citizens from owning and carrying firearms based

on the mere fact of prior criminal charges and without requiring evidence about the conduct

underlying those charges.   These defects also render Defendants' actions illegal under the

**D.C. Administrative Procedure Act**, which affords myriad procedural protections to litigants before

administrative agencies in D.C.  Many of those protections were violated here.

17.    Mr. Allen is entitled to damages, injunctive relief, and a judgment that Defendants'

actions violated the law and his rights.

---

[10] *See id.*

[11] *See* The Sentencing Project, *Report to the United Nations on Racial Disparities in the U.S. Criminal Justice System*, (Apr. 19, 2018), https://perma.cc/Q79M-NZQ5.

## PARTIES

### Plaintiff

18.     Plaintiff Linwood Allen is a citizen of the United States and a resident of Washington, D.C.

### D.C. Defendant

19.     Defendant District of Columbia (D.C.) is a municipal entity organized under the Constitution and laws of the United States.  D.C. can be served via its Mayor, Muriel Bowser, at 441 4th Street N.W., Washington, D.C. 20001.

### MPD Defendants

20.     Defendant Metropolitan Police Department (MPD) is located, and its employees and agents can be served, at 300 Indiana Avenue N.W., Washington, D.C. 20001.  MPD is the primary law enforcement agency for D.C., as well as the agency responsible for registering firearms and issuing concealed pistol licenses in D.C.

21.     Defendant Peter Newsham is the Police Chief for the MPD.  Defendant Newsham is responsible for executing and administering D.C.'s laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs, practices, and policies against Plaintiff; and is in fact presently enforcing the challenged laws, customs, practices, and policies against Plaintiff.  As Police Chief, Newsham is the highest-ranking official in the MPD.

22.     Defendant Colin Hall is a Lieutenant in the MPD's Firearm Registration Branch. Defendant Hall is responsible for executing and administering D.C.'s laws, customs, practices, and policies at issue in this lawsuit; has enforced the challenged laws, customs, practices, and policies against Plaintiff; and is in fact presently enforcing the challenged laws, customs, practices, and policies against Plaintiff.  Lieutenant Hall oversees the application process for firearm registrations and concealed pistol licenses.

23.    Defendant J. Does are or were employees of the MPD who were involved in processing, granting, and/or revoking Mr. Allen's firearm and concealed pistol license applications, and/or working to defend the revocations that Mr. Allen appealed.

24.    This complaint refers to Defendants MPD, Newsham, Hall, and J. Does collectively as the "MPD Defendants."

25.    The MPD Defendants are being sued in their official capacities because they are agents of D.C.  They are being sued in their personal capacities because their conduct, as detailed below, violated clearly established statutory and constitutional rights of which a reasonable government agent would have known.

### CPLRB Defendants

26.    Defendant CPLRB is located and its panelists can be served at 1350 Pennsylvania Avenue N.W., Ste. 513, Washington, D.C. 20004.  The CPLRB is responsible for reviewing appeals of any denials of an application for a concealed pistol license, as well as appeals from license revocations and suspensions.

27.    Defendants Edwin Powell, Gary Abrecht, and Dr. Chad Tillbrook are panelists of the CPLRB who were assigned to hear Mr. Allen's appeal.

28.    This complaint refers to Defendants CPLRB, Powell, Abrecht, and Tillbrook collectively as the "CPLRB Defendants."

29.    The CPLRB Defendants are being sued in their official capacities because they are agents of D.C.  They are being sued in their personal capacities because their conduct, as detailed below, violated clearly established statutory and constitutional rights of which a reasonable government agent would have known.

## JURISDICTION AND VENUE

30.     Jurisdiction is based on 28 U.S.C. §§ 1331 and 1343(a)(3).

31.     This action seeks relief pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. §§ 1983 and 1988.

32.     Venue is proper in this district because a substantial portion of the acts and omissions giving rise to this suit occurred in this district.  *See* 28 U.S.C. § 1391.

## JURY DEMAND

33.     Plaintiff Linwood Allen demands a trial by jury in this action.

## FACTUAL ALLEGATIONS

**I.      D.C.'s Firearm Registration Scheme**

34.     In 1973, Congress passed the D.C. Home Rule Act (HRA).  *See* District of Columbia Self-Government and Governmental Reorganization Act, Pub. L. No. 93-198, 87 Stat. 774 (1973) (codified at D.C. Code § 1-203.01 et seq.).  The HRA established D.C.'s legislative branch, the D.C. Council, and extended D.C.'s legislative power to "all rightful subjects of legislation within the District consistent with the Constitution of the United States and the provisions of this [Act]."  *See* D.C. Code § 1-203.02.

35.     In 2008, pursuant to the HRA, the D.C. Council adopted the Firearms Registration Amendment Act (FRA).

36.     The FRA regulates the ownership of firearms in D.C., including by requiring all firearm owners in D.C. to register their firearms.  D.C. Code § 7-2502.01(a).

37.     In order to register a firearm, applicants first must meet a stringent set of qualifications. *See id.* § 7-2502.03.  Applicants must be 21 years of age or older.  *Id.* § 7-2502.03(a)(1).  Applicants must not have been convicted of a weapons offense or a felony, *id.* § 7-2502.03(a)(2), or be under

indictment for a crime of violence or a weapons offense, *id.* § 7-2502.03(a)(3).  And within the 5 years prior, applicants must not have been convicted of:

    a.    any drug offense, *id.* § 7-2502.03(a)(4)(A);

    b.    any violations of D.C. statutes concerning assaults and threats to do bodily harm, *id.* § 7-2502.03(a)(4)(B);

    c.    multiple violations of laws restricting driving under the influence of alcohol or drugs, *id.* § 7-2502.03(a)(4)(C);

    d.    any misdemeanor domestic offenses, *id.* § 7-2502.03(a)(4)(D);

    e.    any firearm-related offenses under certain D.C. Code provisions, *id.* § 7-2502.03(a)(4)(E);

    f.    any stalking violation, *id.* § 7-2502.03(a)(4)(F); and/or

    g.    any violation of an extreme risk protection order, *id.* § 7-2502.03(a)(4)(G).

38.    Additionally, within the 5 years prior, applicants must not have had a history of violent behavior.  *Id.* § 7-2502.03(a)(6A).

39.    The FRA further requires registration applicants to provide personal and other information to the Chief to register a firearm.  *See id.* § 7-2502.03(b)(1)-(12).

40.    Defendant Newsham has been the Chief throughout the time period relevant to Mr. Allen's complaint.  On information and belief, however, both individual MPD Defendants are involved in the execution of the firearm laws and regulations described in this complaint.

41.    Applicants must sign oaths or affirmations, under the penalty of perjury, attesting to the truth of the information submitted to secure a firearm registration.  *Id.* § 7-2502.05(a), (c).

42.    Applicants also must provide any "other information as the Chief determines is necessary to carry out the provisions of this unit."  *Id.* § 7-2502.03(b)(13); *see* D.C. Mun. Regs. (DCMR) § 2314.3 ("An applicant may be asked to supplement information originally submitted.").

43.     Firearm registration applications must be submitted in person.  D.C. Code § 7-2502.04(c).

44.     Simultaneous with the in-person filing of a firearm registration application, D.C. law says the Chief "shall take a digitalized, full-face photograph of each applicant, other than an organization, to be included as part of a person's firearms registration application." *Id.* § 7-2502.04(b); *see* 24 DCMR § 2312.  Additionally, the Chief "shall require any person applying for a registration certificate to be fingerprinted in order to conduct an efficient and adequate investigation into the matters described in § 7-2502.03 and to effectuate the purposes of this unit."  D.C. Code § 7-2502.04(a); *see* 24 DCMR § 2312.

45.     D.C. regulations require that applicants for firearm registration certificates complete a "written examination" to demonstrate "[k]nowledge of the laws of the District pertaining to firearms, and knowledge of the safe and responsible use of firearms."  24 DCMR § 2311.1.

46.     It is the Chief's responsibility under D.C. law to "make any inquiry and investigation as he or she shall deem necessary to determine whether the applicant is entitled and qualified to receive a registration certificate."  *Id.* § 2314.2.

47.     Once the Chief has determined "that the applicant is entitled and qualified under the provisions of this unit," the FRA requires that he "shall issue a registration certificate."  D.C. Code § 7-2502.07(a).

48.     If the Chief learns of an error in a registration certificate, he may require the holder to return the registration certificate for correction.  *Id.* § 7-2502.07(d).

49.     Once a registration certificate is issued, registrants are subject to a host of duties and related penalties under D.C. law.  For example, registrants must "[n]otify the Chief in writing of the loss, theft, or destruction of the registration certificate or of a registered firearm (including the circumstances, if known) immediately upon discovery of such loss, theft, or destruction."  *Id.* § 7-

2502.08(a)(1).  Violations or omissions of the duties and requirements for firearm registrants are punishable by a series of civil penalties.  *Id.* § 7-2502.08(e).  Those civil penalties include but are not limited to fines and revocation of the registration certificate.  *Id.* § 7-2502.08(e)(1)-(5).

50.    A firearm registration certificate may be revoked for one of three reasons: (1) If any of the criteria for obtaining the registration in the first place are no longer met; (2) If the firearm has become an unregistrable firearm or a destructive device; and/or (3) If the information furnished to the Chief on the application for a registration certificate proves to be intentionally false.  *Id.* § 7-2502.09(a)(1)-(3).

51.    D.C. also regulates the carrying of firearms.  "No person shall carry within the District of Columbia either openly or concealed on or about their person, a pistol, without a license issued pursuant to District of Columbia law."  D.C. Code § 22-4504(a).

