**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LINWOOD ALLEN,

               Plaintiff,

     v.

THE DISTRICT OF COLUMBIA, *et al.,*

           Defendants.

Civil Action No. 20-02453 (TSC)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................1

BACKGROUND .................................................................................................................3

    I.    Mr. Allen's Application for a Firearm Registration Certificate and Concealed Pistol License...................................................................................................................3

    II.    MPD's Initial Grant and Sudden Revocation of Mr. Allen's Registration and License Based on a Change in Policy.........................................................................5

    III.    Mr. Allen's Administrative Appeal...............................................................................6

STANDARD OF REVIEW .................................................................................................9

ARGUMENT .....................................................................................................................10

    I.    Mr. Allen Adequately Pleaded That Defendants Violated the Second Amendment. .........10

    II.    Mr. Allen Adequately Pleaded That Defendants Violated the Fifth Amendment..............18

    III.    D.C. Cannot Escape Liability for Its Own Policy. ....................................................34

    IV.    Defendants Are Not Entitled to Qualified Immunity After Violating Mr. Allen's Clearly Established Rights. ....................................................................................36

    V.    The Court Should Exercise Supplemental Jurisdiction Over Mr. Allen's Adequately Pleaded DCAPA Claims.............................................................................38

CONCLUSION ..................................................................................................................45

## <u>INTRODUCTION</u>

In 2019, Plaintiff Linwood Allen applied for and obtained a firearm registration certificate and a concealed pistol license (CPL) in D.C. The Metropolitan Police Department (MPD) reviewed Mr. Allen's applications, determined that he satisfied all applicable requirements, and properly granted them. Yet just months later, despite absolutely no changes to Mr. Allen's background or application materials, MPD sent Mr. Allen letters revoking both his firearm registration certificate and CPL.

Mr. Allen challenged the revocations through D.C.'s administrative appeal processes, during which MPD admitted that it revoked Mr. Allen's firearm registration "in error," but refused to reinstate his CPL. Compl. ¶¶ 160-61. Counsel for MPD then explained for the first time that the revocation was "the result of a *deliberate* and *principled change* in the Chief of Police's position on what it means to have 'exhibited a propensity for violence or instability.'" Compl. ¶ 175 (emphasis added). Specifically, "[u]nder the Chief's new interpretation of the regulation, conduct that is violent or criminal demonstrating low self-control, regardless of whether it results in a criminal conviction, may be grounds for denial, revocation, or suspension of a CPL on the basis of unsuitability." Compl. ¶¶ 4, 182. And based on this new policy, MPD asserted that Mr. Allen's history of criminal arrests—none of which resulted in conviction—rendered him unsuitable to carry a concealed weapon.

MPD did not explain why these arrests alone supported a finding that Mr. Allen had a "propensity for violence," nor did MPD offer any evidence beyond the mere fact of the arrests to support a finding that Mr. Allen had engaged in any misconduct. MPD did not even produce the policy that it cited—and indeed, to this day, has not produced that policy despite multiple requests that they do so. As a result of MPD's failure to explain or justify its decision, Mr. Allen was deprived of a meaningful opportunity to challenge the revocation. Mr. Allen appealed to the Concealed Pistol Licensing Review Board (CPLRB), which, despite initially expressing justifiable concern about MPD reversing its issuance of Mr. Allen's CPL, ignored the substance of Mr. Allen's constitutional

arguments, refused his requests to develop the evidentiary record and to hold a hearing on his appeal, and affirmed the MPD's erroneous decision.

Mr. Allen filed this lawsuit in federal court to seek redress for the failure to provide him the due process required by the Fifth Amendment, the deprivation of his substantive Second Amendment rights, and related violations under the D.C. Administrative Procedure Act (DCAPA).

Defendants' new policy apparently authorizes the denial or revocation of a CPL of a D.C. resident who otherwise complies with all application requirements based on the mere fact of prior arrests—even absent a conviction or any consideration of the underlying facts about the alleged conduct of the accused. In other words, the policy enables D.C. to deprive citizens of fundamental constitutional rights based on accusations alone. This scheme turns one of the foundational principles of American law—the presumption of innocence—on its head, presuming an applicant or CPL holder is guilty based on the fact of an arrest. Defendants' policy and conduct in this case disregards the Supreme Court's long-standing observation that "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct." *Schware v. Bd. of Bar Exam. of State of N.M.*, 353 U.S. 232, 241 (1957).

The gravity of these constitutional violations is compounded by the disparate impact on Black individuals in DC who are disproportionately likely to encounter the criminal justice system or be arrested. A study of D.C. policing by the American Civil Liberties Union found "a pattern of disproportionate arrests of Black people that persists across geographic areas and offense types."[1] Compl. ¶ 15. Given this backdrop, it is inevitable that Defendants' new policy will deprive Black

---

[1] *See* Am. Civ. Liberties Union D.C., *Racial Disparities in D.C. Policing: Descriptive Evidence from 2013-2017*, May 13, 2019, https://perma.cc/EL4C-BFNP (analyzing arrest data from 2013-2017).

individuals like Mr. Allen of their constitutional rights at disproportionately high rates. For these

reasons, as well as others explained below, Defendants' motion to dismiss should be denied.[2]

## BACKGROUND

I.    **Mr. Allen's Application for a Firearm Registration Certificate and Concealed Pistol License**

Plaintiff Linwood Allen is a 36-year-old lifelong D.C. resident who lives with his two young

children. Compl. ¶ 65. Mr. Allen is a hardworking small business owner who has operated a cleaning

company called LA Cleaning since April 2018. Compl. ¶ 66. LA Cleaning has a variety of clients

around the D.C. area including apartment buildings, a state trooper office, and a mental health

institute. Compl. ¶ 68. Although Mr. Allen has been arrested in the past, none of the incidents

resulted in convictions, and the most serious cases were either dropped completely or even expunged

after investigation by the government. *See* Compl. ¶¶ 103-131. Mr. Allen is a responsible, law-abiding

member of the community. Compl. ¶ 263.

Over the last few years, Mr. Allen became interested in owning a firearm. Compl. ¶ 73. In

part, Mr. Allen wanted to purchase and carry a firearm to protect himself and his family. Compl. ¶ 74.

Mr. Allen's Northeast D.C. neighborhood has experienced significant crime rates and a pattern of

home break-ins. Compl. ¶ 74. Mr. Allen wanted to be able to carry a firearm when working odd

hours for his personal safety. Compl. ¶ 75. In early 2019, Mr. Allen consulted a federally licensed

firearm dealer in D.C. that worked out of the same building as the MPD Headquarters. Compl. ¶ 76.

The dealer provided Mr. Allen with a list of federally approved firearm vendors. Compl. ¶ 76.

Mr. Allen chose to purchase a pistol from Bud's Gun Shop in Paris, Kentucky, one of the vendors on

the list. Compl. ¶¶ 78-80. Mr. Allen followed the application processes for both a firearm registration

---

[2] Mr. Allen acknowledges that the claims against Defendants MPD and CPLRB can be dismissed as
*non sui juris*, and that, if the claims against D.C. survive the motion to dismiss, Defendants named in
their official capacities can be dismissed as redundant. Mot. at 44-45.

certificate and a CPL in May 2019.  Compl. ¶¶ 1, 81.  During the application processes, Mr. Allen provided everything required by D.C. law, including information demonstrating that he satisfied each of D.C.'s eligibility requirements for owning a firearm, and certified that the information was accurate. Compl. ¶¶ 56-58, 81-91.

At the time that Mr. Allen submitted his applications, his history of arrests was known to MPD.  Compl. ¶ 174.  Black individuals have disproportionally high rates of interactions with law enforcement in the United States and D.C.  Compl. ¶¶ 13-15.  Over the years, Mr. Allen himself has been subject to multiple encounters with the police.  *See* Compl. ¶¶ 103-131.  In 2000, when Mr. Allen was a juvenile, he was twice arrested in D.C. for cocaine offenses.  Compl. ¶ 104.  Neither arrest resulted in conviction.  Compl. ¶ 105.  Although there is no record in the D.C. court database of these juvenile cocaine arrests, these were nonviolent charges that occurred two decades ago and, as is typical in juvenile cases, were resolved outside the adult court system.  Compl. ¶ 106.  Mr. Allen has twice been arrested in D.C. for illegal gambling, once in 2006 and once in 2008.  Compl. ¶¶ 109-111; 119-121.  Mr. Allen resolved both arrests through a "post-and-forfeiture" procedure that, under D.C. law, "is not a conviction of a crime and shall not be equated to a criminal conviction," and "may not be relied upon by any District of Columbia court or agency in a subsequent criminal, civil, or administrative proceeding or administrative action to impose any sanction, penalty, enhanced sentence, or civil disability."  Compl. ¶¶ 109-111, 120-21.  Also in 2006, Mr. Allen was wrongfully identified for an alleged assault with a deadly weapon.  Compl. ¶¶ 114-119.  Mr. Allen was held in custody for several months before the Court granted a request for him to submit blood, saliva, and hair samples.  Compl. ¶ 115.  Nine months after his initial arrest, Mr. Allen still had not been indicted for any crime, and he filed a motion to dismiss the case against him.  Compl. ¶ 116.  A week later, that motion was granted.  Compl. ¶ 117.  And on the same day the government formally dropped the charges by entering a *nolle prosequi*.  Compl. ¶ 117.  This arrest thus never even resulted in an indictment,

much less a conviction.  Compl. ¶ 114.  Finally, in 2014, Mr. Allen was arrested in D.C. for being a fugitive related to an armed robbery in Maryland that he had not committed.  Compl. ¶¶ 124-131.  Mr. Allen was extradited to and charged in the District Court for Prince George's County (Maryland) with several offenses[3] but every one of them was expunged from his record after further investigation and the case being dropped.  Compl. ¶¶ 124-29.  Specifically, videotape evidence from a security camera near the scene of the crime showed that a different individual had committed the crimes of which Mr. Allen had been accused.  Compl. ¶ 128.

Mr. Allen's multiple encounters with police are not uncommon for Black individuals living in D.C.  *See* Compl. ¶¶ 13-15.  But none of these arrests have ever led to a conviction, and the most serious charges either never resulted in an indictment or were expunged.  *See* Compl. ¶¶ 103-131.  Despite these accusations, Mr. Allen has been an active member in his community while steadfastly avoiding further interaction with the criminal justice system.  *See* Compl. ¶¶ 65, 263.

## II.     MPD's Initial Grant and Sudden Revocation of Mr. Allen's Registration and License Based on a Change in Policy

Under D.C. law, it is the Chief of Police's responsibility to investigate whether applicants are entitled to a firearm registration certificate and CPL.  Compl. ¶¶ 46, 58.  Defendant Peter Newsham (who has since left the MPD) was the Chief of Police throughout the relevant facts in this case—from Mr. Allen's initial application for a firearm registration certificate to the CPLRB's final order affirming revocation of his CPL.  When Chief Newsham and the MPD reviewed Mr. Allen's applications, they were aware of Mr. Allen's history of criminal arrests.  *See* Compl. ¶¶ 136, 174.  Knowing Mr. Allen's history, Defendant Newsham and the MPD still determined "that [Mr. Allen] is entitled and qualified"

---

[3] The offenses charged were: two counts of armed robbery, two counts of robbery, two counts of assault in the second degree, one count of using a firearm in commission of a felony or violent crime, two counts of theft, two counts of reckless endangerment, and one count of having a handgun on the person.

to own a firearm, and on May 6, 2019, approved his application.  Compl. ¶¶ 47, 92-95; *see also* Compl. ¶¶ 37-43 (listing requirements for firearm registration certificate applicants).   Mr. Allen's firearm registration certificate was issued that same day.  Compl. ¶¶ 92-95.  Likewise, Chief Newsham and the MPD knew about Mr. Allen's prior arrests when reviewing his concealed pistol application, but properly determined that Mr. Allen was "suitable" and thus granted him a CPL on August 15, 2019. Compl. ¶ 136.

