# UNITED STATES DISTRICT COURT\

## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| LINWOOD ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 20-cv-2453 (TSC) |
| | ) | |
| DISTRICT OF COLUMBIA, | ) | |
| METROPOLITAN POLICE | ) | |
| DEPARTMENT, PETER NEWSHAM, | ) | |
| COLIN HALL, J. DOES, CONCEALED | ) | |
| PISTOL LICENSING REVIEW | ) | |
| BOARD, EDWIN POWELL, GARY | ) | |
| ABRECHT, CHAD TILLBROOK | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION

Plaintiff Linwood Allen has sued the District of Columbia (D.C.), the Metropolitan Police Department (MPD), former MPD Police Chief Peter Newsham, Lieutenant Colin Hall in the MPD's Firearm Registration Branch, unnamed John Doe MPD employees, the Concealed Pistol Licensing Review Board (CPLRB), and CPLRB members Edwin Powell, Gary Abrecht, and Dr. Chad Tillbrook for revoking his firearm registration and concealed pistol license.  He alleges that he has a right to carry a concealed pistol in public, despite his previous six arrests, and that Defendants violated his Fifth and Second Amendment rights and the D.C. Administrative Procedure Act (DCAPA) by revoking his firearm registration certificate and concealed pistol license (CPL) without due process.  Defendants have moved to dismiss for failure to state a valid claim for relief.  *See* Mot. to Dismiss, ECF No. 22.  For reasons set forth below, the court will GRANT the motion in part and DENY it in part.

1

# I.   BACKGROUND

## A.   MPD's Policy Change Regarding Firearm Registrations and Concealed Pistol Licenses

Under D.C. law, applicants for a firearm registration certificate must satisfy a variety of age, criminal history, personal history, mental health, and physical requirements.  *See* D.C. Code § 7-2502.03.  Applicants "must not have had a history of violent behavior" within the last five years.  *Id.* § 7-2502.03(a)(6A)).  Applicants must also be "suitable" to be licensed, meaning they must not have "exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another."  24 D.C. Mun. Regs. (DCMR) § 2335.1(d).  The MPD Chief is tasked with investigating each applicant and determining whether they have satisfied these requirements.  *See* Compl., ECF No. 1 ¶¶ 46, 58.  The Lieutenant in the MPD's Firearm Registration Branch oversees the application process for firearm registrations and CPLs.  *See id.* ¶ 22.

A firearm registration certificate may be revoked when 1) the licensee no longer meets the criteria for registration, 2) the firearm has become an unregistrable firearm or a destructive device, or 3) information provided in the registration application "proves to be intentionally false."  24 DMCR § 7-2502.09(a)(1)-(3).  A CPL may be revoked upon a finding that 1) the licensee no longer meets the legal requirements for a CPL or 2) the licensee failed to comply with one or more of the legal requirements or duties imposed on licensees.  D.C. Code § 7-2509.05(a); 24 DMCR § 2341.1.  The MPD must provide notice and explanation for the revocation.  *See* 24 DCMR § 2341.3.  The licensee may then appeal the revocation to the CPLRB, and the licensee bears the "burden of persuasion."  *See* D.C. Code § 7-2509.08.

On August 20, 2019, a CPL holder engaged in a shooting in the 500 block of H Street NE in Washington, D.C.  *See* Compl. ¶ 178.  The CPL holder was not charged, but following the

2

incident, former Chief Newsham determined that a "change in the interpretation of the 'propensity for violence or instability' regulation was justified." *Id.* ¶¶ 179-80.  Specifically, MPD revised its interpretation of DCMR § 2335.1(d), "propensity for violence or instability" to "conduct that is violent or criminal demonstrating low self-control, regardless of whether it results in a criminal conviction" and concluded that such conduct "may be grounds for . . . revocation . . . of a CPL"  *Id.* ¶ 182.  Beginning in August 2019, MPD gave equal weight to incidents regardless of when they occurred and greater weight to the total number of incidents in a person's background.  *See* Mot. to Dismiss at 8.

Following this change, MPD audited all CPLs granted in 2019, including Allen's, to determine whether they satisfied the revised interpretation.  *Id.*  In reviewing Allen's application, license, and criminal history, MPD determined that he demonstrated a propensity for violence or instability based on his six prior criminal charges, and recommended revocation of his CPL.  *Id.* at 8–9.

**B.  <u>Allen's Approved Application, Revocation, and Appeal</u>**

Allen became interested in owning a firearm to protect his family, who live in a Northeast D.C. neighborhood that has experienced significant crime rates, including a pattern of home break-ins.  *Id.* ¶¶ 73–74.  Allen also sought to carry a firearm to protect himself when working odd hours.  *Id.* ¶ 75.  In April 2018, he purchased a black GLOCK 27 GEN 4 semiautomatic .40 caliber pistol.  *Id.* ¶¶ 78–79.

In May 2019, Allen applied for a firearm registration certificate and a CPL and disclosed his criminal history.  *Id.* ¶¶ 71–72.  MPD approved Allen's firearm registration certificate on May 6, 2019 and the CPL on August 15, 2019.  *See id.*  MPD concluded that Allen did not have "a history of violent behavior" in the five years before he submitted his application.  *See* Mot. to

Dismiss at 7.  It separately assessed whether Allen's background rendered him "suitable" for a CPL, including reviewing his arrest history.  *Id.*  At the time, MPD's standard for determining what constituted a "propensity for violence or instability" placed less weight on older incidents and the total number of incidents in an applicant's background.  *See* Mot. to Dismiss at 7, 22; MPD Response to CPLRB Order to Stay Appeal of Linwood Allen, Ex. 1, ECF No. 22-2 at 4.