52.    "Applicants for a concealed carry license must meet a variety of age, criminal history, personal history, mental health, and physical requirements."  *Grace v. District of Columbia*, 187 F.Supp.3d 124, 130 (D.D.C. 2016).  Applicants must have completed a firearms training course or combination of courses, conducted by an instructor (or instructors) certified by the Chief, which includes at least 16 hours of training, and covers the following: (A) Firearm safety; (B) Firearm nomenclature; (C) Basic principles of marksmanship; (D) Care, cleaning, maintenance, loading, unloading, and storage of pistols; (E) Situational awareness, conflict management, and use of deadly force; (F) Selection of pistols and ammunition for defensive purposes; and (G) All applicable District and federal firearms laws, including the requirements of this unit, Chapter 45 of Title 22, and District law pertaining to self-defense.  D.C. Code § 7-2509.02(a)(4).

53.    D.C. regulations concerning concealed pistol licenses are largely consistent with the laws on the topic.  The regulations require additional firearms training courses for obtaining a concealed pistol license.  24 DCMR § 2335.1(b).  They also provide that "[a] person is suitable to

obtain a concealed carry license if he or she . . . [h]as not exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another." *Id.* § 2335.1(d).

54.     Completed concealed pistol license applications must be submitted in person to the Firearms Registration Section of the MPD. *Id.* § 2337.1. Applications must be accompanied by fees for fingerprints and the license. *Id.* § 2337.4.

55.     As with the application for a firearm registration certificate, the application for a concealed pistol license requires disclosing personal information. Applications must contain, for example, "[t]he applicant's name, address, driver's license number or other government issued photo identification number, place and date of birth, height, weight, race, sex, eye and hair color, occupation, and home and work telephone numbers, and email (optional)." *Id.* § 2337.2(a).

56.     Applicants must declare under the penalty of perjury that all information in the concealed pistol license application is true and accurate. D.C. Code § 7-2509.02(e); 24 DCMR § 2337.2(j). "[A]ny knowing material omission or false statement made by or provided by the applicant may be considered grounds for denial of a conceal carry license, or revocation for a license falsely obtained, and may subject the person to criminal prosecution for perjury." 24 DCMR § 2337.6.

57.     Applicants must acknowledge that he or she will be "responsible for compliance with all federal and District laws, rules, regulations, and procedures that are applicable to this license." *Id.* § 2337.2(k).

58.     It is the Chief's responsibility under D.C. law to inquire into and investigate applications for concealed pistol licenses. *Id.* § 2338.1 ("The Chief shall conduct an investigation of every applicant within a reasonable period of time after receipt of a completed application."). The Chief is to consider at least fourteen areas as part of the investigation of every applicant in deciding whether to issue a concealed pistol license, including the applicant's criminal record, psychological

background, propensity for violence, and need for the permit as a precaution against apprehended danger. *See id.* § 2338.1(a)-(n).

59.     As mentioned above, Defendant Newsham has been the Chief throughout the time period relevant to Mr. Allen's complaint.  On information and belief, however, both individual MPD Defendants are involved in the execution of the firearm laws and regulations described in this complaint.

60.     "The Chief may limit or revoke a license upon a finding that the licensee no longer meets" the legal requirements for obtaining a concealed pistol license.  D.C. Code § 7-2509.05(a); 24 DCMR § 2341.1.  The Chief also may limit or revoke a license upon a finding that the licensee failed to comply with one or more of the legal requirements or duties imposed on licensees.  D.C. Code § 7-2509.05(a); 24 DCMR § 2341.1.

61.     "There is established a Concealed Pistol Licensing Review Board for the purpose of hearing appeals from: (1) A denial of an application or renewal application for a license to carry a concealed pistol in the District pursuant to this unit; (2) A summary suspension or limitation of a license to carry a concealed pistol; or (3) A limitation or revocation of a license to carry a concealed pistol." *Id.* § 7-2509.08(a).

62.     The CPLRB consists of seven members: the United States Attorney for D.C. or their designee; the Attorney General for D.C. or their designee; a mental health professional employed by the Department of Behavioral Health, appointed by the Mayor; a former sworn officer of a law enforcement agency other than the MPD, appointed by the Mayor; and three public members appointed by the Mayor including one mental health professional and two D.C. residents with experience in the operation, care, and handling of firearms.  *Id.* § 7-2509.08(b)(1).  The CPLRB can hear evidence taken in conformity with Section 10(b) of the D.C. Administrative Procedure Act.  1 DCMR § 1208.1.  Such evidence could include, for example, documents and direct and cross-

examinations of witnesses. *Id.* §§ 1208.5, 1208.9. The CPLRB may consider hearsay evidence if it will be relevant and material to the resolution of any factual issue in dispute in the matter before the Board. *Id.* § 1208.11. The CPLRB can also "require by subpoena the attendance and testimony of witnesses and the production of documentary evidence," 1 DCMR § 1223.4, upon receiving a request "stat[ing] the relevancy, materiality, and scope of the testimony or documentary evidence sought." *Id.* § 1223.4.

63.     Under D.C. law, "the burden of production of evidence, and the burden of persuasion, at a hearing before the [CPLRB] shall be upon the applicant or licensee that is challenging a denial of an application or renewal application or limitation or revocation of a license." D.C. Code § 7-2509.08(d)(2).

64.     "The appellant has the burden of producing evidence that (1) the appellant met all the non-discretionary requirements of the Act, and (2) that having met all the non-discretionary requirements of the Act, the Chief's exercise of discretion was not supported by reliable, probative, and substantial evidence." 1 DCMR § 1218.2.

## II.     MPD Approved Mr. Allen's Application for a Firearm Registration Certificate.

65.     Mr. Allen is 36 years old. He was born and raised in Northeast D.C., where he lives today with his five-year-old daughter and eight-year-old son.

66.     Mr. Allen is a hardworking small business owner, who has operated a cleaning company, LA Cleaning, in D.C. since April 2018.

67.     Mr. Allen decided to start a cleaning business in D.C. due to his many years' experience in the cleaning industry dating back to around 2006. Specifically, he has experience in cleaning residential, commercial, and healthcare spaces.

68.     LA Cleaning has executed and fulfilled contracts with a variety of clients around the D.C. area, including a mental health institute, a state trooper office, and apartment buildings. The company contracts directly with the manager of the space being cleaned or works with a company

called Home Advisors to locate potential customers.  Mr. Allen often works late at night and early in the morning cleaning spaces for clients of LA Cleaning.

69.     Since LA Cleaning's founding, Mr. Allen and his company have been trusted by about a dozen different clients with access to their spaces without incident.

70.     The revocation of Mr. Allen's firearm registration certificate and concealed pistol license are what spurred this lawsuit.

71.     Regarding the firearm registration certificate, Mr. Allen applied for it on May 2, 2019, Application for Firearms Registration Certificate; it was granted on May 6, 2019, *id.*; it was revoked by a letter dated October 31, 2019, Notice of Firearm Registration Revocation, and Defendants admitted the revocation was erroneous and retracted it on February 8, 2020, Letter Reinstating Firearm Registration Certificate.

72.     Regarding the concealed pistol license, Mr. Allen applied for it during May 2019, it was granted on August 15, 2019, Concealed Pistol License Application Notice of Approval; it was revoked by a letter dated October 31, 2019, Concealed Pistol License Notice of Revocation; and the revocation was affirmed by an administrative appeals board on May 4, 2020, Final Decision and Order Denying Appeal of Linwood Allen.

73.     In the last few years, Mr. Allen became interested in owning a firearm.

74.     Mr. Allen wanted to purchase and carry a firearm to protect himself and his family. His Northeast D.C. neighborhood unfortunately has experienced significant crime rates, including a pattern of home break-ins.

75.     Additionally, Mr. Allen wanted to be able to carry a firearm when working odd hours for his personal safety.

76.     In early 2019, after deciding to acquire a firearm, Mr. Allen met with and consulted Charles W. Sykes, Jr.  Before the COVID-19 pandemic, Mr. Sykes was D.C.'s only federally licensed

firearm dealer, and operated his business, CS Exchange, at 300 Indiana Avenue NW, Washington, D.C. 20001.  That building also houses the MPD Headquarters.   Mr. Sykes has since stepped down from that position, and the MPD stepped in as D.C.'s sole federally licensed firearm dealer.[12]

77.    Mr. Sykes provided Mr. Allen with a list of approved firearm vendors.

78.    From that list, Mr. Allen chose Bud's Gun Shop in Paris, Kentucky.  Mr. Allen purchased a firearm from Bud's Gun Shop in April 2018.

79.    The firearm Mr. Allen purchased is a black GLOCK 27 GEN 4 semiautomatic .40 caliber pistol.

80.    The firearm was not shipped directly to Mr. Allen.  Instead, Bud's Gun Shop shipped it directly to CS Exchange.

81.    Mr. Allen applied for a firearm registration certificate on May 2, 2019.  Allen Firearm Registration Application.

82.    Mr. Allen submitted his firearm registration application in person at the Firearms Registration Branch at the MPD Headquarters, located at the same address (300 Indiana Avenue NW, Washington, D.C. 20001) as CS Exchange.  *Id.*

83.    On his firearm registration application, Mr. Allen provided all of the information required by law.  Application for Firearms Registration Certificate.

84.    For example, Mr. Allen provided his personal and employment information.  *Id.*

85.    Mr. Allen provided information identifying the firearm for which he was seeking a registration certificate.  *Id.*

86.    Mr. Allen described the firearm as a used, black GLOCK 27 GEN 4 semiautomatic .40 caliber pistol, and listed the firearm's serial number.  *Id.*

---

[12] *See, e.g.*, Peter Hermann, *D.C. Police Take Over as Federal Firearms Licensee in the District*, Wash. Post (Apr. 20, 2020), https://perma.cc/D74F-HSRL.