Things changed on November 5, 2019 when Mr. Allen received two MPD letters (dated October 31, 2019) informing him of the proposed revocations of both his firearm registration certificate and CPL.  Compl. ¶¶ 132-143.  Neither letter explained the revocations.  Compl. ¶¶ 137, 140-43.  The letters merely listed six criminal arrests—without any explanation about the inferences MPD was drawing from his arrest record or any information about the resolution of the cases or evidence underlying the arrests—and announced the revocations.  Compl. ¶¶ 135, 140.  Mr. Allen did not understand—based on the vague letters listing years-old arrests (all of which were known to the MPD at the time of his applications) that would not justify the action taken—the reasons for MPD's revocation of his firearm registration certificate and CPL.  Compl. ¶ 143.

## III.    Mr. Allen's Administrative Appeal

Mr. Allen appealed both revocations in parallel proceedings prescribed by D.C. laws and regulations.  Compl. ¶ 144.  On November 19, 2019, Mr. Allen appealed the revocation of his firearm registration certificate to the Director of the Gun Control/Records Division at MPD.  Compl. ¶ 145. The same day, he appealed the CPL revocation to the CPLRB.  Compl. ¶ 153.  Mr. Allen's appeals argued that the notice letters were insufficient and that the revocations were substantively improper under the U.S. Constitution and D.C. law.   Compl. ¶¶ 147, 154.   Both appeals acknowledged Mr. Allen's prior arrests but explained that they were insufficient to justify reversal of the approval

decisions, especially because all the arrests were known at the time of approval and neither of the arrests related to violence resulted in a conviction.  Compl. ¶¶ 147-154.

The firearm registration certificate appeal went unanswered for 88 days.  Compl. ¶¶ 158-59.  Then, in a February 8, 2020 letter from Defendant Lieutenant Colin Hall, the MPD admitted to Mr. Allen that his firearm registration certificate had been revoked "in error."  Compl. ¶¶ 159-160.  The letter said that "[o]nly your concealed carry pistol license was intended to be revoked, and the firearm registration revocation notice was sent in error."  Compl. ¶ 161.  The letter clarified that the reversal did "not change the decision to revoke your concealed pistol license and that matter continues to be handled by the Concealed Pistol Licensing Review Board."  Compl. ¶ 162.

Mr. Allen's CPL suffered a different fate.  The CPLRB notified Mr. Allen on December 2, 2019 that his "appeal hearing request" had been received, and that a panel—consisting of Defendants Edwin Powell, Dr. Chad Tillbrook, and Mr. Gary Abrecht—would hear the appeal.  Compl. ¶ 155.  That panel first responded to Mr. Allen's appeal on February 13, 2020 by issuing an order that stayed the case and required the MPD to address certain "questions and concerns."  Compl. ¶¶ 165-172.  For example, the CPLRB asked MPD to explain why it initially approved and then revoked Mr. Allen's CPL "based on what appear to be the same criminal history records"; demanded that MPD "file . . . a new or corrected Notice of Revocation" in the case; and ordered the production of the MPD's file on Mr. Allen.  Compl. ¶¶ 170-71.

The MPD's March 16, 2020 response to the CPLRB confirmed that the revocation "was based on the same set of incidents that had been available in the criminal history record search conducted during the initial licensing determination."  Compl. ¶ 174.  Instead, the MPD decision was "the result of a deliberate and principled change in the Chief of Police's position on what it means to have 'exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another,' under D.C. Mun. Regs. tit. 24, § 2335.1(d)."

Compl. ¶ 175.  The change apparently came as a result of a self-defense shooting by another holder of a CPL in D.C.  Compl. ¶¶ 177-181.  Under this changed policy, the MPD defended its decision to revoke Mr. Allen's license based on prior criminal cases that it knew about at the time the license was approved, without regard to whether Mr. Allen committed or was convicted for the offenses, or even if they were expunged.  Compl. ¶¶ 183-84.  The MPD produced a copy of its file on Mr. Allen that did not include any new facts about Mr. Allen's prior conduct or record that would support the revocation.  Compl. ¶¶ 187-89.  The MPD did not file or serve a new or corrected notice that better explained the recommendation to revoke Mr. Allen's license or the standard pursuant to which it was made.  Compl. ¶ 193.

Ten days later, on March 26, 2020, Mr. Allen filed with the CPLRB a reply in support of his appeal.  Compl. ¶ 192.  Mr. Allen reiterated that MPD's revocation of the CPL violated the U.S. Constitution and D.C. law, and added that MPD had improperly ignored the CPLRB's order to serve a new notice of revocation.  Compl. ¶¶ 193-94.  The reply argued that, because the MPD had no evidence underlying the revocation, the matter should be resolved without a hearing in Mr. Allen's favor.  Compl. ¶ 194.  At the same time, the reply made clear Mr. Allen's demand that the CPLRB hold a hearing before affirming the MPD's decision based on a legally and factually insufficient record.  Compl. ¶ 195.  In the reply, Mr. Allen cited D.C. law and listed the types of evidence and witnesses he would be entitled to present at the hearing.  Compl. ¶ 195.  Mr. Allen wrote he was entitled to present witnesses and certain categories of documents and communications to adequately defend himself and show that the Defendants' proposed revocation was against the law.  Compl. ¶¶ 195-96.

The appeal was denied in a May 4, 2020 order from the CPLRB.  Compl. ¶¶ 198-216.  The CPLRB explained that the "record in its totality[] provide[d] sufficient evidence to support the Chief's finding that appellant's propensity for violent and unstable behavior may render the possession of a [CPL] a danger to himself or others."  Compl. ¶ 211.  The CPLRB further stated that "the Panel

independently would have reached the same conclusion as the Chief." Compl. ¶ 212. According to the order, the CPLRB had voted to deny the appeal during a meeting on April 29, 2020 that Mr. Allen was not notified about, invited to, or present during. Compl. ¶¶ 202-03. The CPLRB also summarily dismissed Mr. Allen's request for an evidentiary hearing. Compl. ¶ 215. Buried in a footnote of the order, the CPLRB questioned the Chief's "recitation of the reason for his change in interpreting the suitability requirements" and conceded that "[t]he Panel does not disagree with appellant that the Chief's example may be unpersuasive." Compl. ¶ 213. Specifically, CPLRB questioned whether it was reasonable to change the policy based on "a different licensee's specific conduct, and the subsequent audit and revocation of that particular license." Compl. ¶ 213.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) will be granted only if the moving party shows that no legally cognizable claim exists. *Cohen v. Bd. of Trs. of the Univ. of D.C.*, 819 F.3d 476, 481 (D.C. Cir. 2016). At this stage, to survive a motion to dismiss, a plaintiff merely has to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A claim is plausible on its face if it contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Steinberg v. Gray*, 815 F. Supp. 2d 293, 297 (D.D.C. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). "In evaluating whether a complaint is sufficient to withstand a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint." *Id.* (quotation omitted). The court must also construe the complaint in the light most favorable to the plaintiff. *Id.* at 301. Especially where constitutional rights are at stake, "a [moving party] cannot succeed in dismissing [a plaintiff's] claim by mischaracterizing it." *Id.* at 302. The moving party "ha[s] to directly confront the allegations in [the] complaint and attack [the plaintiff's] ability to state a claim based on those allegations." *Id.*

## ARGUMENT

Defendants have not met their burden to establish that Mr. Allen's claims should be dismissed. *First*, Defendants have not shown that their revocation of Mr. Allen's CPL based solely on his prior arrests and without considering the facts underlying those arrests was consistent with his substantive rights under the Second Amendment.  *Second*, Defendants have not shown that the unfair, one-sided process associated with the revocation and administrative appeal provided Mr. Allen with due process under the Fifth Amendment.  *Third*, D.C. can and should be held liable here because the MPD's policy was the moving force behind the constitutional violations.  *See Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978).  *Fourth*, the individual Defendants are not entitled to qualified immunity because any reasonable person would have known that these actions violated Mr. Allen's constitutional rights.  And regardless, even if municipal liability were not enforced and the individual Defendants were entitled to qualified immunity, Mr. Allen would be entitled to the injunctive and declaratory relief requested in the Complaint.  *Fifth*, and finally, this Court should exercise supplemental jurisdiction over Mr. Allen's DCAPA claims given their inextricable relationship to the facts underlying his federal constitutional claims.

## I.    Mr. Allen Adequately Pleaded That Defendants Violated the Second Amendment.

Mr. Allen's Second Amendment claims should survive Defendants' motion to dismiss because the Complaint properly alleges that he is a responsible, law-abiding citizen who is entitled to, but has been deprived of, his constitutional right to carry a firearm.

In evaluating Mr. Allen's Second Amendment claims, the Court should "appl[y] the familiar two-step Second Amendment analysis used by circuits throughout the country." *Medina v. Whitaker*, 913 F.3d 152, 156 (D.C. Cir. 2019) ("*Whitaker*").  "The first step requires [considering] whether the challenged law regulates conduct outside the Second Amendment's protections."  *Id.*  "If the law regulates activity protected by the Second Amendment the second step of the analysis shifts the

burden to the government to show that the regulation is substantially related to an important governmental objective." *Id.* That second step is referred to as "intermediate scrutiny." *See id.*

### A. Defendants targeted rights at the "core" of the Second Amendment.

Defendants' policy and conduct targeted rights protected by the Second Amendment. "At the Second Amendment's core lies the right of responsible citizens to carry firearms for personal self-defense beyond the home, subject to longstanding restrictions." *Wrenn v. District of Columbia*, 864 F.3d 650, 667 (D.C. Cir. 2017). "The core or *central component* of the Second Amendment right to keep and bear arms protects individual self-defense by law-abiding, responsible citizens." *Id.* at 657 (internal quotations and citations omitted; emphasis in original).

Defendants argue that Mr. Allen's prior arrests place him in a category of people who are not entitled to Second Amendment protection. But the mere fact of prior arrests, especially without evidence about the arrests or their resolution, cannot preclude the exercise of core Second Amendment rights. It is well-established that "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct." *Schware v. Bd. of Bar Exam. of State of N.M.*, 353 U.S. 232, 241 (1957); *see also Nelson v. Colorado*, 137 S. Ct. 1249, 1255-56 (2017) ("Axiomatic and elementary, the presumption of innocence lies at the foundation of our criminal law.") (quotation and alteration omitted). "An arrest shows nothing more than that someone probably suspected the person apprehended of an offense." *Schware*, 353 U.S. at 241; *see United States v. Berry*, 553 F.3d 273, 284 (3d Cir. 2009) ("[A] bare arrest record—without more—does not justify an assumption that a defendant has committed other crimes and it therefore cannot support increasing his/her sentence in the absence of adequate proof of criminal activity."). "Actually," as the D.C. Circuit has explained, "a collection of dismissed, abandoned or withdrawn arrest records are no more than gutter rumors when measured against any standards of constitutional fairness to an individual

and, along with records resulting in an acquittal are not entitled to any legitimate law enforcement credibility whatsoever." *Utz v. Cullinane*, 520 F.2d 467, 479 (D.C. Cir. 1975).