Allen does not dispute that he has been arrested multiple times.  In 2000 he was arrested and charged twice as a juvenile with possession with intent to distribute cocaine, though neither arrest "resulted in conviction."  Compl. ¶¶ 10, 104–05.  In 2006 he was arrested for assault with a deadly weapon, but the government dropped the case after blood, saliva, and hair samples indicated that Allen had been wrongly charged.  *Id.* ¶¶ 114, 115, 117.  In 2006 and 2008 Allen was arrested for illegal gambling.  *Id.* ¶¶ 109, 120.  The charges were resolved through a "post-and-forfeiture" procedure, *id.* ¶¶ 111, 121, which "may not be relied upon by any District of Columbia court or agency in any subsequent criminal, civil, or administrative proceeding or administrative action to impose any sanction, penalty, enhanced sentence, or civil disability."  D.C. Code § 5-335.01.  In 2014, Allen was arrested for being a fugitive related to an armed robbery in Maryland, but videotape evidence from a security camera near the scene of the crime showed that a different individual had committed the robbery, and the charges against Allen were dropped and the arrest expunged from his record.  *Id.* ¶¶ 124, 128–29.

On November 5, 2019 Allen received two letters from the MPD revoking his firearm registration and CPL, citing his criminal history as justification.  *See* Compl. ¶¶ 132, 135–36; ECF No. 22-4, Mot. to Dismiss, Ex. 3 at 2.  One letter informed Allen that he could appeal the Firearm Registration Revocation to the MPD.  *See* Compl. ¶ 134.  The CPL revocation letter gave Allen two options: return his license to the MPD's Firearms Registration Branch or request

4

an appeal to the CPLRB within fifteen days of receiving the notice.  *See* Mot. to Dismiss, Ex. 3 at 3.

On November 19, 2019, Allen appealed the revocation of his firearm registration to the MPD in a letter to the Director of the Gun Control/Records Division at the MPD and appealed the CPL revocation to the CPLRB.  *See* Compl. ¶¶ 144–145, 153.  Allen argued that neither of the two letters he received from MPD provided adequate notice because they contained only recitations of his prior arrests and not any facts or explanation justifying the revocations.  *See id.* ¶¶ 149, 154

Allen further argued that none of his prior arrests were relevant because none led to felony convictions or occurred within the prior five years.  *See id.* ¶ 150; ECF No. 22-5, Mot. to Dismiss, Ex. 4 at 2.  The 2000 juvenile cocaine arrests were for nonviolent offenses that were resolved outside the adult court system.  Compl. ¶ 151; Mot. to Dismiss, Ex. 4 at 3.  The 2006 and 2008 gambling arrests were resolved through "post-and-forfeiture."  *Id.*  Allen denied committing the 2006 assault with a deadly weapon and contested the 2014 fugitive arrest, and both charges were dropped and/or expunged after evidence demonstrated he was incorrectly identified.  *Id.*  Thus, according to Allen, both revocations were unlawful and unjustified because they were based on a "mere list of years-old criminal charges" that were irrelevant.  *See* Compl. ¶ 149; Mot. to Dismiss, Ex. 4 at 2.

Once the CPLRB receives an appeal, it first determines whether a hearing is appropriate, and if so, issues notice of the hearing to the appellant and the MPD Chief.  *See* 1 DCMR § 1202. Alternatively, if the Board decides that summary disposition is appropriate, it must follow the procedures in § 1210, under which the appellant may submit written argument concerning the (1) "existence of any material facts in dispute that would require an evidentiary hearing; and why

each such fact is material to the dispute; and/or (2) [i]f there are not material facts in dispute, why the Chief's action is not rationally supportable and could not have been arrived at reasonably." *Id.* § 1210.2.

The CPLRB received Allen's appeal on November 25, 2019, Compl. ¶ 155, and notified him that panel members Powell, Tillbrook, and Abrecht would hear the appeal. *Id.*

On February 8, 2020, MPD responded to Allen's appeal of his firearm registration revocation, informing him that the revocation was an error and fully reinstating his firearm registration. Compl. ¶¶ 159–60. MPD informed Allen that it intended to revoke the CPL, however, and that matter would continue to be handled by the CPLRB. *Id.* ¶¶ 161–62.

On February 13, 2020, the CPLRB issued an Order to Stay Appeal Hearing. ECF No. 22-6, Mot. to Dismiss, Ex. 5 at 4. In the order, the CPLRB quoted the internal September 24, 2019 MPD memorandum recommending revocation of Allen's CPL. *Id.* at 2. At the time of the order, neither MPD nor CPLRB had provided the memorandum to Allen. *See* Compl. ¶ 169.

The CPLRB further asked MPD to 1) explain why it approved and then revoked Allen's CPL based on the same criminal history record, 2) review each of Allen's offenses and explain why each was included as a basis for revocation, 3) explain why the factors detailed in Allen's appeal letter did not mitigate or outweigh the determination of Allen's propensity for violence or instability, 4) explain "in greater detail" the reasoning behind the conclusion that Allen's "criminal history record reflects a '*pattern of dangerous criminal conduct* demonstrat[ing] a propensity for violence or instability,'" 5) explain records in the Chief's file describing incident reports on or about April 23, 2019, involving offenses occurring in Vancouver, Washington, and 6) file a new or corrected Notice of Revocation and Memorandum in support of revocation. *See* Mot. to Dismiss, Ex. 5 at 3–4.