87.     Mr. Allen provided information about the dealer through whom the firearm was bought.  *Id.*

88.     Mr. Allen attested that he had never been involved in any mishap involving a pistol, rifle, or shotgun.  *Id.*

89.     The application was signed both by Mr. Allen and the dealer.  *Id.*

90.     By signing the application, both Mr. Allen and the dealer certified that they were not forbidden by law from purchasing or possessing a firearm and that the information on the application was correct to the best of their knowledge and belief and did not knowingly contain any material misrepresentation of fact.  *Id.*

91.     A notice at the bottom of the application read "[t]his application is **VALID for THREE YEARS as a FIREARMS REGISTRATION CERTIFICATE** only when stamped **'APPROVED'** by the Chief of Police and a **REGISTRATION NUMBER** is affixed thereto."  *Id.* (emphasis in original).

92.     On May 6, 2019, MPD Defendants approved Mr. Allen's application for a firearm registration certificate.  *Id.*; Allen Firearm Registration Certificate.

93.     One of the MPD Defendants physically stamped Mr. Allen's application with the word "APPROVED" in blue.  *Id.*

94.     The MPD Defendants assigned to Mr. Allen a firearm registration number of 201901617.  *Id.*

95.     Also on May 6, 2019, the MPD Defendants issued to Mr. Allen a physical firearm registration certificate card that bore a picture of Mr. Allen, as well as information about his registration.  Allen Firearms Registration Certificate.

96.     The MPD Defendants have never, to the date of filing this complaint, requested Mr. Allen provide any additional information to determine whether he is entitled to a firearm registration

certificate.  *See* D.C. Code § 7-2502.03(b)(13) (authorizing the Chief to request any "other information as [he or she] determines is necessary to carry out the provisions of this unit"); DCMR § 2314.3 ("An applicant may be asked to supplement information originally submitted.").

**III.    MPD Approved Mr. Allen's Application for a Concealed Pistol License.**

97.    On August 15, 2019, the MPD Defendants issued a Notice of Approval of Mr. Allen's concealed pistol license.  Concealed Pistol License Application Notice of Approval.

98.    The notice was communicated via a one-page letter to Mr. Allen from the MPD's Firearms Registration Branch.  Although no author is listed on the letter, the MPD itself signed the letter and, on information and belief, the individual MPD Defendants were responsible for drafting and sending the approval notice. *Id.*

99.    The letter read, "Your application for a Concealed Carry Pistol License has been **APPROVED** by the Metropolitan Police Department (MPD)."  The letter said that Mr. Allen's concealed pistol license would be valid for a maximum of 2 years from the date of issuance.  *Id.*

100.    The letter continued, "Licensees must comply at all times with the requirements of the Firearms Regulations Control Act of 1975 (D.C. Official Code § 7-2501 et seq.), and Chapter 23 (Guns and Other Weapons) of Title 24 (Public Space and Safety) of the District of Columbia Municipal Regulations (DCMR).  Failure to comply with all firearms requirements may result in the suspension or revocation of the license, civil penalties, and / or criminal prosecution."  *Id.*

101.    The letter also enclosed Mr. Allen's physical concealed pistol license and a list of D.C. concealed carry prohibitions.  *Id.*

102.    The MPD Defendants never—in this letter or elsewhere—asked Mr. Allen for further information or evidence concerning his background.

**IV.   MPD Knew of Mr. Allen's Criminal Arrest Record When It Approved His Applications.**

103.   Over the years, like many other Black individuals in the United States and D.C., Mr. Allen has had various encounters with the police.

104.   In 2000, when Mr. Allen was a juvenile, he was twice arrested in D.C. for cocaine offenses.

105.   Neither arrest resulted in conviction.

106.   Although there is no record in the D.C. court database of these juvenile cocaine arrests, these were nonviolent charges that, as is typical in juvenile cases, were resolved outside the adult court system.

107.   Both of these offenses occurred well outside the five-year period specified in the statute.

108.   Defendants have not provided any additional information about Mr. Allen's juvenile cocaine arrests besides the fact that they occurred.  Nor is there any such information in the records related to Mr. Allen that Defendants produced in the course of the administrative appeals in this matter.

109.   In 2006, Mr. Allen was arrested in D.C. for illegal gambling.

110.   This arrest did not result in conviction.

111.   Although there is no record in the D.C. court database of this arrest, Mr. Allen resolved this arrest for illegal gambling through a "post-and-forfeiture" procedure.  In D.C., post-and-forfeiture "is not a conviction of a crime and shall not be equated to a criminal conviction," moreover, it "may not be relied upon by any District of Columbia court or agency in a subsequent criminal, civil, or administrative proceeding or administrative action to impose any sanction, penalty, enhanced sentence, or civil disability."  *See* D.C. Code § 5-335.01(b).

112.    Defendants have not provided any additional information about Mr. Allen's 2006 arrest for illegal gambling besides the fact of the arrest.  Nor is there any such information in the records related to Mr. Allen that Defendants produced in the course of the administrative appeals in this matter.

113.    Regardless, this alleged offense is nonviolent and occurred well outside the five-year period specified by statute.

114.    Also in 2006, Mr. Allen was arrested for an alleged assault with a deadly weapon.  This arrest did not result in an indictment, much less a conviction.  *See* Docket, *United States v. Allen*, 2006 CF3 017651 (D.C. Sup. Ct.).

115.    Mr. Allen was held in custody for several months before the Court granted a request for him to submit blood, saliva, and hair samples.  *See id.* at 4.

116.    Nine months after Mr. Allen was initially arrested, he still had not been indicted for any crime.  He filed a motion to dismiss the complaint against him.  *See id.* at 5.

117.    A week later, that motion was granted and the case against Mr. Allen was dismissed. *Id.*  And on the same day the government formally dropped the charges by entering a *nolle prosequi*.  *Id.*

118.    Defendants have not provided any additional information about Mr. Allen's 2006 arrest for assault with a deadly weapon besides the fact that it occurred.  Nor is there any such information in the records related to Mr. Allen that Defendants produced in the course of the administrative appeals in this matter.

119.    This alleged offense also occurred outside the five-year period specified by statute.

120.    In 2008, Mr. Allen was again arrested for illegal gambling.  *See* Docket, *United States v. Allen*, 2008 PAF 003164 (D.C. Sup. Ct.).

121.    This arrest did not result in a conviction.  Instead, Mr. Allen resolved the arrest by paying a fine through D.C.'s "post-and-forfeiture" procedure.  *See id.*

122.    Defendants have not provided any additional information about Mr. Allen's 2008 arrest besides the fact that it occurred.  Nor is there any such information in the records related to Mr. Allen that Defendants produced in the course of the administrative appeals in this matter.

123.    This alleged offense is nonviolent and occurred well outside the five-year period specified by statute.

124.    And in 2014, Mr. Allen was arrested in D.C. for being a fugitive related to an armed robbery in Maryland that he had not committed.

125.    Mr. Allen was extradited to and charged in the District Court for Prince George's County (Maryland) with two counts of armed robbery, two counts of robbery, two counts of assault in the second degree, one count of using a firearm in commission of a felony or violent crime, two counts of theft, two counts of reckless endangerment, and one count of having a handgun on his person.  Docket, *Maryland v. Allen*, Case No. 4E00539900 (Md. Dist. Ct.).

126.    None of these counts resulted in conviction.

127.    Instead, as with the 2006 arrest for assault with a deadly weapon, the government formally dropped the charges against Mr. Allen after further investigation of the facts.  *Id.*

128.    On information and belief, videotape evidence from a security camera near the scene of the crime showed that a different individual had committed the crimes of which Mr. Allen had been accused.

129.    As a result, the government formally dropped these charges by entering a *nolle prosequi*, and the charges subsequently were expunged from Mr. Allen's record.  *Id.*

130.    Defendants have not provided any additional information about Mr. Allen's 2014 arrest besides the fact that it occurred.  Nor is there any such information in the records related to Mr. Allen that Defendants produced in the course of the administrative appeals in this matter.

131.    This alleged offense occurred outside the five-year period specified by statute.

## V.    MPD Revoked Mr. Allen's Firearm Registration and Concealed Pistol License Just Months After Issuing Them.

132.    On November 5, 2019, Mr. Allen received two letters from MPD, dated October 31, 2019.  *See* Notice of Firearm Registration Revocation; Notice of Concealed Pistol License Revocation.

133.    One of the letters was signed by Defendant Hall and the other was not signed by any specific person or official.  On information and belief, the MPD Defendants were responsible for drafting and sending both letters.

134.    One of the letters—the one not signed by Defendant Hall—said that Mr. Allen's firearm registration certificate was being revoked, and that Mr. Allen could file an appeal with the MPD.  Notice of Firearm Registration Revocation.

135.    This registration revocation letter listed a series of years-old criminal charges against Mr. Allen, but no facts or allegations underlying those charges.

136.    The listed criminal charges in the registration revocation letter were: the 2014 fugitive arrest, the 2006 assault with a deadly weapon (ADW) arrest, the illegal gambling arrests in 2008 and 2006, and the two juvenile cocaine arrests in 2000.  All these charges—none of which resulted in convictions—were known to MPD when it approved Mr. Allen's firearm registration and concealed pistol license.

137.    The registration revocation letter did not explain how those unproven criminal charges justified revocation of Mr. Allen's firearm registration under D.C. Code § 7-2502.09(a).  The letter did not rely on—or even refer to—any of the three statutory reasons for revocation of registration: that a registrant no longer meets the criteria for a registration; that the firearm has become an unregistrable firearm or a destructive device; or that information provided in the registration application "proves to be intentionally false."