Mr. Allen does not belong to the narrow categories of citizens whose right to keep and bear arms fall outside Second Amendment protection.   Although there are limited "longstanding" exceptions to the "core" right to carry a firearm, having an arrest record is not one of those historical exceptions.  *See Wrenn*, 864 F.3d at 657.  To the contrary, these exceptions are limited and defined, such as "bans on possession by felons and the mentally ill." *Id.*  And Mr. Allen does not fall into either of these categories.

To show that Mr. Allen's right to carry a firearm was not at the core of the Second Amendment, Defendants would need to establish that someone who has been arrested but not convicted of a crime should be subject to the same restrictions as a convicted felon.  But Defendants make no attempt to do so.  They simply rely on a host of cases that reaffirm the unexceptional principle that people *convicted of crimes* or who are *mentally ill* may be treated differently for Second Amendment purposes.  *See* Defs.' Mem. ISO Mot. to Dismiss (Mot.) at 28-34 (citing *Schrader v. Holder*, 704 F.3d 980, 982, 990 (D.C. Cir. 2013) (plaintiff was barred from gun ownership because of assault and battery conviction); *Caniglia v. Strom*, 953 F.3d 112, 125, 130-31 (1st Cir. 2020) (confiscation of firearms from individual "reasonably believe[d] to be experiencing acute mental health crises"); *Berron v. Illinois Concealed Carry Licensing Review Bd.*, 825 F.3d 843, 847 (7th Cir. 2016) ("Illinois is entitled to check an applicant's record of *convictions*, and any concerns about his *mental health*, close to the date the applicant proposes to go armed on the streets.") (emphases added); *Whitaker*, 913 F.3d at 154 (plaintiff convicted of falsifying a mortgage application challenged application of federal law barring firearm ownership by felons)).  Those cases simply have no bearing on what limits—if any—can be placed on a person who has merely been arrested.

12

Consider, for example, *Medina v. Whitaker*, which Defendants cite repeatedly.  There, the plaintiff challenged a federal law prohibiting convicted felons from owning firearms.  913 F.3d 152, 154 (D.C. Cir. 2019).  The plaintiff had been convicted of multiple crimes: a felony in 1991 for "grossly misrepresent[ing] his income on a mortgage finance application to qualify for a $30,000 loan," and a misdemeanor in 1996 for making false statements on an application for a hunting license.  *Id.*  The D.C. Circuit affirmed dismissal of the plaintiff's lawsuit, and held that he was outside the Second Amendment's protections, but was clear that its holding extended only to "those convicted of felonies."  *Id.* at 160.  In this case, on the other hand, Mr. Allen has not been convicted of any crimes, let alone felonies related to dishonesty like in *Whitaker*.  Compl. ¶¶ 5-10, 103-131.  Nor is Mr. Allen "unvirtuous" as that phrase is used in *Whitaker*: the D.C. Circuit defined "unvirtuous citizens" as "criminals," 913 F.3d at 159, but Mr. Allen has not been convicted of any crimes, Compl. ¶¶ 5-10, 103-131.

Mr. Allen "is a responsible, law-abiding citizen" who, under *Wrenn*, is entitled to carry a firearm in D.C.   Compl. ¶¶ 263.   That right is protected by the core of the Second Amendment and Defendants' deprivation of it must be analyzed under intermediate scrutiny.

**B.   Defendants have not met their burden under intermediate scrutiny to show that Mr. Allen's Second Amendment claim should be dismissed.**

Intermediate scrutiny puts the burden on the Defendants to establish that the regulation at issue is "substantially related to an important governmental objective by showing that the harms to be prevented by the regulation are real, not merely conjectural, that the regulation will in fact alleviate these harms in a direct and material way, and that the means chosen are not substantially broader than necessary to achieve that interest."  *Medina v. Sessions*, 279 F. Supp. 3d 281, 291 (D.D.C. 2017) ("*Sessions*"), *aff'd sub nom. Medina v. Whitaker*, 913 F.3d 152 (D.C. Cir. 2019).  Defendants cannot satisfy

that burden and have not done so in their motion to dismiss.  The Second Amendment claims should proceed because Defendants' policy was unconstitutional on its face and as applied to Mr. Allen.

**1.    Defendants' policy is unconstitutional on its face.**

Although the exact bounds of Defendants' policy are not known because Defendants have never provided a written description of that policy to Mr. Allen or allowed him to conduct any discovery of it, based on MPD's and its counsel's representations, it is apparent that the policy violates the Second Amendment and fails intermediate scrutiny review for multiple reasons.

*First*, Defendants arbitrarily decided to revoke (and defend the revocation of) Mr. Allen's CPL, but not his firearm registration certificate.  (The latter was initially revoked at the same time as the CPL but then re-issued after Mr. Allen appealed.)   Therefore, effectively, Defendants' position, embodied in its policy, is that people with criminal records (regardless of the facts underlying the records) can possess firearms in their home but not carry them in public.  That assertion contradicts the D.C. Circuit's decision in *Wrenn*, which repeatedly emphasized that "the rights to keep and bear arms are on equal footing" and "that the law must leave responsible, law-abiding citizens some reasonable means of exercising each."  864 F.3d at 663; *see also id.* at 657("But the fact that the need for self-defense is most pressing in the home doesn't mean that self-defense at home is the only right at the Amendment's core.  After all, the Amendment's 'core lawful purpose' is self-defense, and the need for that might arise *beyond* as well as *within* the home." (emphasis added)).  Yet Defendants have offered no evidence or support in the motion to dismiss for treating those two rights differently.  Instead, the motion to dismiss baldly asserts that "[a]llowing an individual to carry a firearm in public presents a greater risk to public safety and does not involve the right to defend one's home."  Mot. at 32.  That assertion contradicts the D.C. Circuit's decision in *Wrenn*, and is unsupported by any citation to law or fact.

*Second*, Defendants have not satisfied their burden to show that a history of arrests, especially without underlying facts or information about the adjudication of the arrests, makes someone more dangerous to the public.  In lieu of evidence, Defendants argue in passing that "MPD relied on its expertise in law enforcement to conclude that the 'typical' individual has not been frequently arrested for drugs, gambling, and guns."  Mot. at 31.  Again, Defendants cannot rely on their own say-so to establish that the "harms to be prevented" by the policy "are real, not merely conjectural, that the regulation will in fact alleviate these harms in a direct and material way."  *See Sessions*, 279 F. Supp. 3d at 291.  To the contrary, the cases cited above consistently hold that prior arrests alone are irrelevant to a person's guilt and cannot be used as evidence.  *See supra* Section I.A.

The federal and D.C. government have both recognized as much in barring the consideration of prior arrests in housing and employment decisions, respectively.  U.S. Dep't of Housing and Urban Development, *Office of General Counsel Guidance on Application of Fair Housing Act standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions* ("HUD Guidance"), April 4, 2016, https://perma.cc/2GK8-62NZ; D.C. Office of Human Rights, *OHR Guidance No. 16-02: Ban the Box: Fair Criminal Record Screening Act*, Sept. 29, 2016, https://perma.cc/QR97-NWQN.  The U.S. Department of Housing and Urban Development (HUD) guidance on the issue states, "[b]ecause arrest records do not constitute proof of past unlawful conduct and are often incomplete (e.g., by failing to indicate whether the individual was prosecuted, convicted, or acquitted), the fact of an arrest is not a reliable basis upon which to assess the potential risk to resident safety or property posed by a particular individual."  HUD Guidance at 5.  "For that reason," HUD continued, "a housing provider who denies housing to persons on the basis of arrests not resulting in conviction cannot prove that the exclusion actually assists in protecting resident safety and/or property."  *Id.*  Likewise, Defendants "cannot prove" that revoking CPLs based on arrests alone "actually assists in protecting [public] safety."

*Third*, and relatedly, Defendants' policy is substantially broader than necessary to achieve its claimed interests in public safety.  Canceling the constitutional rights of law-abiding citizens like Mr. Allen based on history of arrests alone is a blunt instrument for keeping concealed firearms out of the hands of individuals who have a demonstrated propensity for violence.  Where constitutional rights are at stake, Defendants are obligated to do their homework, including by confirming whether there is credible evidence of violent conduct that led a person to be arrested in the first place.  Indeed, D.C. law already disqualifies convicted felons from securing CPLs.  Compl. ¶ 37 (citing D.C. Code § 7-2502.03(a)(3)).  Instead, Defendants' policy sweeps in and denies of their constitutional rights people who have not been convicted of any crimes, are not dangerous or criminals, and by D.C.'s own (prior) judgment had satisfied all the applicable requirements for carrying firearms.  *See* Compl. ¶¶ 34-64, 71-102.  Moreover, the discriminatory effect of such a policy is apparent because Black individuals, including in D.C., are disproportionately likely to have encounters with the criminal justice system regardless of guilt.  *See* Compl. ¶¶ 13-15.

Taking as true that Defendants were worried about public safety and crime prevention in enacting its new policy, there are many narrower ways that they could have regulated CPL licensing to address those goals.  Indeed, D.C.'s licensing scheme already regulates concealed pistol in some of those ways, such as prohibiting individuals recently convicted of violent offenses from concealed pistol.  Notably, Mr. Allen is not disputing that Defendants could use prior arrests or charges as part of a holistic analysis of an applicant's background and suitability—so long as Defendants actually have *sufficient* evidence of illegality or improper conduct by the applicant.  Here, though, Defendants have no such evidence at all and improperly chose to use Mr. Allen's prior arrests as their entire analysis—

without considering the resolution of the cases or the lack of evidence presented against Mr. Allen in the cases.[4]

### 2.        Defendants' policy is unconstitutional as applied to Mr. Allen.

In addition to Defendants' policy being facially unconstitutional, the application of that policy to Mr. Allen violated his Second Amendment rights.  The D.C. Circuit has recognized that individual plaintiffs with criminal records—even convictions, which Mr. Allen does not have—can defeat a motion to dismiss by properly alleging facts which, if proven true, would demonstrate that they fall within the "class of 'law-abiding, responsible citizens.'"  *See Schrader v. Holder*, 704 F.3d 980, 991 (D.C. Cir. 2013) ("To the extent that these allegations are true, we would hesitate to find Schrader outside the class of 'law-abiding, responsible citizens' whose possession of firearms is, under *Heller,* protected by the Second Amendment.").