The CPLRB also invited Allen, pursuant to 1 DCMR § 1210, to file a reply to the Chief's response, raising any material fact in dispute that would require an evidentiary hearing and providing his views on whether the Chief's exercise of discretion was "arbitrary and capricious or was not supported by reliable, probative, and substantial evidence." *Id.* at 5.

MPD responded on March 16, 2020.  ECF No. 22-2, Mot. to Dismiss, Ex. 1.  It wrote that the revocation was the result of a "deliberate and principled change in the Chief of Police's position on what it means to have 'exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another." *Id.* at 2.  MPD recounted the facts of the H Street shooting, after which the Chief determined that changing the interpretation of the "propensity for violence or instability" regulation was justified.  *Id.* at 2-3.  Accordingly, MPD relisted Allen's prior criminal charges[1] and concluded that under its new interpretation, Allen demonstrated a "propensity for violence or instability."  *See id.* at 6.  MPD explained that the lack of convictions and the fact that charges were dropped or expunged were irrelevant because the Chief retained discretion to revoke Allen's license "based on reliable and probative evidence of conduct which demonstrates his propensity for violence or instability."  *See id.* at 4.  MPD's response letter was the first time Allen learned of the changed interpretation.  Compl. ¶ 176.

On or about the same day that MPD sent its response letter, it produced Allen's CPL file, which included the revocation letter, the September 24, 2019 internal memorandum, two FBI reports on Allen's background, and a couple D.C. public incident reports containing Allen's

---

[1] MPD claimed that records regarding incidents on or about April 23, 2019 in Vancouver, Washington were subject to an ongoing investigation and therefore could not be further discussed.  *See* Mot. to Dismiss, Ex. 1 at 6.  It stated: "The Chief's revocation decision was not based on this incident." *Id.*

name.  *Id.* ¶¶ 187–88.  None of these files contained additional facts beyond those that MPD had already presented regarding the basis for revocation of his CPL.  *Id.* ¶ 189.

On March 26, 2020, Allen sent a reply to former Chief Newsham's response letter.  ECF No. 22-7, Mot. to Dismiss, Ex. 6.  Allen argued that the matter could be summarily resolved in his favor because there was "no material fact in dispute that would require an evidentiary hearing."  *Id.* at 1.  He argued in the alternative that if a hearing were necessary, he was entitled to present witnesses and evidence to adequately defend himself.  *Id.* at 4–5.

Without having a hearing, on April 29, 2020, the CPLRB issued its Final Decision and Order Denying Appeal, in which it sustained the MPD's revocation.  ECF No. 22-8, Mot. to Dismiss, Ex. 7.  The order stated that Allen's criminal record may be considered in revocation and concluded that Allen did not meet his burden of showing that the revocation was arbitrary or capricious.  *Id.* at 9.  The CPLRB noted that it "independently would have reached the same conclusion as the Chief."  *Id.* at 10.

## C.  Procedural History

On September 2, 2020, Allen filed this case, alleging eight causes of action.  He claims all Defendants violated his Fifth Amendment and Second Amendment rights.  Compl. ¶¶ 217–73.  He also alleges that D.C. and the CPLRB Defendants violated the DCAPA by depriving him of his right to present evidence and cross-examine witnesses in a hearing setting and revoking his license without "substantial evidence."  *Id.* ¶¶ 274–90.  He further alleges that all Defendants violated the DCAPA because the change in interpretation of the suitability standard was arbitrary and capricious, the revocation was arbitrary, capricious, and an abuse of discretion, and the revocation was contrary to constitutional right.  *Id.*  ¶¶ 291–311.  He seeks compensatory, nominal, and punitive damages.  *Id.*  ¶¶ 312–17.

## II.    LEGAL STANDARD

"To survive a 12(b)(6) motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible when it alleges sufficient facts to permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citation omitted).  When considering a 12(b)(6) motion, the court must "construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Jud. Watch, Inc. v. U.S. Dep't of Just.*, 410 F. Supp. 3d 216, 220-21 (2019) (citing *Schuler v. United States*, 617 F.2d 605, 608) (D.C. Cir. 1979)).

Allen has brought an as-applied challenge to Defendants' revised interpretation of D.C.'s suitability requirement (DCMR § 2335.1(d)).  Unlike a facial challenge, an as-applied challenge contends that the law is unconstitutional as applied to the litigant's particular activity, even though the law may be capable of valid application to others.  *See Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789, 803, n.22 (1984).

## III.    ANALYSIS

Allen claims that Defendants violated the DCAPA as well as his Fifth and Second Amendment rights in revoking *both* his firearm registration certification and CPL.  *See, e.g.*, Compl. ¶¶ 220–22, 271, 278.  Because MPD fully reinstated the firearm registration certification, *id.*, the court considers Allen's challenges to its revocation moot.  *See DeFunis v. Odegaard*, 416 U.S. 312, 317 (1974) ("The controversy between the parties has thus clearly ceased to be 'definite and concrete' and no longer 'touch(es) the legal relations of parties having adverse legal interests.'" (internal citation omitted)).  Consequently, the court will grant Defendants' motion to

dismiss Counts one through eight as moot with regard to Allen's firearm registration certification and addresses only Allen's challenges to revocation of his CPL.