138.     This vague registration revocation letter evinces Defendants' intent to deprive Mr. Allen of his constitutional rights, or at minimum a deliberate disregard or indifference to the serious risk of deprivation of his rights.

139.     The other letter—signed by Defendant Hall—said that Mr. Allen's concealed pistol license was being revoked, and that he could file an appeal with the CPLRB.  Notice of Concealed Pistol License Revocation.

140.     As with the registration revocation letter, the letter concerning the concealed pistol license listed the same six criminal charges against Mr. Allen, again with no facts or allegations underlying those charges.  *Id.*

141.     Nor did the concealed pistol license revocation letter explain how these unproven charges justified revocation of Mr. Allen's concealed pistol license, or connect its decision to any statutory or other basis for revocation.

142.     This vague concealed pistol license revocation letter evinces Defendants' intent to deprive Mr. Allen of his constitutional rights, or at minimum a deliberate disregard or indifference to the serious risk of deprivation of his rights.

143.     Mr. Allen did not and could not understand, based on the letters dated October 31, 2019 and received November 5, 2019, the reason for the MPD Defendants' revocation of his firearm registration certificate and concealed pistol license.  Indeed, the letters from the MPD Defendants could not have put any person on notice of the reasons for the proposed revocations because they contained a mere list of years-old charges that would themselves not warrant revocation under the relevant statutes and regulations.

## VI.     Mr. Allen Appealed Both Revocations.

144.     On November 19, 2019, Mr. Allen filed simultaneous appeals of the revocations of his firearm registration certificate and concealed pistol license.

145.    Mr. Allen appealed the revocation of his firearm registration certificate by writing a letter to the Director of the Gun Control/Records Division at the MPD.  *See* Letter Appealing Proposed Revocation of Firearm Registration.

146.    On information and belief, MPD Defendants are involved in the analysis of and response to appeals of the type Mr. Allen filed with the Director of the Gun Control/Records Division.

147.    In the letter, Mr. Allen explained that the proposed revocation of his firearm registration certificate violated the U.S. Constitution and D.C. law.  *Id.*

148.    Mr. Allen explained that his firearm registration certificate had been properly issued on May 6, 2019, and that nothing had changed since issuance of the certificate to justify its revocation.

149.    Mr. Allen also informed the MPD Defendants that the letter dated October 31, 2019 provided insufficient notice because it contained a mere list of years-old criminal charges but no facts or allegations underlying those charges or their connection to justifiable reasons for revocation under the applicable statutes and regulations.  *Id.*

150.    As for the list of criminal charges in the proposed revocation letter, Mr. Allen explained that none were relevant to his entitlement to a firearm registration certificate.  For example, none of the charges led to felony convictions or occurred within the prior five years.

151.    Mr. Allen's appeal letter explained each of the charges in turn and as follows:

     a.    <u>2014 fugitive arrest.</u>  This was an arrest for an offense that Mr. Allen did not commit.  Accordingly, before trial, the government dropped the case against Mr. Allen, and he was not convicted.  Docket at 1-3, Docket, *Maryland v. Allen*, Case No. 4E00539900 (Md. Dist. Ct.) (listing *nolle prosequi* for each charge). Specifically, the government entered a *nolle prosequi*.  *Id.*; *see* MD Rule 4-247. On Mr. Allen's motion, the charges were expunged.  *See* MD Rule 4-329.

b.   <u>2008 illegal gambling arrest.</u>   This was an arrest for misdemeanor and nonviolent gambling.  The case was resolved through a "post-and-forfeiture" procedure that "is not a conviction of a crime" and "may not be relied upon by any District of Columbia court or agency in a subsequent criminal, civil, or administrative proceeding or administrative action to impose any sanction, penalty, enhanced sentence, or civil disability."  Docket at 1, *District of Columbia v. Allen*, 2008 PAF 003164 (D.C. Super. Ct.) (showing case and charge disposed after payment); D.C. Code § 5-335.01.

c.   <u>2006 ADW gun arrest.</u>   This was an arrest for an offense that Mr. Allen did not commit.  Accordingly, before trial, the government dropped the case against Mr. Allen before trial, and he was not convicted.  Docket at 1, *District of Columbia v. Allen*, 2006 CF3 017651 (D.C. Super. Ct.) (case dismissed after *nolle prosequi* entered).  Specifically, the government entered a *nolle prosequi. Id.*; D.C. Crim. Rule 48(a)(1).  Mr. Allen was never indicted in the case.  Mot. to Dismiss Compl. at 1, *District of Columbia v. Allen*, 2006 CF3 017651 (D.C. Super. Ct.) ("As of the date of the filing of this motion the United States Attorney's Office for the District of Columbia has failed to indict the defendant Mr. Linwood Allen.").

d.   <u>2006 illegal gambling arrest.</u>   There is no record in the D.C. court database of a 2006 illegal gambling arrest for Mr. Allen.  However, as with the 2008 illegal gambling arrest, any arrest for illegal gambling would likely be resolved through a "post-and-forfeiture" procedure that "is not a conviction of a crime" and "may not be relied upon by any District of Columbia court or agency in a subsequent criminal, civil, or administrative proceeding or administrative

action to impose any sanction, penalty, enhanced sentence, or civil disability."
D.C. Code § 5-335.01.

e.  2000 juvenile cocaine arrests.  There is no record in the D.C. court database
of these juvenile cocaine arrests.  However, these were arrests for nonviolent
charges that, as is typical in juvenile cases, were resolved outside the adult court
system.

152.    Mr. Allen attached as exhibits to his appeal letter the underlying documentation
concerning the criminal charges and their dispositions.  Letter Appealing Revocation of Firearm
Registration at 4-27.

153.    Also on November 19, 2019, Mr. Allen appealed the proposed revocation of his
concealed pistol license by writing a letter to the CPLRB Defendants.  *See* Letter Appealing Revocation
of Concealed Pistol License.

154.    Similarly to his appeal letter to the MPD Defendants, Mr. Allen's appeal letter to the
CPLRB Defendants argued that the concealed pistol license had been properly issued and that nothing
(including years-old criminal charges that did not result in felony convictions) justified its revocation,
and that the MPD Defendants' notice of revocation of the concealed pistol license was inadequate.
*See generally id.* at 1-3.

155.    On December 2, 2019, the CPLRB notified Mr. Allen that his appeal paperwork had
been received on November 25, 2019: the CPLRB had "received from [Mr. Allen's] attorney [the]
appeal hearing request complete with a copy of the Chief's final action being reviewed."  Notice of
Receipt of Letter Appealing Revocation of Concealed Pistol License.  The letter also announced that
the CPRLB Defendants—Mr. Edwin Powell, Dr. Chad Tilbrook, and Mr. Gary Abrecht—would hear
Mr. Allen's appeal.  *Id.*  Defendant Powell apparently was selected as the presiding member.  *Id.*

**VII.    MPD Admitted Error and Reinstated Mr. Allen's Firearm Registration Certificate.**

156.    As of January 31, 2020, Mr. Allen had not received any response from MPD Defendants to his appeal of his firearm registration certificate since it had been submitted on November 19, 2019.

157.    This unexplained delay reflects that Defendants were acting with intent to deprive Mr. Allen of his constitutional rights, or at minimum a deliberate disregard or indifference to the serious risk of deprivation of his rights.

158.    On January 31, 2020, Mr. Allen wrote to the MPD Defendants and requested an update and/or resolution concerning his firearm registration appeal.  Follow-up to Letter Appealing Revocation of Concealed Pistol License.  Mr. Allen noted that he was entitled by law to receive a final decision from the MPD Defendants within ten days of his appeal.  *See id.* (citing D.C. Code § 7-2502.10).

159.    On February 8, 2020 (88 days after Mr. Allen had submitted his appeal), the MPD Defendants finally responded to Mr. Allen's appeal of his firearm registration certificate.  *See* Letter Reinstating Firearm Registration Certificate.

160.    In a letter authored by Defendant Hall, a Lieutenant for the MPD Firearms Registration Branch, MPD stated that "[d]uring the case review it was found that your registration was revoked in error and your firearm registration is now fully reinstated."  *Id.*

161.    The MPD Defendants further stated "[o]nly your concealed carry pistol license was intended to be revoked, and the firearm registration revocation notice was sent in error."  *Id.*

162.    The MPD Defendants clarified that their reversal "does not change the decision to revoke your concealed pistol license and that matter continues to be handled by the Concealed Pistol Licensing Review Board."  *Id.*

163.    The decision to continue to proceed with revocation of Mr. Allen's concealed pistol license—even though that revocation was premised on the same facts that the MPD Defendants had just conceded did not support revocation of his firearm registration—demonstrates Defendants' intent to deprive Mr. Allen of his constitutional rights, or at minimum a deliberate disregard or indifference to the serious risk of deprivation of his rights.

164.    Mr. Allen was never notified of or party to any communications between the MPD Defendants and CPLRB Defendants besides those that became a part of the official record of his administrative appeals.

## VIII.   CPLRB Sought Answers from the MPD and Stayed the Appeal.

165.    On February 13, 2020, the CPLRB Defendants issued an Order to Stay Appeal Hearing in the case of Mr. Allen's concealed pistol license revocation.  CPLRB Order to Stay Appeal Hearing.

166.    The order described a meeting of the CPLRB Defendants that had taken place on January 23, 2020 in Mr. Allen's appeal.  *Id.* at 1.

167.    Mr. Allen was not notified about, invited to, or present during the CPLRB Defendants' meeting on January 23, 2020.