That is exactly what Mr. Allen did here.  As alleged in the Complaint, Mr. Allen is a responsible, law-abiding citizen and lifelong resident of D.C.  Compl. ¶¶ 65, 263.  Mr. Allen is also a father and a small business owner.  Compl. ¶¶ 65-66.  Additionally, like an unfortunate number of Black men in D.C., and around the United States, Mr. Allen has been arrested and jailed in the past

---

[4] Mr. Allen disagrees with Defendants that "rational basis" review is appropriate for evaluating D.C.'s policy and deprivation of core Second Amendment rights. Mot. at 32.  "Because the right to keep and bear arms is enumerated in the Constitution, courts cannot subject laws that burden it to mere rational-basis review."  *See Silvester v. Becerra*, 138 S. Ct. 945 (2018) (Thomas, J., dissenting from denial of certiorari).  However, even if the Court applies rational basis review, the motion to dismiss should be denied.  The rational basis standard "has some teeth because it leads to the abrogation of a law whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *AFL-CIO v. United States*, 195 F. Supp. 2d 4, 12 (D.D.C. 2002) (internal quotations omitted).  Here, revoking Mr. Allen's concealed carry license was "not a rational means of advancing a legitimate government purpose."  *Hettinga v. United States*, 677 F.3d 471, 478 (D.C. Cir. 2012).  The revocation was arbitrary and irrational, as well as corrosive to a "foundation of our criminal law," because it equated the fact of criminal arrests with evidence of guilt. *See Nelson*, 137 S. Ct. at 1255-56.  It is more likely that the Court would apply strict scrutiny and require that the government action "be narrowly tailored to a compelling public interest," *see Wrenn*, 864 F.3d 650 at 656, a test that Defendants would fail given their brazen and continued reliance on arrests as evidence of conduct.

for crimes of which he was innocent, as well as for minor drug and gambling offenses that were resolved without a conviction. Compl. ¶ 136. But as explained repeatedly above, *see supra* Section I.B, there was no evidence or additional information underlying Mr. Allen's arrest record to justify the extraordinary step of revoking a CPL that was issued months earlier and where nothing had changed about Mr. Allen's record or suitability. Further, the arrests mostly were for nonviolent offenses allegedly occurring years ago. The most serious charges either did not result in an indictment or were outright expunged after additional investigation by the government. Compl. ¶ 151. The government has not given the Court any reason to "hesitate to find [Mr. Allen] outside the class of 'law-abiding, responsible citizens." *Schrader*, 704 F.3d at 991.

The Defendants' therefore violated Mr. Allen's Second Amendment rights when they revoked his CPL.

## II.    Mr. Allen Adequately Pleaded That Defendants Violated the Fifth Amendment.

"A procedural due process violation occurs when an official deprives an individual of a liberty or property interest without providing appropriate procedural protections." *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 689 (D.C. Cir. 2009). Mr. Allen's procedural due process claims should survive Defendants' motion because he has plausibly alleged that Defendants deprived him of liberty and property interests in his CPL "without providing appropriate procedural protections," and through a demonstrably unfair process. *Id* at 689.

### A.    Defendants violated Mr. Allen's rights by imposing an irrebuttable presumption that prior arrests alone demonstrated a propensity for violence.

Under Defendants' policy, MPD presumes that a person has a "propensity for violence" based solely on a history of criminal arrests—regardless of whether the arrests resulted in formal charges or were ever proven, or (as in Mr. Allen's case) disproven, abandoned, and even expunged.

That sort of "irrebuttable presumption" that has "long been disfavored under the Due Process Clause[]." *See Vlandis v. Kline*, 412 U.S. 441, 446 (1973); *see also Bell v. Burson*, 402 U.S. 535 (1971); *Carrington v. Rash*, 390 U.S. 89 (1965). Courts have long rejected governmental schemes based on this kind of presumption, where the "presumption is not necessarily or universally true" and the government "has reasonable alternative means of making the crucial determination." *See Vlandis*, 412 U.S. at 452. The question is the "adequacy of the 'fit' between the classification and the policy that the classification serves." *See Michael H. v. Gerald D.*, 491 U.S. 110, 121 (1989).

Here, Defendants' policy does not "fit" the objective that it serves—determining whether an individual has a "propensity for violence"—and as a result, the policy impermissibly burdens the exercise of the constitutional right to concealed carry. *See id.*; *cf. Weinberger v. Salfi*, 422 U.S. 749, 772 (1975) (explaining that presumptions may not target "a constitutionally protected status"). Under Defendants' policy, MPD presumes that a person has a "propensity for violence" based *solely* on a history of criminal arrests—regardless of whether the arrests resulted in formal charges or were ever proven, or (as in Mr. Allen's case) disproven, abandoned, and even expunged. But it is not "necessarily or universally true" that a person with a criminal record will have a "propensity for violence." *See Vlandis*, 412 U.S. at 452. As discussed previously, "[a]n arrest shows nothing more than that someone probably suspected the person apprehended of an offense." *See Schware*, 353 U.S. at 241. Indeed, MPD's policy draws precisely the opposite presumption from that ingrained in American jurisprudence since the country's founding: the presumption of innocence "unless and until" proven guilty. *See Nelson*, 137 S. Ct. at 1255; *see also Coffin*, 156 U.S. at 456 (the presumption of innocence is "found in every code of law which has reason and religion and humanity for a foundation" (citation omitted)). MPD's irrebuttable presumption does not actually help determine whether a person has a "propensity for violence," and so does not "fit" the objective it purports to serve.

Moreover, there are other "reasonable alternative means" of determining whether someone has a "propensity for violence."  To start, the government could simply look into the factual record surrounding a person's arrest to determine whether there is any evidence *beyond the mere fact of arrest* that would indicate that the person has engaged in behavior that suggests a "propensity for violence."  The government might also "establish [] reasonable criteria" for evaluating an individual's criminal history, in light of the nature of the arrests, the facts surrounding those arrests, and any other factors that could bear on whether a person has a propensity for violence.  *See Vlandis*, 412 U.S. at 453.  What the government cannot do is set up an irrational presumption that any person accused of a crime has a propensity for violence, place the burden on the accused to rebut the presumption with "substantial evidence," *see* Mot. at 23, and then simultaneously ignore the evidence rebutting the presumption.

**B.**  **Defendants deprived Mr. Allen of due process through their revocation of his CPL.**

Defendants also failed to provide Mr. Allen with due process of law during their revocation of his CPL.  Courts "follow a two-step process" in evaluating procedural due-process claims:  first, whether the plaintiff has asserted an "interest encompassed within the protection of the due process clause," and second, whether plaintiff has alleged a failure to provide the "process [that] was due."  *See Propert v. D.C.*, 948 F.2d 1327, 1331 (D.C. Cir. 1991).  Mr. Allen's allegations satisfy both steps of that analysis.

**1.**  **Mr. Allen has protected liberty and property interests in his CPL.**

"A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies."  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (internal citations omitted).  In this case, Mr. Allen's protected interest arises from both, but the Court's analysis can begin and end with the Constitution.

Mr. Allen has an indisputable liberty interest arising from the Constitution.  As the Supreme Court has explained, the Due Process Clause "provides heightened protection against government interference with certain fundamental rights and liberty interests," which include "*the specific freedoms protected by the Bill of Rights.*"  *See Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (emphasis added). The Bill of Rights, of course, includes the Second Amendment, and those rights are thus entitled to "heightened protection against government interference."  *See McDonald v. City of Chicago*, 561 U.S. 742 (2010) (individual rights under the Second Amendment are "deeply rooted in this Nation's history and tradition" (quoting *Glucksberg*, 521 U.S. at 721)); *D.C. v. Heller*, 554 U.S. 570, 595 (2008); *see also Doe I v. Evanchick*, 355 F. Supp. 3d 197, 217 (E.D. Pa. 2019) ("From *Heller* and *McDonald*, it is clear that the right to bear arms is a protected liberty interest.").  In other words, after *Heller*, "the right to possess arms (among those not properly disqualified) is no longer something that can be withdrawn by government on a permanent and irrevocable basis without due process."  *United States v. Rehlander*, 666 F.3d 45, 48 (1st Cir. 2012).

As laid out above, *see supra* Section I.A, Mr. Allen's right as a responsible citizen to carry a firearm outside his home is at the "core of the Second Amendment's protections," *Wrenn*, 864 F.3d at 667, and that right is therefore a "protected liberty interest," *see Rehlander*, 666 F.3d at 48; *Doe I*, 355 F.Supp.3d at 217; *Fisher v. Kealoha*, No. CIV. 11-00589 ACK, 2012 WL 2526923, at *8 (D. Haw. June 29, 2012) ("[B]ecause Plaintiff has a clear Second Amendment right to bear arms for self-defense within the home, Defendants' denial of this right without a meaningful opportunity to be heard or to have the decision reviewed likely impacts Plaintiff's right to procedural Due Process pursuant to the Fourteenth Amendment."); *Simmons v. Gillespie*, No. 08-CV-1068, 2008 WL 3925157, at *3 (C.D. Ill. Aug. 1, 2008), *report and recommendation adopted* No. 08-CV-1068, 2008 WL 3876145 (C.D. Ill. Aug. 20, 2008) (noting that plaintiff may have liberty interest in possession of firearms and therefore the Court

could not "rule out" a federal procedural due process claim). The government cannot interfere with that right without first providing due process of law.

Defendants' motion essentially ignore the constitutional foundations of Mr. Allen's protected liberty interest. Defendants first improperly seek to narrow Mr. Allen's asserted liberty interest by suggesting that his interest is limited to "carrying a firearm *for his employment*,"[5] and then argue in a single sentence that the "Due Process Clause does not . . . guarantee him such 'liberty.'" Mot. at 18. (emphasis added). As discussed above, the Supreme Court and the D.C. Circuit have made clear that "such liberty" is guaranteed by the Second Amendment, and thus protected by the Due Process Clause.

The cases cited by Defendants do not change that. The first case cited, *Erdelyi v. O'Brien*, 680 F.2d 61, 63 (9th Cir. 1982), is an out-of-circuit decision that predated the Supreme Court's decisions in *Heller* and *McDonald*. The decision held only that the plaintiff lacked a protected liberty or property interest under California law. *See id.* at 63. That holding was predicated on an outdated legal regime and another state's firearms policies—neither of which are relevant to Mr. Allen's case. The second case, *Haeker v. Linder*, No. 16-26, 2016 WL 3976610 (D. Mon. July 2016), involved the revocation of a plaintiff's concealed pistol permit after a local court entered a protective order against him. *Id.* at *1. There, the court held that there was no liberty or property interest because Ninth Circuit precedent foreclosed any argument that the Second Amendment "encompasses the right to carry concealed firearms in public." *Id.* at *3 ("This controlling authority precludes Haeker's argument that the Second Amendment affords protection to those who wish to carry concealed firearms and renders Haeker's

---

[5] As Mr. Allen repeatedly alleged throughout his Complaint, he asserts his constitutional right as a "responsible citizen" "to carry common firearms beyond the home for self-defense." *See Wrenn*, 864 F.3d at 661. Nowhere in his Complaint did Mr. Allen argue that this right depends on his possible interest in carrying a firearm in the course of his job. Moreover, the D.C. Circuit has squarely rejected the notion that the government can require a person to show a "special self-defense need[]" in order to exercise the core constitutional right to concealed carry. *Wrenn*, 864 F.3d at 656, 663.

Second Amendment claim legally deficient."). Here, by contrast, "controlling authority" from the D.C. Circuit makes clear that the Second Amendment protects the right to "carry common firearms beyond the home." *Wrenn*, 864 F.3d at 661. Applying the logic from *Haeker* therefore leads to the conclusion that Mr. Allen has a protected liberty interest based in the Constitution.