## A. **DCAPA Claims (Counts 3–7)**

Allen alleges that Defendants violated the DCAPA because they denied him a hearing and revoked his CPL without "reliable, probative, and substantial evidence."  Compl. ¶¶ 278, 287.  Allen also claims that Defendants' revised interpretation of "propensity for violence and instability" and the revocation of his CPL was arbitrary, capricious, and contrary to law.  *Id.* ¶¶ 294–97, 302–05.  Defendants contend that the D.C. Court of Appeals, and not this court, has exclusive jurisdiction over the DCAPA claims.  *See* Mot. to Dismiss at 34–35.  The court agrees.

"Any person suffering a legal wrong, or adversely affected or aggrieved, by an order or decision of the Mayor or an agency in a contested case, is entitled to a judicial review."  D.C. Code Ann. § 2-510 (Judicial Review).  "DCAPA's judicial review provision places exclusive jurisdiction in the D.C. Court of Appeals to review District agency action."  *Lightfoot v. D.C.*, 448 F.3d 392, 399 (D.C. Cir. 2006); *see also Robinson v. Palmer*, 841 F.2d 1151–1157 (D.C. Cir. 1988) (finding that whether the D.C. Department of Corrections complied with the public notice and comment requirements of the DCAPA "is more properly decided in the first instance by the local courts of the District of Columbia.") (internal quotations omitted); *Kingman Park Civic Ass'n v. Gray*, 956 F. Supp. 2d 230, 252 (D.D.C. 2013) ("[T]he United States Court of Appeals for the District of Columbia Circuit discourages courts in this District from exercising supplemental jurisdiction over claims challenging administrative decisions by the District of Columbia.").

Given the judicial review provision of the DCAPA and the D.C. Circuit's binding determination that the provision gives the D.C. Court of Appeals "exclusive jurisdiction" to

review District agency actions, *Lightfoot*, 448 F.3d at 399, the court finds that it does not have

subject matter jurisdiction over counts three through seven.  Furthermore, the court declines the

opportunity to exercise supplemental jurisdiction over Allen's DCAPA claims.  *See* 28 U.S.C.

§ 1367(c) (stating that the court may decline to exercise supplemental jurisdiction if the related

state-law claims "substantially predominate[ ]" over the federal-question claims).  The court will

therefore dismiss Allen's counts three through seven.

### B. <u>Fifth Amendment Claim (Count 1)</u>

Allen claims that he had both liberty and property interests in his CPL and that by

revoking his license, the MPD deprived him of liberty and property without due process in

violation of his Fifth Amendment rights.  *See* Compl. ¶¶ 220–223.  "But expectation of a benefit

is not enough to generate a liberty interest protected by the Constitution."  *Robinson*, 841 F.2d at

1155.  "The most common manner in which a State creates a liberty interest is by establishing

substantive predicates to govern official decision-making, and, further, by mandating the

outcome to be reached upon a finding that the relevant criteria have been met."  *Kentucky Dep't*

*of Corr. v. Thompson*, 490 U.S. 454, 462 (1989) (internal quotations omitted).  For example,

"specific directives to the decisionmaker that if the regulations' substantive predicates are

present, a particular outcome must follow" can create a liberty interest.  *Id.* at 463.  Moreover, a

benefit conferred by the government is not a constitutionally protected property interest "if

government officials may grant or deny it in their discretion."  *Town of Castle Rock v. Gonzales*,

545 U.S. 748, 756 (2005).  "To have a property interest in a benefit, a person clearly must have

more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.

He must, instead, have a legitimate claim of entitlement to it."  *Bd. of Regents of State Colleges*

*v. Roth*, 408 U.S. 564, 577 (1972).

Courts have found that there is no constitutional entitlement where a state regulation does not include mandatory language.  *See e.g.*, *Connecticut Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981) (finding state regulation did not create entitlement because it was "wholly and expressly discretionary" and did not include language like "shall"); *Thompson*, 490 U.S. at 464–65 (finding state regulation did not create entitlement because it lacked "the requisite relevant mandatory language" and "administrative staff reserve[d] the right to allow or disallow" the privilege).

In *Robinson*, a prisoner's wife had her visitation privileges suspended for one year when she attempted to bring contraband into the prison.  841 F.2d at 1153.  Eleven months later, the D.C. Department of Corrections "amended its contraband policy directive to prescribe permanent suspension of the visiting privileges of anyone who attempts to introduce contraband into a Department institution."  *Id.*  The Court found that although the letter the wife received stating that her privileges would be suspended for a year "may indeed have created a mutually explicit understanding," it did not create a liberty interest.  *Id.* at 1155–56.

In *Town of Castle Rock*, the Supreme Court concluded that a respondent did not have a property interest in police enforcement of a restraining order because she had no personal entitlement to it.  545 U.S. at 760 (finding that the well-established tradition of police discretion did not make the enforcement of restraining orders mandatory).

Here, the fact that Allen was originally granted a CPL and then had it revoked is similarly insufficient to establish a property interest.  As in *Robinson*, the initial letter granting Allen the CPL merely created a "mutually explicit understanding" between Allen and the MPD but likewise did not create a liberty interest.  And, as in *Dumschat* and *Thompson*, D.C. regulations outlining how an applicant can obtain a CPL do not include mandatory language creating a

property interest.  For example, MPD has broad discretion to revoke a CPL "upon a finding that

the licensee no longer meets the [legal] requirements [for a CPL]."  D.C. Code § 7-2509.05(a);

24 DMCR § 2341.1.  Consequently, Allen has not demonstrated that he had a liberty or property

interest in the CPL and thus has failed to state a claim under the Fifth Amendment.