168.    The order summarized the MPD Defendants' notice of proposed revocation of Mr. Allen's concealed pistol license.  *Id.* at 2.  In attempting to reprint the MPD Defendants' notice of proposed revocation, the CPLRB erroneously represented that the "fugitive arrest" occurred in 2019 and not 2014.  *Id.* at 1.  The order also summarized certain of Mr. Allen's arguments, from his appeal letter, in favor of his entitlement to a concealed pistol license and against the MPD Defendants' proposed revocation.  *Id.* at 1-2.

169.    The order quoted an internal MPD memorandum that purported to be the basis for revocation of Mr. Allen's concealed pistol license under 24 DCMR 2335.1(d).  *Id.* at 2.  At the time of

this order, neither the MPD nor CPLRB Defendants yet had provided Mr. Allen the memorandum purporting to state reasons for the proposed revocations. MPD Defendants later were ordered by CPLRB Defendants to produce the internal MPD memorandum, which did not provide any information about Mr. Allen's arrests besides the fact that they occurred. *See* MPD File on Allen at 3-4. On information and belief, although no author is listed on the internal memorandum, the MPD Defendants were responsible for drafting it or at least supervising its drafting.

170.     The order required the MPD Defendants to respond to certain "questions and concerns" of the CPLRB Defendants. CPLRB Order to Stay Appeal Hearing at 3.

171.     Specifically, the order required the MPD Defendants to:

a.     explain why they "initially approved appellant's CPL application, and then on October 31, 2019, recommended revocation of appellant's CPL, based on what appear to be the same criminal history records";

b.     "[r]eview each offense listed in appellant's three-page appeal letter, and explain why each offense is included as a basis for revocation";

c.     "explain why the factors detailed in the appellant's letter do not mitigate, or outweigh, the totality of appellant's criminal history record which the Chief has determined demonstrates a propensity for violence or instability";

d.     "[e]xplain in greater detail the Chief's reasoning that is the basis for his conclusion that appellant's criminal history record reflects a '*pattern of dangerous criminal conduct* demonstrat[ing] a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another' per District law"; and

e.      "file . . . a new or corrected Notice of Revocation and Memorandum in support of the Chief's revocation[] and a properly <u>redacted copy of the Chief's file</u>" on Mr. Allen.  *Id.* at 2-3 (emphases in original).

172.    The order also invited Mr. Allen to file a reply concerning "(1) [t]he existence of any material fact in dispute that would require an evidentiary hearing; and (2) [t]he appellant's views on why the Chief's exercise of discretion in denying the appellant's application was arbitrary and capricious or was not supported by reliable, probative, and substantial evidence."  Mr. Allen's reply is described below.

## IX.    MPD Responded to the CPLRB Order and Produced a File Devoid of New Facts Justifying the Revocation.

173.    On March 16, 2020, the MPD Defendants responded to the CPLRB Defendants' Order to Stay Appeal.  *See* MPD Response to Order to Stay Appeal.

174.    The MPD Defendants conceded that "[t]he recommendation [to revoke the concealed pistol license] was based on the same set of incidents that had been available in the criminal history record search conducted during the initial licensing determination."  *Id.* at 3, MPD's Response to Order to Stay Appeal.

175.    Instead, the MPD Defendants wrote that "[t]he decision to revoke Mr. Allen's CPL is the result of a deliberate and principled change in the Chief of Police's position on what it means to have 'exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another,' under D.C. Mun. Regs. tit. 24, § 2335.1(d)."  *Id.* at 2.

176.    Notably, this was the first time any of Defendants disclosed to Mr. Allen the existence of a policy change inspiring the revocation of Mr. Allen's concealed pistol license.  To this day, and in part because of the CPLRB Defendants' refusal to hold a hearing, MPD has provided no further

information about the policy change. MPD has given no indication of the types of applicant "conduct" that will be deemed to demonstrate "low self-control" under the Chief's new interpretation, what evidence will be used to assess the applicant's purported conduct other than the fact that an arrest was made, the scope of investigation that will be conducted to identify and evaluate that evidence, or the level of evidence needed to establish that the purported conduct actually occurred.

177.    The MPD Defendants continued that "[t]he Chief revised his interpretation of the regulation as the result of an incident involving another CPL holder that occurred shortly after Mr. Allen's CPL had been issued." *Id.* at 2.

178.    The MPD Defendants described in detail the facts underlying that incident. "On August 20, 2019, shortly before 2:00 p.m., a CPL holder engaged in a shooting in the 500 block of H Street NE. The CPL holder and two of his acquaintances had been sitting on the corner of 5th and H Street NE and were approached by two other men, one of whom displayed a handgun. The CPL holder thought the two men were about to rob him and opened fire on them using his registered handgun. One of his rounds struck one of the men in the arm, and his stray bullets broke windows in four storefronts nearby. Ten shell casings were recovered on the scene." *Id.* at 2-3.

179.    The MPD Defendants also described the legal outcomes for those involved in the incident. "The shooter was not criminally charged as a result of this incident and was deemed to have acted in self-defense. The two men who approached him were arrested for the offense of assault with the intent to rob." *Id.* at 3.

180.    Per the MPD Defendants, after summarily suspending the shooter's license and reevaluating his application for the firearm registration certificate and concealed pistol license, "[t]he Chief determined that a change in the interpretation of the 'propensity for violence or instability' regulation was justified." *Id.*

181.    According to the MPD Defendants, "[t]he Chief's decision was based on an analysis of the circumstances of the H Street shooting/CPL holder in the context of his existing criminal history with the intent of improving the risk assessment aspect of the suitability determination process." *Id.* The MPD Defendants did not disclose any further details or records of the shooter's "existing criminal history."

182.    "Under the Chief's new interpretation of the regulation," the letter continued, "conduct that is violent or criminal demonstrating low self-control, regardless of whether it results in a criminal conviction, may be grounds for denial, revocation, or suspension of a CPL on the basis of unsuitability." *Id.* at 3

183.    The letter then listed once again the years-old criminal charges on which the MPD Defendants were basing their proposed revocation of Mr. Allen's concealed pistol license.  *Id.* at 3-4. The letter argued that "Mr. Allen's criminal history record includes serious criminal conduct over the course of at least 14 years." *Id.* at 4.

184.    The letter argued that it does not matter whether Mr. Allen committed or was convicted for the offenses.  *Id.* at 5.  It further argued that it does not matter whether charges against Mr. Allen were dropped by the government or expunged or otherwise resolved pursuant to statute. *Id.*  According to the MPD Defendants, such "allegations do not change the Chief's determination that [Mr. Allen] has demonstrated a propensity for violence or instability." *Id.*

185.    The MPD Defendants' letter did not include any new facts about Mr. Allen's conduct in relation to the criminal offenses, and instead continued to depend on the fact of the criminal charges against Mr. Allen without explaining how they demonstrate a propensity for violence or instability.

186.    This letter and the apparent policy change demonstrate the Defendants' intent to deprive Mr. Allen of his constitutional rights, or at minimum a deliberate disregard or indifference to the serious risk of deprivation of his rights.

187.    On or about the same day that MPD Defendants responded to the CPLRB's Order to Stay Appeal Hearing, the MPD Defendants also produced its file in relation to Mr. Allen's concealed pistol license. *See* MPD File on Allen.

188.    The MPD Defendants' file is 17 pages long and included (1) the October 31, 2019 letter it sent Mr. Allen (received November 5, 2019) notifying him of the proposed revocation (*id.* at 1-2), (2) a September 24, 2019 internal MPD memorandum "auditing" Mr. Allen's background and recommending that his concealed pistol license be revoked (*id.* at 3-4), (3) a FBI Criminal Justice Information Services Division (CJISD) report on Mr. Allen's background, as well as correspondence related to the report (*id.* at 5-9), (4) a FBI National Crime Information Center report on Mr. Allen's background (*id.* at 10-15), and (5) a couple of D.C. public incident reports mentioning Mr. Allen's name (*id.* at 16-17).

189.    None of these sources included any new facts about Mr. Allen's conduct in relation to the criminal offenses on which MPD Defendants based the revocation of his concealed pistol license.

190.    The internal MPD memorandum (which, on information and belief, MPD Defendants were responsible for drafting) recommending revocation of Mr. Allen's concealed pistol license did not mention any facts of his conduct as it relates to the offenses for which his license was being revoked. *See id.* at 3-4.  Nor did the memorandum mention the self-defense shooting by the other concealed pistol license holder, nor any details of his background or criminal history.

191.    The FBI records made clear, in all caps, that "AN INDIVIDUAL SHOULD BE PRESUMED NOT GUILTY OF ANY CHARGE/ARREST FOR WHICH THERE IS NO FINAL DISPOSITION STATED ON THE RECORD OR OTHERWISE DETERMINED." *Id.* at 6.

**X.      Mr. Allen Filed a Reply in Support of His Appeal and Demanded a Hearing.**

192.    On March 26, 2020, Mr. Allen filed a reply to the CPLRB Defendants' Order to Stay Appeal Hearing.  The letter made three different arguments.  Reply in Support of Concealed Pistol License Appeal.

193.    First, Mr. Allen asked the CPLRB Defendants to stay the case until the MPD Defendants filed a new or corrected notice in accordance with the CPLRB Defendants' Order to Stay Appeal Hearing.  *Id.* at 1.  As of March 26, 2020, the MPD Defendants had not filed or provided such a notice with the CPLRB or Mr. Allen.  The same is true as of the date of filing this complaint.

194.    Second, Mr. Allen argued that the case could be summarily resolved in his favor because the MPD Defendants had not introduced any evidence of his conduct and instead relied on the mere fact of criminal charges in attempting to revoke the concealed pistol license.  *Id.* at 1-3.  For example, nothing in MPD Defendants' file on Mr. Allen's background established any evidence of his conduct in relationship to charges that were described in the file.  *Id.* at 2.  Accordingly, even without further development of the record, it was clear that the MPD Defendants' attempted revocation "was not supported by reliable, probative, and substantial evidence," and also "was arbitrary and capricious."  *Id.* at 1-3.