Although this Court may end its analysis there, Mr. Allen also has both protected liberty and property interests in his CPL under D.C. law. *First*, Mr. Allen has a liberty interest arising out of D.C. law. *See Kuck v. Danaher*, 600 F.3d 159, 164 (2nd Cir. 2010) (holding that a person's "stake in [a] firearm license is a liberty interest tied to the right to bear arms recognized by state law"). D.C.'s licensing regulations mirror the structure of other state laws that the Supreme Court has recognized to create protected liberty interests. Specifically, D.C.'s licensing regulations "use[] mandatory language ('shall')" to "create a presumption" that a license will be issued "when the designated findings are made." *Bd. of Pardons v. Allen*, 482 U.S. 369, 375 (1987) (*quoting Greenholtz v. Inmates of Neb. Penal & Corr. Compl.*, 442 U.S. 1, 12 (1979)). In D.C., an applicant must satisfy seven "eligibility" requirements to receive a CPL including the requirement that a person be "suitable" for the license. *See* Compl. ¶¶ 51-57; 24 DCMR § 2332.1. Whether a person is "suitable" is in turn determined based on five additional requirements. *See id.* § 2335.1. "A completed application shall satisfy all the requirements[.]" *See id.* § 2340.2. Once an application is completed, the regulations instruct that "the Chief *shall* issue a license to carry a concealed pistol *or* provide a written denial of the application . . . contain[ing] the reasons the application was denied." *Id.* § 2340.1, 2340.3 (emphasis added).

D.C. regulations thus *require* the Chief either to issue the license based on a finding that the applicant satisfies all the requirements, or to provide a reasoned explanation as to why the applicant does not. The presumption then is that a license "is *required* [to be granted] after the [Chief] determines (in its broad discretion) that the necessary prerequisites exist." *See Allen*, 482 U.S. at 376 (emphasis in original). This mandatory, multi-factor licensing scheme shares precisely the same structure as state

23

statutes that the Supreme Court has recognized as creating protected liberty interests.  In those cases, as here, the regulatory scheme creates a protected liberty interest even though an official's exercise of "broad discretion" requires "an equity-type judgment involving 'a synthesis of record facts and personal observation . . .  leading to a predictive judgment as to what is best both for the individual [person] and for the community[.]'"  *Allen*, 482 U.S. at 375 (quoting *Greenholtz*, 442 U.S. at 8). Furthermore, D.C.'s licensing scheme even more clearly creates a liberty interest because federal law compels that D.C. grant a CPL to a "typically situated" and "law-abiding" person who otherwise satisfies the regulatory requirements.  *See Wrenn*, 864 F.3d at 667-68.

Defendants insist that the "built-in flexibility" of the licensing requirements means that Mr. Allen has no protected interest in his license.  Mot. at 15.  But the Supreme Court has rejected the idea that the type of discretion afforded to Defendants under D.C.'s licensing regulations necessarily deprives a person of the liberty interest created by state law.  Although discretion that is unencumbered by any standards may not create a property interest, here the decisionmaker's exercise of discretion requires the official to "use judgment in applying the standards set him [or her] by authority."  *Allen*, 482 U.S. at 375 (quoting Ronald Dworkin, Taking Rights Seriously 31-32 (1977)).  If the exercise of this discretion requires "mandatory" application of prescribed standards, then even if the decision is "necessarily subjective" and the discretion "very broad," those standards establish "a liberty interest protected by the Due Process Clause."  *See id.* at 380-81 (*quoting Greenholtz*, 442 U.S. at 13).

The caselaw cited by Defendants is inapposite.  Defendants cite several cases from jurisdictions that either have not recognized a constitutional right to carry a concealed pistol or predate the recognition of that right.  Mot. at 16-17 (citing cases in Second and Ninth Circuits).  But the D.C. Circuit recognized that constitutional right in *Wrenn*, so there is no question here that a protected liberty interest arises under the Constitution.  Defendants also rely on a number of cases concerning state licensing schemes that give officials greater discretion to deny or revoke concealed-carry licenses

than is provided by D.C.'s licensing regulations.  In one case, the state statute at issue allowed revocation for any "good cause," *see Reilly v. Lebanon Cnty.*, No. 1:16-1469, 2016 WL 7404591, at *4 (M.D. Pa. Dec. 22, 2016), and in two others, the state statutes used permissive language (the licensing authority "may issue" a concealed-carry permit) to afford officials greater discretion in granting licenses than is provided by D.C.'s mandatory language ("shall issue").  *See Erdelyi*, 680 F.2d at 63; *Hayward v. Massachusetts*, No. 16-30046, 2016 WL 11189805, at *10 (D. Mass. Nov. 14, 2016).  Because MPD's discretion is cabined by D.C.'s regulatory framework, D.C. law creates a liberty interest in a CPL, where those more permissive statutes operating in different legal landscapes do not.  Finally, Defendants cite one case, *Gross v. Norton*, that addresses a person's right to carry a concealed weapon at work, an issue that is wholly irrelevant to this case.  120 F.3d 877, 878 (8th Cir. 1997).

*Second*, because D.C. affirmatively granted Mr. Allen a CPL, he has a property interest in that license.  As courts have long recognized, "once granted, the license becomes a right, and due process of law must be followed to achieve deprivation.  This is true even though the license is a severely qualified one[.]"  *In re Carter*, 177 F.2d 75, 78 (D.C. Cir. 1949); *see also Hightower v. City of Boston*, 822 F. Supp. 2d 38, 56 (D. Mass. 2011) (finding a property interest in an unrestricted carry license and reasoning that "'[d]oubtless once a license, or the equivalent, is granted, a right or status recognized under state law would come into being, and the revocation of the notice [sic] would require notice and hearing as' required by due process." (quoting *Medina v. Rudman*, 545 F.2d 244, 250 (1st Cir. 1976)); *Donofrio v. City of New York*, No. 04-CV-3336, 2009 WL 6388381, at *3-*4 (E.D.N.Y. Sept. 24, 2009) (denying defendants summary judgment for failure to show no liberty interest existed in "an already-issued gun license"); *Greenlee v. Bd. of Med. of D.C.*, 813 F. Supp. 48, 56 (D.D.C. 1993) ("present enjoyment is integral to the existence of a property entitlement").  Once a license is granted, the question is "whether the permit holder has 'more than a unilateral expectation' in the permit's continued effect."  *See 3883 Connecticut LLC v. D.C.*, 336 F.3d 1068, 1072 (D.C. Cir. 2003).

Here, the Chief's discretion is "constrained sufficiently" to give Mr. Allen "an expectation in the continued effect of [his license]—and therefore a property interest in [the CPL]." *Id.* at 1073. Specifically, D.C. regulations provide that the Chief "may revoke a concealed carry license" only after making a finding either that the licensee no longer satisfies a requirement or otherwise failed to comply with the requirements or the law. *See* 24 DCMR § 2341.1. The regulations also allow the Chief to limit a license after its issuance "upon a finding by the Chief that such limitation is necessary to protect the health, safety, security, or welfare of the District and its residents," *id.* § 2341.2, and to "summarily suspend or limit" a license if the conduct of a licensee "presents an imminent danger to the health and safety of a person or the public," *id.* § 2341.5. These regulations provide the Chief reasonable flexibility to ensure public safety, but do not amount to unfettered discretion. *See 3883 Connecticut LLC*, 336 F.3d at 1073. The substantive limits on the Chief's discretion to revoke or suspend already-issued licenses demonstrate that licensees, like Mr. Allen, have a protected property interest in the "continued effect" of their licenses. *See id.*; *see also Spinelli v. City of New York*, 579 F.3d 160, 169 (2d Cir. 2009) ("Where a license can be 'suspended only upon a satisfactory showing' of misconduct, the licensee has 'a property interest in his license sufficient to invoke the protection of the Due Process Clause.'" (quoting *Barry v. Barchi*, 443 U.S. 55, 64 (1979)).

Therefore, whether the Court looks to the Constitution or D.C. law, Mr. Allen has protected liberty and property interests in his CPL.

## 2.     Defendants deprived Mr. Allen of those interests without due process.

Defendants deprived Mr. Allen of his interest in his CPL without due process. Specifically, Defendants did not provide notice to Mr. Allen of the critical issues to be addressed by the Defendants in evaluating the revocation of his license; Defendants did not produce the new policy they used to revoke Mr. Allen's rights; Defendants did not provide Mr. Allen with a hearing or meaningful opportunity to challenge the fundamental errors of the Defendants' analyses, fact-finding, and

decisionmaking; Defendants did not provide an opportunity for Mr. Allen to present evidence demonstrating the error of depriving him of his liberty and property; and Defendants' unfairly placed the burden on Mr. Allen to disprove dated arrests and allegations against him, and then ignored the proof he presented.  Compl. ¶ 258.

At minimum, the core requirements of due process are "adequate notice" and "a genuine opportunity to explain."  *See Gray Panthers v. Schweiker*, 652 F.2d 146, 165 (D.C. Cir. 1980).  The "precise form" of process required depends upon a balancing of the *Mathews* factors:  "(1) the private interest affected by the government action; (2) the risk of erroneous deprivation and the value of additional safeguards; and (3) the government's interest, including the fiscal and financial burdens that additional or substitute procedural requirements would entail."  *See Propert*, 948 F.2d at 1332 (*citing Mathews v. Eldridge*, 424 U.S. 319, 335 (1976)).  And balancing the *Mathews* factors here, Mr. Allen was due more process than he received.

**Mr. Allen's private interest.**  As discussed above, Mr. Allen has a "significant" private interest in his CPL that arises from the Constitution, as well as D.C. law.  *See supra* Section II.B.1.  Although this interest is "not overwhelming or absolute," it is "an interest that is highly valued by many . . . citizens."  *Kuck*, 600 F.3d at 165.  And given the importance of this interest, licensees "are entitled to basic due process protections, including a meaningful opportunity to be heard after a denial or revocation."  *Id.*

**Risk of error.**  Without additional procedural safeguards, there is serious "risk of error," such as the Defendants' error in revoking Mr. Allen's license.  *Propert*, 948 F.2d at 1333.  During their recent audit, Defendants revoked Mr. Allen's license based solely on his years-old arrest history, concluding that this fact alone demonstrated that Mr. Allen has a propensity for violence.  Defendants' assumption creates a serious risk—even probability—that Defendants will improperly revoke the licenses of qualified and suitable citizens in violation of their Second Amendment rights.  As discussed

above, "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct." *Schware*, 353 U.S. at 241.

Defendants' blanket treatment of anyone with a history of criminal arrest(s)—regardless of the alleged offense, resolution of the case, or other particularized circumstances—as "unsuitable" for a CPL means that Defendants will inevitably revoke the licenses of some people who did not warrant revocation. *See, e.g.*, *Stanley v. Illinois*, 405 U.S. 645, 654 (1972). Indeed, since the filing of Mr. Allen's Complaint, counsel has become aware of a number of other Black men like Mr. Allen who have had their licenses revoked based solely on a history of criminal arrests that were known to MPD at the time the licenses were initially granted. Moreover, regarding Mr. Allen's firearm registration certificate, Defendants have already admitted, after reevaluation of Mr. Allen's record, that they had revoked the certificate in error. Compl. ¶¶ 160-61. Defendants' policy thus "needlessly risks running roughshod over the important interests" of many responsible, law-abiding citizens—and more specifically here, of responsible, law-abiding Black citizens in D.C. *See Stanley*, 405 U.S. at 657.