    **C.**  **Second Amendment Claim (Count 2)**

        "[T]he right secured by the Second Amendment is not unlimited."  *D.C. v. Heller*, 554

U.S. 570, 626 (2008).  In *Heller*, the Supreme Court held that the Second Amendment does not

prohibit measures that have historically constrained the right to keep and bear arms such as

"longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws

forbidding the carrying of firearms in sensitive places such as schools and government buildings,

or laws imposing conditions and qualifications on the commercial sale of arms."  *Id.* at 626–27;

*see also McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 786 (2010) ("We made it clear in

*Heller* that our holding did not cast doubt on such longstanding regulatory measures…We repeat

those assurances here.").  In *Heller* and *McDonald*, the Court recognized that the Second

Amendment protects "the right of an ordinary, law-abiding citizen to possess a handgun in the

home for self-defense."  *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111,

2122 (2022).  In *Wrenn v. D.C.*, 864 F.3d 650, 661 (D.C. Cir. 2017), this Circuit held that the

"individual right to carry common firearms beyond the home for self-defense—even in densely

populated areas, even for those lacking special self-defense needs—falls within the core of the

Second Amendment's protections."  And in *Bruen*, the Supreme Court held "consistent with

*Heller* and *McDonald*, that the Second and Fourteenth Amendments protect an individual's right

to carry a handgun for self-defense outside the home."  142 S. Ct. at 2122

Courts previously used a "two-step" framework in analyzing Second Amendment challenges that combined history with means-end scrutiny.  *See e.g.*, *Heller v. D.C.*, 670 F.3d 1244, 1252 (D.C. Cir. 2011) ("We ask first whether a particular provision impinges upon a right protected by the Second Amendment; if it does, then we go on to determine whether the provision passes muster under the appropriate level of constitutional scrutiny.").  With respect to the first step, courts generally considered whether a regulation burdened the type of people and conduct traditionally and historically covered within the scope of the Second Amendment.  *See* e.g., *Medina v. Whitaker*, 913 F.3d 152, 158–60 (D.C. Cir. 2019) (finding that history and tradition support excluding someone with a felony conviction from the scope of the Second Amendment); *United States v. Carpio-Leon*, 701 F.3d 974, 979 (4th Cir. 2012) (finding that history and tradition support excluding illegal aliens from the scope the Second Amendment).

In *Bruen,* the Supreme Court "decline[d] to adopt that two-part approach," finding it to be "one step too many" and concluding that "the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."  *Bruen*, 142 S. Ct. at 2126–27.  Following *Bruen*, a court must analyze a challenge to the Second Amendment solely by relying on part one of the previously used two-step framework.  *See id.*  To put it more clearly, the Court wrote:

> We hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  To justify its regulation, the government may not simply posit that the regulation promotes an important interest.  Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation.  Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961).

14

In *Bruen*, two applicants sought unrestricted licenses to carry handguns in public and challenged a New York law requiring applicants to present a "proper-cause" or "special need for self-protection distinguishable from that of the general community." *See id.* at 2117. In applying its newly consolidated test, the Court first considered whether the petitioners and their proposed course of conduct—carrying handguns publicly for self-defense—were covered within the scope of the Second Amendment. *Id.* at 2134. The Court found it "undisputed that petitioners Koch and Nash—two ordinary, law-abiding, adult citizens—are part of 'the people' whom the Second Amendment protects" and that "handguns are weapons 'in common use' today for self-defense." *Id.* It also found that the Second Amendment's plain text presumptively guaranteed petitioners the right to carry handguns publicly for self-defense. *Id.*

Next, the Court shifted the burden to the government to "show that New York's proper-cause requirement [was] consistent with this Nation's historical tradition of firearm regulation." *Id.* at 2135 ("Only if respondents carry that burden can they show that the pre-existing right codified in the Second Amendment, and made applicable to the States through the Fourteenth, does not protect petitioners' proposed course of conduct."). The government cited a variety of historical sources from the late 1200s to the early 1900s, but the Court ultimately found that "the historical record compiled by respondents [did] not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense." *Id.* at 2135–38. Consequently, it held that the proper-cause requirement was unconstitutional. *Id.* at 2138.

The D.C. Circuit has not addressed a Second Amendment challenge since *Bruen,* and few Circuits have analyzed the constitutionality of regulations in light of the new framework. *See e.g.*, *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1332  (11th  2023) (finding that a Florida statute prohibiting persons under 21 from buying firearms was consistent with the nation's historical

tradition of firearm regulation and therefore did not violate the Second Amendment); *United States v. Rahimi*, 61 F.4th 443, 448, 461 (5th Cir. 2023) (holding unconstitutional a federal statute prohibiting possession of firearms by someone subject to a domestic violence restraining order because prohibition was inconsistent with historical tradition).  Other Circuits have remanded cases for district courts to engage in further proceedings in light of *Bruen*.  *See Miller v. Smith*, No. 22-1482, 2023 WL 334788, at *1 (7th Cir. Jan. 20, 2023); *Mitchell v. Atkins*, No. 20-35827, 2022 WL 17420766, at *1 (9th Cir. Dec. 2, 2022).