195.    Third, Mr. Allen requested that the CPLRB Defendants hold a hearing before affirming revocation of his concealed pistol license.  *Id.* at 3-4.  Mr. Allen wrote that if a hearing were necessary to resolve his appeal, he was entitled to present witnesses and categories of documents and communications to adequately defend himself and show that the MPD Defendants' proposed revocation was against the law.  *Id.*  Mr. Allen listed the evidence that he intended to present and that he was requesting CPLRB to require by subpoena.  *Id.*  He explained why the applicable law governing evidence in CPLRB and administrative hearings justified his requests for witnesses and documents. *Id.*

196.    Specifically, Mr. Allen explained his legal entitlement to testimony from MPD personnel involved in his case (including the MPD Defendants) as well as documents and communications related to the initial issuance of Mr. Allen's concealed pistol license, its proposed revocation just months later, and data on other similar cases where MPD has proposed revocation of concealed pistol licenses. *Id.* Mr. Allen explained that the "MPD's decision to revoke [his] concealed carry license has put directly in issue the above evidence, and possibly more." *Id.*

197.    Mr. Allen concluded by asking the "CPLRB [to] reject the MPD's invitation to bless a regulatory scheme that would necessarily deprive responsible, law-abiding citizens of the right to carry a firearm," and to reinstate his concealed pistol license. *Id.* at 3.

## XI.    CPLRB Affirmed the MPD's Revocation.

198.    On May 4, 2020, Mr. Allen received from the CPLRB Defendants the Final Decision and Order Denying Appeal of Linwood Allen.  CPLRB Final Decision and Order Denying Appeal.

199.    The order described the procedural history of Mr. Allen's appeal of his revoked concealed pistol license.  For example, the order again detailed the meeting on January 23, 2020 that Mr. Allen was not invited to or notified of and that he did not attend. *Id.* at 1.

200.    The CPLRB Defendants repeated the error from the Order to Stay by stating that the "fugitive arrest" occurred in 2019 instead of 2014. *Id.*

201.    The order summarized Mr. Allen's and the MPD Defendants' arguments and excerpted the letters both parties had filed during the appeal of the revoked concealed pistol license. *See generally id.*

202.    According to the order, the CPLRB Defendants voted to deny Mr. Allen's appeal during a meeting on April 29, 2020. *Id.* at 8.

203.    Mr. Allen was not notified about, invited to, or present during the CPLRB Defendants' meeting on April 29, 2020.

204.     The CPLRB Defendants incorrectly concluded in the order that the record contained no disputed material facts.  *Id.*

205.     The CPLRB Defendants ruled "as a matter of law" that Mr. Allen's criminal history records may be a factor in revoking his concealed pistol license.  *Id.* at 9.

206.     That is true, according to the CPLRB Defendants, regardless of whether the charges resulted in convictions.  *Id.*

207.     The CPLRB Defendants ruled that "the law does not require that the Chief find that appellant has a history of violent behavior."  *Id.*

208.     The CPLRB Defendants cited differences between criminal and civil cases in disregarding Mr. Allen's arguments that his background was insufficient to justify revoking the concealed pistol license.  *Id.*

209.     The CPLRB Defendants concluded that Mr. Allen "did not meet his burden to establish that there was not substantial evidence upon which the Chief could base the revocation, or that the revocation was arbitrary or capricious."  *Id.*

210.     The CPLRB Defendants deemed the MPD Defendants' review and explanation of Mr. Allen's background "complete and detailed."  *Id.* at 10.

211.     The CPLRB Defendants wrote that the "record in its totality[] provide[d] sufficient evidence to support the Chief's finding that appellant's propensity for violent and unstable behavior may render the possession of a CPL a danger to himself or others."

212.     The CPLRB Defendants additionally concluded "that, based upon the record before the Chief and the materials submitted to the Panel during this appeal, the Panel independently would have reached the same conclusion as the Chief."  *Id.*

213.     In a footnote in its decision, the CPLRB Defendants signaled agreement that the MPD Defendants' reason for changing its interpretation of the suitability requirements—"namely, a

different licensee's specific conduct, and the subsequent audit and revocation of that particular license"—"may be unpersuasive." *Id.* at 8 n.2.

214.     In that same footnote, the CPLRB Defendants excused the MPD Defendants' failure to provide a new or corrected notice (which was one of the CPLRB's holdings in its Order to Stay) by stating that the MPD Defendants' additional explanation of the proposed revocation was sufficient notice. *Id.*

215.     Finally, and also in the same footnote, the CPLRB Defendants summarily dismissed Mr. Allen's requests for an evidentiary hearing and witnesses and documents essential to defending himself in the administrative appeal. *Id.*

216.     The CPLRB Defendants' refusal to afford any semblance of fair process and repeated mistakes about the record suggests their intent to deprive Mr. Allen of his constitutional rights, or at minimum their deliberate indifference to the serious risk of a violation of his constitutional rights.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION (AGAINST ALL DEFENDANTS)
### 42 U.S.C. § 1983 – Fifth Amendment of the U.S. Constitution

217.    Mr. Allen incorporates all preceding paragraphs by reference here.

218.    In November 2019, Mr. Allen received two letters, dated October 31, 2019, from the MPD Defendants: one said that his firearm registration certificate was being revoked, and the other said the same about his concealed pistol license.

219.    Mr. Allen was in possession of the certificate and the license, both of which had already been granted to Mr. Allen by the MPD Defendants.

220.    Mr. Allen had both liberty and property interests in the firearm registration certificate and the concealed pistol license.

221.    By revoking the certificate and the license, the MPD Defendants deprived Mr. Allen of liberty and property.

222.    The process by which the MPD Defendants deprived Mr. Allen of his liberty and property was insufficient and therefore a violation of his Fifth Amendment rights.

223.    "[T]he due process clause requires, at minimum, that the government provide notice and some kind of hearing before final deprivation of a property interest." *Propert v. District of Columbia*, 948 F.2d 1327, 1331 (D.C. Cir. 1991). "The notice provided must be reasonably certain to inform those affected, and the opportunity to be heard must be given at a meaningful time and in a meaningful manner." *Id.* at 1332 (internal quotations and citations omitted).

### Deficient Notice

224.    In explaining the process and justification for this deprivation, the MPD Defendants' sole reason was a list of years-old criminal charges against Mr. Allen.

225.    The MPD Defendants, however, did not cite any evidence underlying those criminal charges. The MPD Defendants did not cite any evidence of Mr. Allen's conduct beyond the fact of

the years-old criminal charges.  The MPD Defendants did not provide any explanation as to why the mere fact of these years-old, unproven charges would justify revoking Mr. Allen's firearm registration certificate or concealed pistol license.

226.    Mr. Allen could not understand, based on the letters received in November 2019 and dated October 31, 2019, the reason for MPD Defendants' revocation of his firearm registration certificate and/or concealed pistol license.

227.    In appealing the revocation of his firearm registration certificate, Mr. Allen informed the MPD Defendants that the letter was insufficient notice because it failed to adequately state the reasons for the proposed revocation.

228.    Nonetheless, Mr. Allen never received adequate notice of the firearm registration certificate revocation from MPD Defendants.

229.    In appealing the revocation of his concealed pistol license, Mr. Allen informed the CPLRB Defendants that the MPD Defendants' letter was insufficient notice because it failed to adequately state the reasons for the proposed revocation.

230.    On February 26, 2020, the CPLRB Defendants ordered the MPD Defendants to "file with the Panel . . . a new or corrected Notice of Revocation and Memorandum in support of the Chief's revocation."

231.    On March 26, 2020, Mr. Allen again notified the CPLRB Defendants of the inadequate notice issue in a letter supporting his concealed pistol license appeal.

232.    Nonetheless, Mr. Allen never received adequate notice of the concealed pistol license revocation from the MPD Defendants.

233.    The CPLRB Defendants improperly adopted and endorsed the MPD Defendants' insufficient notice by writing in a footnote to the May 4, 2020 final order that "the Panel finds that

the Chief's Response is sufficient notice[.]"  *See* CPLRB Final Decision and Order Denying Appeal at 8 n.2.

234.    The CPLRB Defendants did not reconcile this finding with the previous order that MPD Defendants issue a new or corrected notice.

235.    If MPD had provided proper notice and did not rely on unproven charges, the risk of erroneously depriving Mr. Allen of his licenses would be significantly limited.

236.    The deficient notice (which was drafted and sent by the MPD Defendants and then improperly adopted, over objection, by the CPLRB Defendants) was a direct and foreseeable consequence of Defendants' unconstitutional policy permitting the revocation of a concealed pistol license based on the mere fact of prior criminal charges.  That policy was the moving force behind Defendants' failure to include in the revocation letter any evidence of conduct that could adequately inform a reasonable person on what bases the Defendants intended to take the proposed action.

**No Hearing**

237.    Mr. Allen requested that the CPLRB Defendants hold a hearing before deciding to affirm revocation of his concealed pistol license.

238.    Mr. Allen provided the CPLRB Defendants with the legal and evidentiary bases for holding a hearing before revoking his concealed pistol license.

239.    The CPLRB Defendants, however, affirmed the MPD Defendants' revocation of the concealed pistol license without first holding a hearing.

240.    If the CPLRB Defendants provided the opportunity for a hearing, the risk of erroneously depriving Mr. Allen of his licenses would be significantly limited.  For example, had Mr. Allen been able to question MPD Defendants regarding the scope of the new policy and supposed audit of Mr. Allen's record, the necessity of granting Mr. Allen's appeal and reinstating his concealed pistol license would have been even clearer.