This risk of error is multiplied by Defendants' failure to provide actual notice of the reasons for their revocation decisions. In Mr. Allen's case, Defendants' conclusory revocation letter and administrative filings entirely failed to explain why the mere fact of these years-old arrests, the most serious of which were abandoned by the government, would justify revoking his license. Defendants provided no evidence to support the revocation decision beyond the mere fact of Mr. Allen's arrest history. As a result, Defendants never truly gave Mr. Allen notice of the "critical issues" to be addressed by the CPLRB—namely the basis for finding that Mr. Allen had a propensity for violence.[6] *See Nnebe v. Daus*, 931 F.3d 66, 88 (2d Cir. 2019) (quoting *Turner v. Rogers*, 564 U.S. 431, 447 (2011)).

---

[6] Defendants assert that Mr. Allen did not "actually allege that he was unaware of the reasons why MPD was revoking his license. Mot. at 24. Mr. Allen made this precise allegation throughout his Complaint. *See* Compl. ¶¶ 143, 149, 169, 226, 227, 229, 258.

And because Mr. Allen never had true notice of the reasons for or the evidence supporting Defendants' decision, he could not meaningfully evaluate or respond to those reasons or effectively challenge any purported "evidence" relied on by Defendants.  *See Greene v. McElroy*, 360 U.S. 474, 496 (1959) ("[W]here governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue.").

Mr. Allen thus never had a genuine opportunity to show that the Defendants' analysis and conclusions were wrong.  Mr. Allen could not rebut the specific inferences that Defendants drew from his arrest history, because Defendants never disclosed those inferences; Mr. Allen could not test the veracity of any facts that Defendants relied upon, because Defendants never disclosed those facts either; and without the opportunity to develop a factual record, Mr. Allen could not present additional evidence to dispel the stigma of years-old arrests because "it is exceedingly difficult to prove a negative."  *See Kaur v. Maryland*, No. 19-1045, 2020 WL 5882039, at *2 (U.S. Oct. 5, 2020) (Sotomayor, J., statement respecting the denial of certiorari).  Mr. Allen was not even permitted to compare his record and that of the licensee whose self-defense shooting apparently inspired the changed policy. In sum, there is no doubt that "additional safeguards" would have provided significant "value" here, and in light of all of these circumstances, the Due Process Clause compels it.

***Government's interest.***  Additional process would not impose a significant burden on the D.C. government, or interfere with D.C.'s legitimate interests in protecting public safety.  Mr. Allen is not suggesting that *only* criminal convictions can lead to denial or revocation of a CPL—just that if D.C. is going to deny applicants a CPL based on a record of arrests, it must review the facts underlying those arrests and provide its analysis of those facts and the governing policy to the applicant so that he or she has an opportunity to challenge that determination.  Of course, providing additional process could impose *some* burden on D.C.: "Procedure by presumption is always cheaper and easier than

individualized determination." *Stanley*, 405 U.S. at 656-57. But, if D.C.'s intended aim here is to restrict dangerous individuals from possessing CPLs, the additional process urged by Mr. Allen would better serve that legitimate interest without depriving an applicant's constitutional rights simply because the applicant has been arrested in the past.

Defendants make much of Mr. Allen's purported failure to assert his right to a hearing in the administrative appeal process. Mot. at 25. But the fact is that Mr. Allen *did* assert his right to an evidentiary hearing in his March 26, 2020 reply to the CPLRB. *See* Compl. ¶¶ 11, 155, 176, 195-196, 237, 279-82. In that reply, Mr. Allen challenged MPD's application of the "propensity for violence" standard, noting that a hearing *should* not be necessary because the "MPD Defendants had not introduced any evidence of his conduct and instead relied on the mere fact of criminal charges in attempting to revoke the concealed pistol license." Compl. ¶ 194. Mr. Allen also explained, however, that if CPLRB accepted MPD's application of its new policy, that he would need an evidentiary hearing and that he was "entitled to examine additional witnesses, documents, and evidence to show his license should be reinstated." Compl. ¶¶ 195-96. There is nothing controversial or contradictory about Mr. Allen's position that he deserved an evidentiary hearing before the government deprived his right to carry a firearm, but such a hearing would be unnecessary if the right was not going to be deprived. More broadly, Defendants' focus on the Mr. Allen's request for an in-person "hearing" unfairly avoids the thrust of his argument—that more process generally was required before deprivation of the CPL.

*     *     *

Mr. Allen has genuine grievances with the deficiencies in the process provided to him—he is not simply "reargue[ing] the merits of his case." Mot. at 28. Mr. Allen has alleged that Defendants did not provide sufficient notice, such that he was unaware of the critical issues to be addressed, or what evidence, if any, he needed to present; Defendants did not produce or explain the new policy they used to revoke Mr. Allen's rights; Defendants did not provide Mr. Allen with a meaningful

opportunity to attend a hearing where he could explain the fundamental errors of the Defendants' decisionmaking; Defendants did not provide an opportunity for Mr. Allen to present evidence demonstrating the error of depriving him of his liberty and property; Defendants' ultimate reason for depriving Mr. Allen of his liberty and property unfairly placed the burden on Mr. Allen to prove his suitability to exercise his constitutional rights; and Defendants' arbitrary apparent reversal of their policy with regard to Mr. Allen's irrelevant prior arrests made it impossible to understand the Defendants' reasons for depriving Mr. Allen of his liberty and property.  Compl. ¶ 258.

Mr. Allen's allegations, at minimum, present "a factually laden claim that can neither be dismissed nor summarily adjudged."  *See McCabe v. Barr*, No. CV 19-2399, 2020 WL 5668711, at *20 (D.D.C. Sept. 24, 2020).  Defendants' motion to dismiss Mr. Allen's procedural due process claims should be denied.

### C.   Mr. Allen diligently pursued his objections through appeals procedures established by D.C. law.

Defendants mistakenly contend that Mr. Allen's due process claims should be dismissed because he did not "avail[] himself of available procedures under District of Columbia law" by first taking his case to the D.C. Court of Appeals.  Mot. at 19.

As an initial matter, Mr. Allen is entitled to bring his constitutional claims in federal court, and the U.S. Supreme Court has "on numerous occasions rejected the argument that a § 1983 action should be dismissed where the plaintiff has not exhausted state administrative remedies."  *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 500 (1982).  Moreover, in this case where Mr. Allen's rights under the Second Amendment and Fifth Amendment are inextricably intertwined with his rights under D.C. law, and where D.C. has demonstrated a repeated disregard of his constitutional rights, it is imperative that a federal court adjudicate Mr. Allen's claims.  Forcing Mr. Allen to bring a DCAPA claim or writ of mandamus to the D.C. Court of Appeals prior to asserting his due process claim

would place him in the position of having to litigate the basis of his Second Amendment claim outside of federal court in a manner that could have preclusive effect on such claims when raised in federal court, and could otherwise subject his claims to a slanted burden of proof after administrative fact finding. Such a posture could expose Mr. Allen to the unfair situation the Supreme Court recently condemned in *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162, 2167–69 (2019), where requirements to bring certain takings clause actions first in state litigation barred plaintiffs from having their federal claims fairly and fully adjudicated in federal court. *See also San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 347 (2005).

Nor do the D.C. firearm laws and regulations themselves require that an aggrieved individual appeal to the D.C. Court of Appeals before bringing colorable constitutional claims to federal court. To the contrary, they specify that the CPLRB is the proper entity to hear an appeal of a revoked CPL. *See* D.C. Code § 7-2509.02(g); 1 DCMR 2341.2(b). In fact, while the rules say that "[a] motion for reconsideration, rehearing, or re-argument shall not be a prerequisite to judicial review," they do not limit the forum in which judicial review may be sought. *See* 1 DCMR § 1222.5. And although Defendants claim now that Mr. Allen should have appealed the issue further within D.C., to its courts, the CPLRB's order on its face was a "*Final* Decision and Order Denying Appeal." Compl. ¶ 233 (emphasis added). There is nothing in the CPLRB's order itself requiring Mr. Allen to first appeal to the D.C. courts before bringing colorable constitutional claims to federal court.

The cases Defendants cite on this point are distinguishable. In *English v. District of Columbia*, for example, the plaintiff filed a lawsuit over a denied grievance—for earnings allegedly withheld from the plaintiff while he was a resident at Saint Elizabeths Hospital—without first challenging the decision under D.C. law. 717 F.3d 968, 970-71, 973-75 (D.C. Cir. 2013). The only review under D.C. regulations the plaintiff sought of his denied grievance was "a non-binding advisory opinion," and he failed to "seek a contested-case fair hearing as contemplated by [D.C.] regulations." *Id.* at 970-71,

973.  In this case the opposite is true: Mr. Allen sought *binding* reversals of the concealed pistol revocation from *official government decisionmakers* and sought a hearing, and one (the CPLRB) ignored his legitimate arguments and rubberstamped the initial decision.  Compl. ¶¶ 144-55, 192-216.  Therefore, Mr. Allen attempted to avail himself of the exact type of pre-judicial proceeding deemed lacking in *English*.

The other cases Defendants cite—*Chavis v. Garrett*, 419 F. Supp. 3d 24 (D.D.C. 2019) and *Medina v. District of Columbia*, 517 F. Supp. 2d 272 (D.D.C. 2007)—are inapposite for a different reason: those plaintiffs were not bringing valid, substantive constitutional claims in addition to their Fifth Amendment procedural due process claims.   Mr. Allen, on the other hand, is also bringing a substantive constitutional claim under the Second Amendment that could risk being subject to preclusive effects if the factual or legal bases for it were first litigated in the D.C. courts.  *See, e.g.*, *Knick*, 139 S. Ct. at 2167–69; *San Remo Hotel*, 545 U.S. at 347.  The court in *Medina* made clear that it was worried about opening the federal courts to "[c]laims that are, in essence, state law claims" that have been given "constitutional 'window dressing'" to "make[] the federal government the enforcer of state law."  *See* 517 F. Supp. at 280.  The "essence" of Mr. Allen's claims is not merely that he was treated illegally and unfairly during his appeal of the CPL revocation, but that the revocation itself was a violation of his core Second Amendment rights.  Further, both *Chavis* and *Medina* are cases in which the plaintiffs alleged some type of *inaction* by a D.C. agency that could reasonably be remedied through, for example, a mandamus action.  Mr. Allen is alleging an unconstitutional policy and wrongful conduct by multiple D.C. agencies and employees, and there is no reason to believe that a D.C. court reviewing those allegations under a deferential standard would be an adequate forum for determining their legality.  *See* D.C. Code § 2-510(a)(3).

Because Mr. Allen diligently pursued his objections through appeals processes prescribed by D.C. law, Compl. ¶¶ 61-64, 144-155, Defendants should not be permitted to avoid the adjudication of constitutional claims in this Court.