      Among the cases decided after *Bruen, Rahimi* is analogous to this case.  There, the defendant had previously entered *by agreement* into a restraining order during a civil proceeding. *Rahimi*, 61 F.4th at 459.  The order expressly prohibited Rahimi from possessing a firearm and restrained him from "committing family violence," "using or threatening use of physical force," "following, harassing, annoying, abusing, or tormenting his ex-girlfriend, and from going within 200 yards of his ex-girlfriend or her family (including their child)."  *Rahimi*, 61 F.4th at 449, n.2. Rahimi was later found with a gun and convicted of unlawful possession of a firearm under 18 U.S.C. § 922(g)(8), which disarms individuals based on civil protective orders, not criminal proceedings.  *Id.* at 449.  Nonetheless, the Fifth Circuit found that the defendant was among "the people" protected by the Second Amendment.  *Id.* at 452 ("while he was *suspected* of other criminal conduct at the time, Rahimi was not a convicted felon or otherwise subject to another longstanding prohibition on the possession of firearms that would have excluded him.") (omitting internal quotations).  Next, the Fifth Circuit considered and rejected the government's proffered historical analogues to § 922(g)(8), including English and American laws providing for disarmament of "dangerous people," particularly because the laws were either not relevant to § 922(g)(8) or "only disarmed an offender after criminal proceedings and conviction."  *Id.* at 458

Here, Allen challenges Defendants' new interpretation of "propensity for violence or instability" under 24 DCMR § 2335.1(d) as unconstitutional as applied to him.  *See* Compl. ¶ 273.  The revision assesses suitability by giving the same weight to all criminal history incidents and greater weight to the number of incidents.  *See* Mot. to Dismiss at 38.

Allen filed a Notice on July 8, 2022 apprising the court of how *Bruen* impacted his case. *See* Notice of Supplemental Authority, ECF No. 28.  Defendants did not file a response. Although the parties filed their briefs before *Bruen* was decided, the court must base its ruling on binding precedent, even if such precedent was decided after the parties filed their briefs. Because *Bruen* maintained step one of the previous two-step framework, the court must determine whether Allen and his proposed conduct (i.e., publicly carrying a pistol) are covered by the Second Amendment.

Defendants argue that the Second Amendment is limited to "typical" citizens who present a "common" level of risk.  *See* Mot. to Dismiss at 29–32.  They argue that although Allen has never been convicted, his six prior arrests show "that he has a 'propensity' for placing himself in the middle of activities that have a correlation to gun violence: drugs and gambling."  *Id.* at 31. Because "States have long excluded 'unvirtuous' individuals from the right to bear arms," Defendants maintain that Allen is not the "typical" citizen covered by the Second Amendment. *Id.*

Allen contends that he is a "responsible, law-abiding citizen," Compl. ¶¶ 262–263, and that Defendants "relied on years-old disproven allegations, non-violent juvenile drug charges handled outside the adult criminal system, and non-violent gambling charges" in reaching its decision.  *See* Compl. ¶¶ 267–273.  He further argues that Black individuals, like himself, "are more likely to be stopped or arrested by police, are more likely to be wrongfully convicted, and

thus are more likely to suffer any collateral consequences associated with having a criminal record—even a record of unproven charges that the government itself decided not to pursue." Compl. ¶ 15.

Defendants did not marshal any evidence or adequately explain how history and tradition support excluding someone from the Second Amendment's scope because they were arrested but never convicted.  The court agrees with Allen in that "it is not necessarily or universally true" that a person with a criminal record will have a propensity for violence.  *See* Pl's Opp'n, ECF No. 24, at 19 (omitting internal quotations).  Likewise, "[t]he mere fact that a man has been arrested has very little, if any, probative value in showing that he has engaged in any misconduct."  S*chware v. Bd. of Bar Exam. of State of N.M.*, 353 U.S. 232, 241 (1957).  Allen is "not a convicted felon or otherwise subject to another 'longstanding prohibition[] on the possession of firearms' that would have excluded him."  *Rahimi*, 61 F.4th at 452 (internal citation omitted).  As in *Rahimi*, the fact that Allen may have been suspected of criminal conduct in the past (but not charged) does not permit Defendants to restrict his Second Amendment rights.  The court finds that Allen has adequately pleaded an as-applied challenge to Defendants' revised interpretation of 24 DCMR § 2335.1(d).  Consequently, the court will deny Defendants' Motion to Dismiss with regard to Allen's Second Amendment claim.

### D. **Damages (Count Eight)**

#### i. Claims Against Individual Government Officials

Allen brought his Second Amendment claim under 42 U.S.C. § 1983 against all Defendants, including the following individuals in their official and personal capacities: MPD Chief Newsham, Lieutenant Hall, John Does representing MPD employees, and CPLRB members Powell, Abrecht, and Tillbrook.  *See* Compl. ¶¶ 20–23, 27, 261–67.  Defendants argue

that the individual Defendants are entitled to qualified immunity, which provides "immunity from suit rather than a mere defense to liability." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam) (emphasis omitted).

Although §1983, by its text, does not afford government officials any immunity, the Supreme Court has determined that "certain government officials" have "either absolute or qualified immunity from suit." *Wyatt v. Cole*, 504 U.S. 158, 163 (1992). "At the motion to dismiss stage, a plaintiff must allege sufficient facts to establish that the defendants are not entitled to qualified immunity." *Patterson v. United States*, 999 F. Supp.2d 300, 311 (D.D.C. 2013) (emphasis omitted). "[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). "Qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Jeffries v. District of Columbia*, 917 F. Supp.2d 10, 28 (D.D.C. 2013) (internal citation omitted). To determine whether qualified immunity applies, the court must consider (1) "whether a constitutional right would have been violated on the premises alleged," and (2) "whether the right was clearly established" at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001).

Showing that the unlawfulness of an officer's actions is clearly established "does not 'require a case directly on point.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "Regardless of whether a court expressly has declared certain conduct unlawful, a government official is not entitled to qualified immunity where every reasonable official would have understood that what he is doing violates th[e] right." *Id*. Indeed, the Supreme Court has acknowledged that "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently

clear even though existing precedent does not address similar circumstances." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)).