241.   The CPLRB Defendants' refusal to hold a hearing before affirming revocation of Mr. Allen's concealed pistol license was a direct and foreseeable consequence of Defendants' unconstitutional policy of permitting the revocation of concealed pistol licenses based on the mere fact of prior criminal charges.  That policy was the moving force behind CPLRB Defendants' refusal to hold a hearing before deciding whether to affirm revocation of Mr. Allen's concealed pistol license.

**No Evidence**

242.   Mr. Allen requested that the CPLRB Defendants allow for development of the evidentiary record before affirming revocation of his concealed pistol license.

243.   Mr. Allen described to the CPLRB Defendants the legal and evidentiary justifications for allowing the development of the evidentiary record before revoking his concealed pistol license.

244.   Mr. Allen requested the production of relevant documents and testimony to defend himself against the revocation of his concealed pistol license.

245.   The CPLRB Defendants, however, affirmed the MPD Defendants' revocation of the concealed pistol license without first allowing for development of the evidentiary record.

246.   By failing to inform Mr. Allen of the reasoning behind reliance on charged, but not proven, conduct, and by failing to justify that reliance by reference to any DC law or policy, MPD unreasonably increased the risk that Mr. Allen would improperly lose his licenses.

247.   The CPLRB Defendants' refusal to allow for development of the evidentiary record was a direct and foreseeable consequence of Defendants' unconstitutional policy of permitting the revocation of concealed pistol licenses based on the mere fact of prior criminal charges.  That policy was the moving force behind Defendants' failure to develop any evidence related to Mr. Allen's conduct in connection with his charges.

**Unfair Burden**

248.     In denying Mr. Allen's appeal of the revocation of his concealed pistol license, the CPLRB Defendants stated that "the burden is on appellant to demonstrate that the Chief failed to establish by substantial evidence the appellant's unsuitability." *See* CPLRB Final Decision and Order Denying Appeal at 9.

249.     Mr. Allen repeatedly told the CPLRB Defendants that the MPD Defendants' revocation of his concealed pistol license rested on the mere fact of criminal charges without any underlying evidence.

250.     Yet somehow, the CPLRB Defendants ruled, per 1 DCMR § 1218, that Mr. Allen had not presented sufficient evidence to grant his appeal and reinstate his concealed pistol license.

251.     This standard is manifestly unfair and unconstitutional in cases, like Mr. Allen's, where an appellant challenges the sufficiency of evidence supporting the revocation.

252.     The standard requires Mr. Allen to prove a negative while allowing the MPD Defendants to rely on the mere fact of criminal charges without any underlying evidence.

253.     Defendants wrongly shifted the burden to Mr. Allen pursuant to a D.C. regulation, 1 DCMR § 1218.   That D.C. regulation was thus the moving force behind defendants' unlawful process.

**Arbitrary Reversal**

254.     The MPD Defendants had full knowledge of the years-old criminal charges on Mr. Allen's record when it granted his applications for a firearm registration certificate and a concealed pistol license.

255.     Nothing has changed since the MPD Defendants' granting of Mr. Allen's applications for a firearm registration certificate and a concealed pistol license that would undermine or invalidate his right to those documents.

256.    The MPD Defendants' arbitrary reversal of Mr. Allen's applications for a firearm registration certificate and a concealed pistol license was a direct and foreseeable consequence of Defendants' unconstitutional policy of permitting the revocation of concealed pistol licenses based on the mere fact of prior criminal charges.  That policy was the moving force behind the MPD Defendants' arbitrary reversal of Mr. Allen's applications for a firearm registration certificate and a concealed pistol license without any evidence related to Mr. Allen's conduct in connection with the years-old charges.

*        *        *

257.    The above facts, especially taken together, reveal a failure by all Defendants to provide Mr. Allen meaningful due process before revoking his firearm registration and concealed pistol license. The deficient process provided unreasonably increased the risk that Mr. Allen would improperly lose his licenses.

258.    Specifically, MPD Defendants did not provide sufficient notice such that Mr. Allen was aware of the critical issues to be addressed by the MPD Defendants or CPLRB Defendants or what evidence, if any, he needed to present; Defendants did not produce or explain the new policy they used to revoke Mr. Allen's rights; Defendants did not provide Mr. Allen with a meaningful opportunity to attend a hearing where he could explain the fundamental errors of the MPD Defendants' and CPLRB Defendants' analyses, fact-finding, decision-making, etc.; Defendants did not provide an opportunity for Mr. Allen to present evidence demonstrating the error of depriving him of his liberty and property; Defendants' ultimate reason for depriving Mr. Allen of his liberty and property unfairly placed the burden on Mr. Allen to prove his suitability to exercise his constitutional rights, and despite the aforementioned barriers to carrying that burden in this context; and MPD Defendants' arbitrary apparent reversal of their policy with regard to Mr. Allen's irrelevant and

unproven criminal charges made it impossible to understand the Defendants' reasons for depriving Mr. Allen of his liberty and property.

259.    At all times, Defendants acted with intent to deprive Mr. Allen of his constitutional rights, or with deliberate indifference to the serious risk of deprivation of his constitutional rights.

260.    According to the notice provided to Mr. Allen and MPD Defendants' briefing in the administrative appeals, Defendants acted pursuant to an official policy regarding unproven criminal charges.  That policy creates a presumption that a registration- or license-holder has a "propensity for violence" based solely on consideration of unproven and/or irrelevant criminal charges.  Under Defendants' apparent reading, the policy allows MPD Defendants to reject applications or revoke registrations and/or licenses without providing individuals sufficient notice of the weight or purpose of such consideration or a meaningful opportunity to rebut such evidence.  The Defendants deprived Mr. Allen of liberty and property pursuant to this official policy promulgated by the MPD.

## SECOND CAUSE OF ACTION (AGAINST ALL DEFENDANTS)
### 42 U.S.C. § 1983 – Second Amendment of the U.S. Constitution – Concealed Pistol License

261.    Mr. Allen incorporates all preceding paragraphs by reference herein.

262.    "[T]he law must leave responsible, law-abiding citizens some reasonable means of exercising" "the rights to keep and bear arms." *Wrenn*, 864 F.3d at 656, 663 (ruling for "plaintiffs [who were] denied a concealed-carry license solely for failing to show a special need for self-defense"). As held by the D.C. Circuit, "the individual right to carry common firearms beyond the home for self-defense—even in densely populated areas, even for those lacking special self-defense needs—falls within the core of the Second Amendment's protections." *Id.* at 661. "[A]t a minimum," the Second Amendment "shields the typically situated citizen's ability to carry common arms generally." *Id.* at 667.

263.    Mr. Allen is a responsible, law-abiding citizen. The mere fact of prior charges against Mr. Allen—especially without accompanying evidence regarding his alleged conduct—cannot change that.

264.    Mr. Allen has a Second Amendment right to possess a firearm outside his home.

265.    Mr. Allen satisfied all of D.C.'s rules and regulations for applying for his concealed pistol license.

266.    On October 31, 2019, the MPD Defendants sent a Notice of Revocation to Mr. Allen, informing him that the MPD Defendants were revoking his concealed pistol license.

267.    The MPD Defendants relied on years-old disproven allegations, non-violent juvenile drug charges handled outside the adult criminal system, and non-violent gambling charges in erroneously determining that Mr. Allen has a "propensity for violence or instability" and was therefore precluded from possessing a concealed pistol license.

268.    These arrests and charges, by themselves, do not establish that Mr. Allen was not a responsible, law abiding citizen when he applied for and obtained his concealed pistol license.

269.    MPD cited no additional facts or evidence supporting the revocation of Mr. Allen's concealed pistol license.

270.    Mr. Allen appealed the revocation of his concealed pistol license on November 19, 2019, and the CPLRB Defendants affirmed the revocation of his concealed pistol license on May 2, 2020.

271.    Accordingly, all the Defendants deprived Mr. Allen of his Second Amendment right to possess a firearm outside his home.

272.    At all times, Defendants acted with intent to deprive Mr. Allen of his Second Amendment rights, or with deliberate indifference to the serious risk of deprivation of his constitutional rights.

273.    The reason for the revocation of Mr. Allen's concealed pistol license was a "deliberate and principled change in the Chief of Police's position" with respect to who may possess concealed pistol licenses.  The CPLRB Defendants wrongly deferred to the MPD Defendants' position despite a complete lack of evidence supporting it.  The official policy was the "moving force" behind Defendants' deprivation of Mr. Allen's Second Amendment rights.

**THIRD CAUSE OF ACTION (AGAINST D.C. AND CPLRB DEFENDANTS)**
**D.C. Code § 2-509 – D.C. Administrative Procedure Act – No Hearing**

274.     Mr. Allen incorporates all preceding paragraphs by reference here.

275.     The D.C. Administrative Procedure Act (DCAPA) applies to appeals and proceedings

before the CPLRB.  D.C. Code § 7-2507.09.

276.     The DCAPA provides that "[e]very party shall have the right to present in person or

by counsel his case or defense by oral and documentary evidence, to submit rebuttal evidence, and to

conduct such cross-examination as may be required for a full and true disclosure of the facts." *Id.* § 2-

509(b).

277.     The DCAPA requires the reversal of any administrative "action or findings and

conclusions" that are "[w]ithout observance of procedure required by law, including any applicable

procedure provided by this subchapter[.]"  *Id.* § 2-510(a)(3)(D).

278.     The CPLRB Defendants violated the DCAPA by refusing Mr. Allen's repeated

requests to present evidence and examine pertinent witnesses in support of his appeal of his revoked

concealed pistol license.