## III.    D.C. Cannot Escape Liability for Its Own Policy.

A municipality like D.C. can be held liable under § 1983 when the "municipality *itself* causes the constitutional violation at issue" through a "policy or custom." *Steinberg v. Gray*, 815 F. Supp. 2d 293, 299 (D.D.C. 2011) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) and *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 694 (1978)).  This liability extends to policies "approv[ed] through the body's official decisionmaking channels," as well as to practices "so permanent and well settled as to constitute a custom or usage." *Monell* at 691 (internal citation omitted).  The question is whether the municipality's policy is the "moving force" behind a constitutional violation. *Id.*

Defendants' argument to this Court—that there was no official policy at issue that would justify municipal liability, Mot. at 42-44—flies in the face of their own statements before the lawsuit was filed.  Specifically, when the CPLRB asked the MPD to explain its decision to revoke Mr. Allen's CPL despite there being no change in his record since the license was issued, the MPD wrote that decision resulted from "*a deliberate and principled change in the Chief of Police's position* on what it means to have 'exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another,' under D.C. Mun. Regs. tit. 24, § 2335.1(d)."  Compl. ¶ 175 (emphasis added).  That description fits perfectly the definition of a "policy" in the caselaw: "a deliberate choice to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing" such a position "with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).

Here, Mr. Allen has alleged that D.C.'s policy was the "moving force" behind constitutional and statutory violations that caused injury to Mr. Allen, and therefore that D.C. itself should be liable.

*See Monell* at 691.  D.C.'s policy—which has not yet been produced but that apparently authorized revoking or denying a CPL without evidence—enabled a series of serious errors, including the issuance of a defective revocation notice that did not tell Mr. Allen what was at issue, Compl. ¶ 236; refusing to hold a hearing or develop the evidentiary record to interrogate the validity of MPD's proposed revocation, Compl. ¶¶ 241, 247; unfairly burdening Mr. Allen with proving a negative and then ignoring the proof he offered, Compl. ¶¶ 248-53; and the arbitrary revocation of Mr. Allen's CPL based on the same set of facts that existed when it was initially granted, Compl. ¶ 256.

Defendants wrongly assert that Mr. Allen's allegations are too conclusory to establish municipal liability.  Mot. at 42.  As an initial matter, a complaint "need not allege all that a plaintiff must eventually prove."  *See Atchinson v. District of Columbia*, 73 F.3d 418, 421–22 (D.C. Cir. 1996). Regardless Mr. Allen has alleged several facts demonstrating D.C.'s involvement in the creation of the new policy: the Chief is the official responsible for investigating CPL applications, Compl. ¶ 58; the Chief revised his interpretation of 24 DCMR § 2335.1(d) in response to an incident unrelated to Mr. Allen that occurred after his CPL had been issued, Compl. ¶ 177; and the Chief revoked Mr. Allen's CPL pursuant to that changed policy, Compl. ¶ 175.  Because the MPD was the final decisionmaker here in terms of the alleged policy and its application to Mr. Allen, and because the matter is firmly within the MPD's authority, D.C. is liable as a municipality.  *See Sanders v. District of Columbia*, 85 F. Supp. 3d 523, 530–31 (D.D.C. 2015), *see Banks v. Booth*, 468 F. Supp. 3d 101, 119 (D.D.C. 2020) (finding that municipal liability exists "[b]ecause a final policy maker was involved in addressing the conditions of the DOC facilities in response to COVID-19, and because this was a matter within his authority").

Contrary to Defendants' arguments, Mr. Allen need not allege more than one incident of unconstitutional action to establish municipal liability: a "single action can represent municipal policy where the acting official has final policymaking authority over the 'particular area, or . . . particular

issue.'" *Compare* Mot. at 43, *with Thompson v. D.C.*, 832 F.3d 339, 347–48 (D.C. Cir. 2016) (citation omitted).  Moreover, even if the pervasiveness of Defendants' unconstitutional actions were relevant to municipal liability, it would be premature to dismiss municipal defendants before discovery, which may reveal additional instances of unconstitutional revocations.[7] *Cf. Elkins v. D.C.*, 527 F. Supp. 2d 36, 47 (D.D.C. 2007).

Were it not for MPD's change in policy, Mr. Allen would still have his CPL.  There is thus an "affirmative link between the city's policy and the particular constitutional violation alleged," *Carter v. District of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986) (alteration omitted), such that D.C. should be held accountable.  *Carter v. D.C.*, 795 F.2d 116, 122 (D.C. Cir. 1986) (alterations omitted).  Therefore, Mr. Allen's claims against D.C. should not be dismissed.

## IV.   Defendants Are Not Entitled to Qualified Immunity After Violating Mr. Allen's Clearly Established Rights.

The individual Defendants are not entitled to qualified immunity because a "reasonable person would have known" that it was unconstitutional to revoke Mr. Allen's CPL based on the mere fact of prior criminal arrests.[8] *See Hope v. Pelzer*, 536 U.S. 730, 744 (2002).

As an initial matter, the individual Defendants have not argued that they are entitled to qualified immunity from Mr. Allen's Fifth Amendment or DCAPA claims.  Because qualified immunity is an "affirmative defense[]" and Defendants have not raised it as to these claims, the Court

---

[7] As noted above, since filing of the Complaint, counsel has become aware of multiple other Black men like Mr. Allen who have had their concealed pistol licenses revoked based on a history of criminal arrests.

[8] Although Mr. Allen acknowledges that the doctrine of qualified immunity is still good law, he respectfully submits that the doctrine should be overturned as it not supported by the statutory text of 42 U.S.C. § 1983. *See, e.g., Baxter v. Bracey*, 140 S. Ct. 1862 (2020) (Thomas, J., dissenting from denial of certiorari).

cannot use it as a basis for dismissing Mr. Allen's Fifth Amendment or DCAPA claims.  *See Johnson v. Gibson*, 14 F.3d 61, 64 (D.C. Cir. 1994).

As to Mr. Allen's Second Amendment claims, the "unlawfulness" of Defendants' revocation was "apparent 'in the light of pre-existing law.'"  *See Bloem v. Unknown Dep't of the Interior Emps.*, 920 F. Supp. 2d 154, 164 (D.D.C. 2013) (citations omitted).  Mr. Allen's right to concealed carry was made clear by the D.C. Circuit's 2017 decision in *Wrenn*, which established that the "typically situated" and "law-abiding" citizen has a constitutional right "to carry firearms for personal self-defense beyond the home."  *See* 864 F.3d at 667.  Although the D.C. Circuit recognized that this right is subject to certain longstanding historical exceptions—namely, bans on possession "by felons and the mentally ill"—the *Wrenn* decision left no doubt that apart from those limited exceptions, the Constitution guarantees a right to carry a firearm.  *See id.* at 657.  And there is no basis in the law for thinking (nor do Defendants seriously argue) that people who have merely been *accused* of crimes would fit into those narrow exceptions.  The "unlawfulness" of Defendants' revocation was "apparent."

Defendants argue that Mr. Allen does not share the constitutional right to concealed carry because he has a "lengthy arrest record[.]"  Mot. at 41.  But that argument assumes that one could reasonably conclude based off Mr. Allen's *arrest record alone* that he is not "law-abiding."  Mr. Allen's arrest record "shows nothing more than that someone probably suspected [him] of an offense."  *See Schware*, 353 U.S. at 241.  Someone's suspicion alone is not enough to deprive Mr. Allen of his constitutional rights.  Centuries of American law and tradition have demonstrated the "unquestioned" importance of the "presumption of innocence in favor of the accused."  *See Coffin v. United States*, 156 U.S. 432, 453 (1895).  Therefore, no reasonable official could conclude, based on Mr. Allen's arrest record *alone*, that he was not "law-abiding."

Defendants also assert that "[n]o precedent exists that would have put the Chief or any other individual defendant on notice" that their actions were unconstitutional.  Mot. at 41.  But as the

Supreme Court has repeatedly admonished that "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *See Hope*, 536 U.S. at 741; *see also Taylor v. Riojas*, __ S. Ct. __, 2020 WL 6385693 at *2, n.2 (2020). Thus, to survive qualified immunity, a plaintiff need not "point to a previous case" identical to his—which makes sense because often "[t]he easiest cases don't even arise." *See K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) (Posner, J.). Here, "no reasonable official could conclude" that Mr. Allen was not law-abiding based on the mere fact of prior arrests alone. *See Patterson v. United States*, 999 F. Supp. 2d 300, 316 (D.D.C. 2013). The officials thus should have understood that revocation of Mr. Allen's license was unlawful, based both on the D.C. Circuit's decision in *Wrenn* and the bedrock principle that an accused person is entitled to a presumption of innocence. Defendants are therefore not entitled to qualified immunity.

Finally, even if the individual Defendants were entitled to qualified immunity, that immunity would extend only to Mr. Allen's request for damages—not Mr. Allen's request for injunctive or declaratory relief to stop Defendants' continued violation of his Second Amendment rights. *See Meredith v. Fed. Mine Safety & Health Rev. Comm'n*, 177 F.3d 1042, 1049 (D.C. Cir. 1999) (noting that qualified immunity "does not extend to a suit seeking equitable relief").

## V.   The Court Should Exercise Supplemental Jurisdiction Over Mr. Allen's Adequately Pleaded DCAPA Claims.

Defendants' broadside attack on Mr. Allen's DCAPA claims also falls short. Those claims arise from the same nucleus of operative fact as Mr. Allen's constitutional claims, and judicial economy, convenience, and fairness to the parties warrant the Court exercising its jurisdiction to resolve those claims together. Moreover, Mr. Allen has amply pleaded each of his five claims arising under the DCAPA.

A.      **The Court has—and should exercise—jurisdiction over Mr. Allen's DCAPA claims.**

Defendants do not dispute that the Court has jurisdiction over Mr. Allen's DCAPA claims under 28 U.S.C. § 1367(a).  Nor could they.  Those claims arise from the same set of operative facts and are sufficiently related to Mr. Allen's constitutional claims that they "form part of the same case or controversy." *Id.*  Defendants instead assert that the Court should decline to exercise its jurisdiction on the mistaken belief that Mr. Allen has failed to adequately state any constitutional claims over which this Court has subject-matter jurisdiction, and primarily rely on cases in which courts refrained from exercising jurisdiction over state-law claims after all federal claims had already been or were to be dismissed.  *See* Mot. at 34-35 & n.10.  As already explained, Mr. Allen has plausibly and particularly alleged claims arising under the Constitution.  Where, as here, factually related and legally similar federal and state claims remain, considerations of judicial economy, convenience, and fairness to litigants favor resolving all claims in a single forum.  *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349 (1988); *Jones v. Changsila*, 271 F. Supp. 3d 9, 22-23 (D.D.C. 2017).  Furthermore, none of the other reasons for declining to exercise supplement jurisdiction apply here.  *See* 28 U.S.C. § 1367(b)-(c).