Here, the right in question is whether a person with a history of arrests but no convictions has a right to a CPL under the Second Amendment.  Allen argues that *Wrenn* clearly established this right because it held that a "typically situated" and "law-abiding" citizen has a constitutional right "to carry firearms for personal self-defense beyond the home."  *See* 864 F.3d at 667.  But *Wrenn* analyzed whether an individual must provide a special need for self-defense to obtain a conceal-carry license and did not address whether an individual with prior arrests has a right to a CPL.  *Id.*  Allen has not provided—nor has the court located—a single decision within the D.C. Circuit considering the circumstances under which a person with prior arrests but no convictions has a right to a CPL.  Most precedents involve individuals with prior convictions, and were decided pre-*Bruen*.  *See e.g.*, *Medina*, 913 F.3d at 161 (finding statute that prohibited plaintiff convicted of decades-old, nonviolent felony from owning firearm did not violate the Second Amendment); *Schrader v. Holder*, 704 F.3d 980, 989 (D.C. Cir. 2013) (finding statute that prohibited plaintiff convicted of forty-year-old, common-law misdemeanor from possessing a firearm did not violate the Second Amendment).

Allen contends that his rights under the Second Amendment were clearly established at the time of violation because "the presumption of innocence lies at the foundation of our criminal law." *Nelson v. Colorado*, 581 U.S. 128, 135-36 (2017); *See* Pl's Opp'n at 38.  But the Supreme Court has repeatedly cautioned courts to not identify a constitutional right at too high a level of generality, *see Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018), lest plaintiffs "convert

the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

Moreover, *Bruen* was decided after Allen's CPL was revoked and even *Bruen* does not directly address whether someone with a history of arrests but no convictions has a right to a CPL under the Second Amendment. Given that this is a case of first impression, the right Allen alleges was not clearly established. Consequently, MPD Chief Newsham, Lieutenant Hall, John Does representing MPD employees, and CPLRB members Powell, Abrecht, and Tillbrook are immune from suit in their personal capacities under a theory of qualified immunity.

Moreover, the individual Defendants are not liable in their official capacities. A suit against a D.C. official in his or her official capacity is "equivalent to a suit against the municipality itself." *Atchinson v. District of Columbia,* 73 F.3d 418, 424 (D.C. Cir. 1996). The District of Columbia is named as a Defendant in this action, making it redundant to name the individual Defendants in their official capacities. Therefore, the court will grant Defendants' Motion to Dismiss the claims against the individual government officials in their personal and official capacities.

ii.  <u>Municipal Liability</u>

Allen seeks compensatory, nominal, and punitive damages against all Defendants. *See* Compl. ¶¶ 312–17. But MPD and CPLRB cannot be sued as separate entities, leaving only Allen's Second Amendment claims against D.C. *See Sobin v. District of Columbia,* Civil Action No. 19-2580, 2020 WL 4732098, at n.1 (D.D.C. Aug. 14, 2020) ("A noncorporate department or other body within a municipal corporation is non sui juris, and generally, bodies within the District of Columbia government . . . are not suable as separate entities.") (citing *Amobi v.*

*District of Columbia Dept. of Corrections*, 755 F.3d 980, 987 n.5 (D.C. Cir. 2014)).
Consequently, Allen's claims against MPD and CPLRB will be dismissed.

To state a claim for municipal liability, a plaintiff must state (1) "a predicate
constitutional violation" and (2) "that a custom or policy of the municipality caused the
violation." *Baker v. District of Columbia*, 326 F.3d 1302, 1306 (D.C. Cir. 2003). *Baker* sets out
four ways to allege an official municipal policy: a plaintiff may point to (1) "the explicit setting
of a policy by the government," (2) "the action of a policy maker within the government," (3)
"adoption through a knowing failure to act by a policy maker of actions by his subordinates that
are so consistent that they have become 'custom,'" and (4) "failure of the government to respond
to a need (for example, training of employees) in such a manner as to show 'deliberate
indifference' to the risk that not addressing the need will result in constitutional violations." *Id.*
Each theory has its "own elements" which must be established by plaintiff's allegations. *Blue v.
District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015), *cert. denied*, 137 S. Ct. 77 (2016).

Here, Allen has pleaded a predicate constitutional violation by alleging that Defendants
violated his Second Amendment right when they revoked his CPL pursuant to MPD's official
policy of weighing criminal history incidents equally regardless of whether they resulted in
conviction. *See* Compl. ¶¶ 261–73; *supra* Section C. Allen's claims can best be analyzed under
*Baker* prongs one and two because he alleges that MPD's policy was explicit and was an action
by a government policymaker *i.e.*, MPD Chief Newsham. *See* Compl. ¶ 21. Defendants argue
that Allen has not identified "a policy that actually exists," *see* Defs' Reply at 20, and even if
there were such a policy it did not violate Allen's Second Amendment rights. *See* Mot. to
Dismiss at 44. As discussed above, the court finds that Allen properly pleaded that his Second

Amendment rights were violated.  The question that remains is whether Allen has sufficiently pleaded that an official municipal policy existed.

### 1.   Explicit Policy (Baker #1)

"To establish the existence of an explicit municipal policy requires showing that 'the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *Tyson v. D.C.*, No. CV 20-1450 (RC), 2021 WL 4860685, at *9 (D.D.C. Oct. 19, 2021) (quoting *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *see also Barnes v. District of Columbia*, 793 F. Supp. 2d 260, 271 (D.D.C. 2011) (finding that city ordinance prohibiting release of inmates after 10 p.m. was an official policy); *Monell v. Department of Social Services*, 436 U.S. at 611 (finding that requirement that pregnant employees take unpaid leave from their city jobs although still willing and able to work was an official policy).