279.     Specifically, in his March 26, 2020 letter in support of his appeal, Mr. Allen listed

various witnesses associated with MPD Defendants (two of whom are named Defendants here) that

he was entitled to examine in a hearing setting.

280.     Mr. Allen also listed categories of evidence and documents that he was entitled to

discover and then present in a hearing setting.

281.     No matter, the CPLRB Defendants cursorily denied Mr. Allen's requests for a hearing

with witnesses and documents, in a footnote in its decision affirming revocation of the concealed

pistol license.

282. The CPLRB Defendants violated the DCAPA by failing to provide Mr. Allen a chance to cross-examine witnesses and present contrary evidence in a hearing setting.

283. At all times, Defendants acted with intent to deprive Mr. Allen of his rights under D.C. law, or with deliberate indifference to the serious risk of deprivation of his rights.

**FOURTH CAUSE OF ACTION (AGAINST D.C. AND CPLRB DEFENDANTS)**
**D.C. Code § 2-509 – D.C. Administrative Procedure Act – No Evidence**

284.    Mr. Allen incorporates all preceding paragraphs by reference here.

285.    The DCAPA provides that "[f]indings of fact and conclusions of law shall be supported by and in accordance with the reliable, probative, and substantial evidence."  D.C. Code § 2-509(e).

286.    The DCAPA requires the reversal of any administrative "action or findings and conclusions" that are "[u]nsupported by substantial evidence in the record of the proceedings[.]"  *Id.* § 2-510(a)(3)(E).

287.    The CPLRB Defendants violated the DCAPA by deciding to revoke, and to affirm the revocation of, Mr. Allen's concealed pistol license without "reliable, probative, and substantial evidence"—let alone "substantial evidence"—that his conduct warranted the revocation.

288.    For example, throughout Mr. Allen's administrative appeal of his concealed pistol license, the CPLRB Defendants consciously disregarded his good faith and factually correct arguments that the MPD Defendants' proposed revocation was based not on evidence of Mr. Allen's conduct but on the mere fact of prior criminal charges against him.

289.    The CPLRB Defendants ignored Mr. Allen's explanation that none of the charges resulted in felony convictions, and that the government dropped charges against Mr. Allen in the most serious cases after investigating them and finding evidence of another person's guilt.

290.    At all times, Defendants acted with intent to deprive Mr. Allen of his rights under D.C. law, or with deliberate indifference to the serious risk of deprivation of his rights.

**FIFTH CAUSE OF ACTION (AGAINST ALL DEFENDANTS)**
**D.C. Code § 2-509 – D.C. Administrative Procedure Act – Change in Policy Was**
**Arbitrary, Capricious, & Otherwise Contrary to Law**

291.    Mr. Allen incorporates all preceding paragraphs by reference here.

292.    The APA requires the reversal of any administrative "action or findings and conclusions" that are "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  D.C. Code § 2-510(a)(3)(A).

293.    Defendants' violated the DCAPA when they issued a new policy and regulatory interpretation—which creates a presumption that a person has a "propensity for violence" based solely on the existence of past criminal charges even absent any evidence of conduct related to those charges.

294.    This new policy/interpretation is an arbitrary revision of Defendants' preexisting policy.

295.    This new policy/interpretation is an arbitrary and capricious interpretation of the phrase "propensity for violence."

296.    This new policy/interpretation is an unreasonable interpretation of the statutory text that Defendants are charged with executing.

297.    This policy/interpretation of law is also not in accordance with the U.S. Constitution.

**SIXTH CAUSE OF ACTION (AGAINST ALL DEFENDANTS)**
**D.C. Code § 2-509 – D.C. Administrative Procedure Act – Revocation Decision Was**
**Arbitrary, Capricious, & Otherwise Contrary to Law**

299.    Mr. Allen incorporates all preceding paragraphs by reference here.

300.    The DCAPA requires the reversal of any administrative "action or findings and conclusions" that are "[a]rbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  D.C. Code § 2-510(a)(3)(A).

301.    Defendants violated the DCAPA by deciding to revoke, and to affirm the revocation of, Mr. Allen's concealed pistol license based on the mere fact of prior criminal charges without requiring evidence of the licensee's conduct in connection with the years-old charges.

302.    Given the lack of evidence of Mr. Allen's conduct underlying the years-old criminal charges, Defendants' actions were arbitrary.

303.    Given the lack of evidence of Mr. Allen's conduct underlying the years-old criminal charges, Defendants' actions were capricious.

304.    Given the lack of evidence of Mr. Allen's conduct underlying the years-old criminal charges, Defendants' actions constituted an abuse of discretion.

305.    And given the lack of evidence of Mr. Allen's conduct underlying the years-old criminal charges, Defendants' actions were not in accordance with D.C. law or the U.S. Constitution.

306.    At all times, Defendants acted with intent to deprive Mr. Allen of his rights under D.C. law, or with deliberate indifference to the serious risk of deprivation of his rights.

**SEVENTH CAUSE OF ACTION (AGAINST ALL DEFENDANTS)**
**D.C. Code § 2-509 – D.C. Administrative Procedure Act – Contrary to Right**

307.    Mr. Allen incorporates all preceding paragraphs by reference here.

308.    The DCAPA provides for the reversal of any administrative "action or findings and conclusions" that are "[c]ontrary to constitutional right, power, privilege, or immunity[.]"  D.C. Code § 2-510(a)(3)(B).

309.    Mr. Allen repeatedly warned Defendants throughout the pendency of his administrative appeal that revocation of his concealed pistol license would violate the U.S. Constitution and D.C. law.

310.    Defendants violated the DCAPA by deciding to revoke, and to affirm the revocation of, Mr. Allen's concealed pistol license based on the mere fact of prior criminal charges without requiring evidence the licensee's conduct in connection with the years-old charges.

311.    At all times, Defendants acted with intent to deprive Mr. Allen of his rights under D.C. law, or with deliberate indifference to the serious risk of deprivation of his rights.

**EIGHTH CAUSE OF ACTION (AGAINST ALL DEFENDANTS)**
**Damages – Compensatory, Nominal, and Punitive**

312.    Mr. Allen incorporates all preceding paragraphs by reference here.

313.    Since receiving the revocation letters, Mr. Allen has been inhibited from freely exercising his Second Amendment rights.  He also has been subjected to an administrative appeals process that, as described above, falls far short of the protections required by the Fifth Amendment and the D.C. Administrative Procedure Act.  As a result, Mr. Allen suffered (and continues to suffer) anxiety, emotional distress, and embarrassment due to the ongoing uncertainty surrounding his registration and license.

314.    Mr. Allen has been arrested twice for serious violent felonies (the 2006 assault and 2014 armed robbery) that he did not commit.  He spent time in jail for both of those crimes, only for the government to conduct more investigation and drop the charges.  Those experiences were harmful enough on Mr. Allen's emotional state.  The realization that he continues to be penalized for crimes he did not commit stoked the same anxieties once again.

315.    As a direct result of Defendants' actions, Mr. Allen suffered impairment of reputation, humiliation, and mental anguish.  Mr. Allen is therefore entitled to compensatory damages.

316.    In the alternative to receiving compensatory damages, and because Mr. Allen's firearm registration certificate and concealed pistol license were unconstitutionally revoked, Mr. Allen is entitled to nominal damages.

317.    Finally, Defendants' actions as described in this complaint—all made in the face of strenuous objection by counsel and contrary to the U.S. Constitution and D.C. law—involved reckless or callous indifference to the federally protected rights of Mr. Allen and others, and therefore Mr. Allen is entitled to punitive damages.

## PRAYER FOR RELIEF

318.   Mr. Allen respectfully requests relief as follows:

a.     An order enjoining Defendants' unlawful policy, which apparently presumes that a history of unproven and/or irrelevant criminal charges necessarily means that a registration holder has a "propensity for violence";

b.     An order enjoining Defendants from enforcing the revocation of Mr. Allen's concealed pistol license;

c.     An order directing Defendants to reinstate Mr. Allen's concealed pistol license, or, in the alternative, directing Defendants to reanalyze Mr. Allen's qualifications for possessing a concealed pistol license in accordance with this Court's orders, the law, and the evidence currently available in Defendants' files, and to issue a revised decision within 30 days;

d.     A declaratory judgment that the administrative record in Mr. Allen's case does not support a finding of a "propensity for violence" under D.C. law;

e.     A declaratory judgment that Defendants' policy of revoking firearm registration certificates and/or concealed pistol licenses on its face and as applied to Mr. Allen was unconstitutional;

f.     Nominal, compensatory, and punitive damages to address the injuries and conduct described in this complaint and in amounts to be determined by the factfinder;

g.     An order awarding Mr. Allen his costs of suit including attorneys' fees and costs pursuant to 42 U.S.C. § 1988; and/or

h.     Such other relief as may be warranted or is just and proper.

Dated: September 2, 2020

Respectfully submitted,

s/ Hayter L. Whitman
Hayter L. Whitman (D.C. Bar No. 1031057)
Kieran Gostin (D.C. Bar No. 1019779)
(*pro hac vice* pending)
Matthew R. Skanchy (D.C. Bar No. 1045601)
(*pro hac vice* pending)
Jennifer H. Pavelec (D.C. Bar No. 1614398)
(*pro hac vice* pending)
Benjamin D. Raker (D.C. Bar No. 1671815)
(*pro hac vice* pending)

WILKINSON WALSH LLP
2001 M Street NW, 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4000
Fax: (202) 847-4005
hwhitman@wilkinsonwalsh.com
kgostin@wilkinsonwalsh.com
mskanchy@wilkinsonwalsh.com
jpavelec@wilkinsonwalsh.com
braker@wilkinsonwalsh.com

*Attorneys for Plaintiff Linwood Allen*