Contrary to Defendants' contention, the D.C. Circuit's decision in *Lightfoot v. District of Columbia*, 448 F.3d 392 (D.C. Cir. 2006), does not bar this Court from exercising its jurisdiction here.  Although *Lightfoot* explained reasons why a district court "might" decline to exercise jurisdiction over a DCAPA claim in light of D.C. Code § 2-510, it did so in dicta, with only "minimal briefing on the[ ] issue[ ]," and in recognition that its position was inconsistent with its prior treatment of the issue.  *Id.* at 398–99 (citing other D.C. Circuit cases).  This Court has also concluded that the language of *Lightfoot* "makes clear, however, that a federal district court is by no means barred from exercising supplemental jurisdiction over a District of Columbia administrative action."  *Kingman Park Civic Ass'n v. Gray*, 27 F. Supp. 3d 171, 178 (D.D.C. 2014) a*ff'd on other grounds sub nom. Kingman Park Civic Ass'n v. Bowser*, 815

F.3d 36 (D.C. Cir. 2016); *but see States v. D.C.*, 2019 WL 295472, at *7 (D.D.C. Jan. 23, 2019) (viewing *Lightfoot's* pronouncement of exclusive jurisdiction in the D.C. Court of Appeals as binding).

Principles of fairness also weigh in favor of the Court exercising its jurisdiction here.  If this Court declines to do so, Mr. Allen would be required to bring his DCAPA claims before the D.C. Court of Appeals, while simultaneously litigating his constitutional claims in federal court.  Such a posture could create the potential for competing and preclusive decisions on factually and legally related claims in two forums.  It would risk placing Mr. Allen in the Catch-22 the Supreme Court warned against in *Knick*, where requirements to bring certain constitutional claims first in state court barred plaintiffs from having their federal claims fairly and fully adjudicated in federal court.  139 S. Ct. at 2167–69; *see also San Remo Hotel*, 545 U.S. at 347.

### B.   Defendants improperly denied Mr. Allen a hearing (Count 3).

The DCAPA provides that "[e]very party shall have the right to present in person or by counsel his case or defense by oral and documentary evidence," including by conducting cross-examination.  D.C. Code § 2-509(b); *see also id.* § 2-502(8).  Defendants incorrectly assert that Mr. Allen waived this right when he took the position before the CPLRB that it could determine from the record that the MPD Defendants' revocation of his CPL was not supported by reliable, probative, and substantial evidence.  Defendants ignore, however, that Mr. Allen expressly stated that there was insufficient evidence on the record to *affirm* the revocation, and that were the CPLRB inclined to make such a determination Mr. Allen was entitled to a hearing in order to present witnesses, conduct cross-examination, and produce documentary evidence.  Compl. ¶¶ 11, 155, 176, 195-196, 237, 279-82.  Despite Mr. Allen's express request, and contrary to the DCAPA and Constitution, the CPLRB issued its ruling without affording Mr. Allen an evidentiary hearing.

**C.      Defendants' revocation of Mr. Allen's CPL was not supported by substantial evidence (Count 4).**

Defendants violated the DCAPA by revoking and affirming the revocation of Mr. Allen's CPL without reliable, probative, and substantial evidence.   *See* D.C. Code §§ 2-509(e), 2-510(a)(3)(E). Defendants have repeatedly acknowledged that their decisions were not based on or supported by any evidence of Mr. Allen's actual conduct, but rather on the mere fact that Mr. Allen had been arrested— but never convicted of—a series of years-old criminal offenses.  Compl. ¶¶ 11, 176-185.  The mere fact of those arrests is insufficient to support a finding that Mr. Allen has a "propensity for violence," as the arrests alone have "very little, if any, probative value in showing that he engaged in any misconduct."  *See Schware*, 353 U.S. at 241.

Defendants fail to identify a single fact or piece of evidence underlying those arrests that a "reasonable mind" might accept as demonstrating a propensity for violence or instability that presents a danger to other persons.  *The Washington Times v. District of Columbia Dep't. of Employment Servs.*, 724 A.2d 1212, 1216 (D.C. 1999) (substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion").  Indeed, the underlying details of Mr. Allen's arrests and the ultimate resolutions of those incidents further confirm Defendants' error.  It is undisputed that the government dropped both 2006 and 2014 cases against Mr. Allen relating to a firearm because further investigation and incontrovertible evidence demonstrated that he had been wrongly identified.   Compl. ¶¶ 8, 114-119, 124-131.   Although Mr. Allen was arrested for two purported misdemeanor gambling offenses, neither resulted in a conviction and by their nature, neither involves any violent or dangerous conduct.   Compl. ¶¶ 109-113, 120-123.   Similarly, Mr. Allen's two drug arrests as a juvenile over twenty years ago did not result in conviction and there is no indication that either incident involved violence.  Compl. ¶¶ 104-108.

Against this undisputed factual background, coupled with the disproportionate rate in D.C. at which Black individuals, like Mr. Allen, are arrested and wrongfully accused of crimes, Compl. ¶¶ 13-15, it is clear that Mr. Allen's arrest record alone does not constitute legally sufficient evidence of a propensity for violence.  Neither substantial evidence nor reasonable inferences support Defendants' finding of a propensity for violence here.

### D.   Defendants' revised interpretation of 24 DCMR § 2335.1(d) was arbitrary, capricious, and an abuse of discretion (Count 5).

Defendants' revised interpretation of 24 DCMR § 2335.1(d) violates the DCAPA because this change of policy was arbitrary, capricious, and an abuse of discretion.  As an initial matter, Defendants incorrectly assert that Mr. Allen challenges their decision to place greater weight than they had previously on older incidents and the number of incidents in an applicant's background when undertaking a risk assessment.  Mot. at 38.  As the Complaint makes clear, Mr. Allen argues that Defendants' revised interpretation of 24 DCMR § 2335.1(d) is arbitrary and capricious because it deems past criminal arrests—absent conviction and any evidence of the conduct underlying those arrests—as relevant and sufficient to support a finding of a "propensity for violence."  Compl. ¶¶ 291-297.  Under this new interpretation, Defendants equate any past criminal arrest, regardless of its nature, resolution, or underlying facts, to conduct that is violent or demonstrating low self-control. *Id.*

Defendants' sole reason for their expansive new interpretation is a passing reference to an incident involving another CPL holder who was involved in a self-defense shooting.  *See* Mot. Ex. 1 at 2-3.[9]  But Defendants offer no explanation as to why that incident supports a conclusion that the mere existence of past criminal arrests is relevant and sufficient evidence to establish an individual's

---

[9] Defendants' only citation for the facts of the other concealed pistol licensee's case is a local online news article and associated video.  *See* Mot. at 8 n.2.  Without more, those materials are not competent evidence that can be considered in evaluating the motion to dismiss.  The materials are hearsay that has not been authenticated or incorporated into the Complaint.

propensity for violence. *Id.*; *see also* Mot. at 38. Not only is the rationale "inadequately explained," *Gen. Chem. Corp. v. United States*, 817 F.2d 844, 857 (D.C. Cir. 1987), it is contrary to the legal authority and empirical evidence explained above and detailed throughout the Complaint demonstrating that the mere existence of criminal arrests says little, if anything, about whether an individual actually engaged in violent or criminal conduct. *See supra* Section I.A. Furthermore, Defendants' new interpretation and its rationale are "internally inconsistent," *Gen. Chem. Corp.*, 817 F.3d at 857, as it fails to explain how an incident in which a CPL-holder was adjudged to have used a firearm in self-defense merits revocation of that license holder's CPL and institution of a new policy that deems the prior criminal arrests of *other* license holders as evidence of their propensity for violent conduct. Defendants' revised interpretation is therefore arbitrary and capricious. *See id.*; *see also Sorenson Comm'n Inc. v. F.C.C.*, 755 F.3d 702, 708-09 (D.C. Cir. 2014) (deeming agency's promulgation of a rule arbitrary and capricious for failure to articulate a satisfactory explanation for its action).

### E. Defendants' revocation of Mr. Allen's CPL was arbitrary, capricious, and an abuse of discretion (Count 6).

The arbitrary and capricious nature of the Defendants' actions is particularly clear in their application of 24 DCMR § 2335.1(d) to Mr. Allen. As already discussed, Defendants offered no evidence of Mr. Allen's conduct that would support a conclusion that he has a propensity for violence. Instead, Defendants relied on the mere existence of arrests in his background, without any explanation as to why those arrests support their conclusion. Defendants overlooked the facts underlying those arrests, including that Mr. Allen had been wrongfully identified in the most serious cases and was never convicted of any crimes. Defendants offered no explanation as to why these were not considered mitigating facts in Mr. Allen's case, or why he was treated in the same manner as a CPL-holder with a different criminal background that had recently been involved in a shooting. Defendants' decision lacked substantial evidence as a result, and was both inadequately explained and

internally inconsistent.  Accordingly, their revocation of Mr. Allen's CPL was arbitrary and capricious.  *See Citizens Ass'n of Georgetown v. D.C. Bd. Of Zoning Adjustment*, 925 A.2d 585, 593 (D.C. 2007) (failure to revisit the decision or provide an explanation for not acknowledging uncontested facts "left the 'record inadequate to reveal the basis for its decision' and was arbitrary and capricious"); *see also Iaccarino v. Duke*, 327 F. Supp. 3d 163, 175 (D.D.C. 2018) ("[A]n agency decision 'would be arbitrary and capricious' if it is not 'supported by substantial evidence' because 'it is impossible to conceive of a "nonarbitrary" factual judgment supported only by evidence that is not substantial . . . .'").

### F.   Defendants violated the DCAPA by disregarding Mr. Allen's constitutional rights (Count 7).

The DCAPA provides for the reversal of administrative "action[s] or findings and conclusions" that are "[c]ontrary to constitutional right, power, privilege, or immunity."  D.C. Code § 2-510(a)(3)(B).  As set forth above, *see supra* Sections I-II, Defendants violated Mr. Allen's constitutional rights and he is therefore entitled to relief under the DCAPA.  Defendants' reliance on this Court's decision in *Classic Cab, Inc. v. District of Columbia*, 288 F. Supp. 3d 218, 226 (D.D.C. 2018), for the opposite conclusion is misplaced.  Here, Mr. Allen does not suggest that protections afforded by the DCAPA have been constitutionalized in the Second and Fifth Amendments, but rather that violations of those Amendments are grounds for reversing an agency decision or finding under the DCAPA.

## **CONCLUSION**

Mr. Allen's lawsuit should go forward, and the motion to dismiss should be denied, because he has alleged facts that would entitle him to relief for Defendants' violations of his rights under the U.S. Constitution and D.C. law.


Dated: December 18, 2020                          Respectfully submitted,


                                                 */s/ Hayter L. Whitman*
                                                 Hayter L. Whitman (D.C. Bar No. 1031057)
                                                 Kieran G. Gostin (D.C. Bar No. 1019779)
                                                 Matthew R. Skanchy (D.C. Bar No. 1045601)
                                                 Jenna H. Pavelec (D.C. Bar No. 1614398)

                                                 WILKINSON STEKLOFF LLP
                                                 2001 M Street NW, 10th Floor
                                                 Telephone: (202) 847-4000
                                                 Facsimile: (202) 847-4005
                                                 hwhitman@wilkinsonstekloff.com
                                                 kgostin@wilkinsonstekloff.com
                                                 mskanchy@wilkinsonstekloff.com
                                                 jpavelec@wilkinsonstekloff.com

                                                 *Counsel for Linwood Allen*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on this 18th day of December 2020, a true and correct copy of the foregoing document was served upon the parties in this case via the Court's electronic filing system and is available for viewing and downloading from the ECF system.


Dated: December 18, 2020                    By: _/s/ Hayter L. Whitman_
                                             Hayter L. Whitman