Here, Allen identifies as an explicit policy MPD's revised interpretation of "propensity for violence or instability."  *See* Compl. ¶ 4.  Defendants do not use the word "policy" but refer to the change as a new "standard" and "balancing test" in their briefing materials, s*ee* Mot. to Dismiss at 7–8, and a "change in interpretation" or "new interpretation" in a memorandum to the CPLRB.  *See* MPD Response to CPLRB Order to Stay Appeal of Linwood Allen at 3. Defendants implemented the MPD Chief's new interpretation when it audited all the CPLs granted in 2019, including Allen's, and when it ultimately decided to revoke Allen's CPL.  *See* Mot. to Dismiss at 8 ("After revising its interpretation, MPD audited the CPLs that were granted in 2019…it was determined that plaintiff's long history of arrests for drugs, gambling, and guns rendered him not suitable for a CPL.").  Although Defendants do not call it a policy, their revised interpretation is most certainly one.  By their own words the revised interpretation was a

"deliberate and principled change."  Mot. to Dismiss at 22.  Consequently, the court finds that

Allen sufficiently pleaded that an explicit policy existed.

## 2.   Action of a Policymaker (Baker #2)

"[M]unicipal liability may be imposed for a single decision by municipal policymakers

under appropriate circumstances."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)

(plurality opinion); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) ("an

unconstitutional governmental policy [can] be inferred from a single decision taken by the

highest officials responsible for setting policy in that area of the government's business.").

A "final decision maker typically must be at least an agency head or the governing body

of an agency."  *Coleman v. District of Columbia*, 828 F. Supp. 2d 87, 91 (D.D.C. 2011); *see e.g.,*

*Banks v. Dist. of Columbia*, 377 F. Supp. 2d 85, 91 (D.D.C. 2005) (holding the Director of the

District of Columbia Department of Mental Health to be a final policymaker with authority under

D.C. Code § 7–1131.05); *Singletary v. District of Columbia*, 685 F. Supp. 2d 81, 90–91 (D.D.C.

2010) (holding the District of Columbia Board of Parole to be a final policymaker).

When determining whether a municipal employee, including the head of an agency, has

final policymaking authority, courts in this district look for "specific provisions in the D.C.

Code" that "grant[ ] the director authority to promulgate rules for the administration of his

respective department with regard to the [specific] conduct at issue."  *Byrd v. District of*

*Columbia*, 807 F. Supp. 2d 37, 75 (D.D.C. 2011) (holding that Director of the District of

Columbia Department of Parks and Recreation was not a final policy maker because "[no]

portion of the D.C. Code specifically grant[ed] authority to the DPR director to promulgate

administrative rules or anti-harassment policies and procedures")

Courts have held that an official need only be the final policymaker as to a subject matter for a particular department or agency. *See, e.g., Dave v. Dist. of Columbia Metro. Police Dep't,* 905 F. Supp. 2d 1, 12 (D.D.C. 2012) (Chief of Police was final policymaker sufficient for liability regarding employment matters); *Barnes,* 793 F.Supp.2d at 290–91 (Department of Corrections Director was final policymaker sufficient for liability regarding strip search policy).

Here, the MPD Chief is the highest-ranking official in the MPD. *See* Compl. ¶ 21. Unlike the municipal employees in *Byrd*, the MPD Chief is specifically authorized to make policy regarding gun licensing: "Subject to applicable laws, rules, regulations, and orders of the Mayor or directives pursuant to orders of the Mayor, the Chief of Police shall have full power and authority over the department and all functions, resources, officials, and personnel assigned thereto." 6A DCMR Sec. 800.7. Moreover, Defendants concede that D.C.'s License to Carry a Pistol Amendment Act of 2014 (the Act), D.C. Code § 7-2509.01, et seq., sets forth the process by which individuals may apply for a CPL in D.C. and authorizes the Chief of MPD to issue rules to implement the law under § 7-2509.11. *See* Mot. to Dismiss at 5. Thus, Allen has sufficiently pleaded that MPD Chief Newsham was a policymaker.

Allen has also sufficiently alleged that Newsham's decision was the "moving force" behind Allen's CPL revocation and deprivation of his Second Amendment rights. *Id.* at 273. Notably, MPD stated that the "decision to revoke Mr. Allen's CPL is the result of a deliberate and principled change in the Chief of Police's position on what it means to have 'exhibited propensity for violence or instability' . . .under 24 DCMR § 2335.1(d).'" MPD Response to CPLRB Order to Stay Appeal of Linwood Allen at 2. MPD went on to say the "Chief is charged with enforcing this regulation, and his interpretation of the regulation is due deference." *Id.* Consequently, the court finds that Allen sufficiently pleaded a municipal liability claim under

*Baker* prongs one and two, thus permitting Allen to continue litigating his Second Amendment claim against the District of Columbia.

## IV.    CONCLUSION

For the reasons previously stated, the court will GRANT in part and DENY in part Defendants' Motion to Dismiss, ECF No. 22.  Specifically, the court will DISMISS as moot Counts one through eight regarding Allen's firearm registration certification.  The court will also DISMISS the following claims regarding Allen's CPL: Counts one, three, four, five, six, and seven.  The court will deny Defendants' motion to dismiss as to Allen's Second Amendment and Damages claims against D.C. (Counts two and eight).


Date: March 31, 2023

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge