## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **LINWOOD ALLEN** | |
| **Plaintiff,** | |
| **v.** | **No. 1:20-cv-02453-TSC** |
| **DISTRICT OF COLUMBIA,** | |
| **Defendant.** | |

## REPLY IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO STAY THE CASE

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................................. 1

ARGUMENT ................................................................................................................... 1

    I.     Allen Misunderstands the Judicial Economy Gains Provided by *Rahimi*. ............. 1

    II.    The Balance of Hardships Weighs Decidedly in Favor of a Stay........................... 8

          A.    Allen Overstates the Harm to Him From a Stay. ........................................ 8

          B.    Allen Understates the Harms to the District Absent a Stay. ...................... 17

CONCLUSION ............................................................................................................... 18

## INTRODUCTION

One perspective is noticeably absent from Linwood Allen's discussion of a stay: this Court's.  *See* Pl.'s Opp'n to Defs.' Mot. to Stay (Pl.'s Opp.) [44].  In arguing that *United States v. Rahimi* will have no effect here, Allen ignores that *this Court* already held that *Rahimi* "is analogous to this case."  *Allen v. District of Columbia*, No. 20-cv-2453, 2023 U.S. Dist. LEXIS 60950, at *23 (D.D.C. Mar. 31, 2023).  And in complaining about a stay's supposed burdens, Allen does not spare a thought for the burdens on *this Court* of managing difficult, probably needless discovery and wading through inevitable double briefing (pre- and post-*Rahimi*) absent a stay.

But it is not just this Court's time and resources that Allen leaves unmentioned.  He fails to mention that the proper interpretation of *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), is at the center of both *Rahimi* and this case.  He fails to mention that his complaints of irreparable harm are undercut by the time-saving value of a stay, D.C. Circuit case law, and his own actions.  And he fails to mention discovery and briefing issues that a stay would allow the Court and Parties to avoid.  What Allen does mention, then, is not enough to overcome the common-sense benefit of a short stay of this case.

## ARGUMENT

### I.     Allen Misunderstands the Judicial Economy Gains Provided by *Rahimi*.

Allen argues that the issues in *Rahimi* are too different from the issues in this case.  Pl.'s Opp'n at 6.  This Court disagrees with him.  This Court already explained that "*Rahimi* is analogous to this case."  *Allen* 2023 U.S. Dist. LEXIS 60950, at *23.  In trying to distinguish *Rahimi*, Allen says not one word about this Court's own interpretation of *Rahimi*.  His failure to respond to the District's point that this Court has already held that *Rahimi* bears on this case, Def.'s Mot. at 6–7, concedes the point, *Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir.

2014).  Put simply, this case went forward based on *Rahimi*, so it only makes sense to briefly

pause it while *Rahimi* is reviewed by the Supreme Court.

    Allen also says nothing about *Bruen*.  *See* Def.'s Mot. at 7–8.  *Bruen*, however, sets the

governing legal standard in this case.  *Allen* 2023 U.S. Dist. LEXIS 60950, at *23.  Yet, as this

Court observed, there have been no precedential cases applying *Bruen*.  At the same time, and as

Justice Kagan observed, there is "a fair bit of division and a fair bit of confusion about what

*Bruen* means and what *Bruen* requires in the lower courts."  Tr. of Oral Arg. at 38, *United States*

*v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023) ("*Rahimi* Tr.").  So the interpretation of *Bruen*'s test

is front and center in *Rahimi*.  *Id.* at 38–41 (Solicitor General explaining how the Court can

clarify *Bruen*); *see also* Reply Brief for the United States at 1–6, *United States v. Rahimi*, No.

22-915 (U.S. Oct. 25, 2023) ("U.S. Reply") (disputing Rahimi's interpretation of *Bruen*'s

analytical framework).  It simply does not make sense to proceed with a case where the legal

standard is subject to "confusion" and "division," *Rahimi* Tr. at 38, when the Supreme Court is

poised to soon clarify that standard.

    Rather than confront the interaction between *Bruen*, *Rahimi*, and this case, Allen

misconstrues the District's argument as saying just that both *Rahimi* and this case are Second

Amendment cases.  Pl.'s Opp'n at 6, 8.  The District never asked the Court to stay this case

simply because it and *Rahimi* are Second Amendment cases.  The reason the Court should stay

this case is because the specific legal standard the Court must apply here is contested and has

never been applied by either the Supreme Court or the D.C. Circuit since it was first announced.

That standard will shape discovery, summary judgment briefing, and this Court's final judgment.

Def.'s Mot. at 11–12.  Allen, however, wants to rush this case forward without regard for the

reality that guidance on the complex legal standard is coming.  That is not how this Court

2

manages cases. *See 9REN Holding S.A.R.L. v. Kingdom of Spain*, No. 19-cv-1871, 2020 WL 5816012, at *2 (D.D.C. Sept. 30, 2020) (Chutkan, J.) ("A hasty resolution resulting in inconsistent rulings is not in the interest of judicial economy."); Min. Order, *Sokol World Ent., Inc. v. Small Bus. Admin.*, No. 21-cv-2385 (D.D.C. Feb. 13, 2023) (Chutkan, J.) (staying case pending related D.C. Circuit proceedings). Unlike here, none of the cases relied on by Allen involved a stay pending an argued Supreme Court case that will set the governing legal standard for the claim at bar. *See, e.g.*, *Nat'l Indus. for the Blind v. Dep't of Vet. Affairs*, 296 F. Supp. 3d 131, 142–43 (D.D.C. 2017) (denying stay because the other, Federal Circuit case "involves an entirely different cause of action"); *Dellinger v. Mitchell*, 442 F.2d 782, 787 (D.C. Cir. 1971) (vacating stay in a civil case pending out-of-circuit criminal case involving different parties when the stay movant only argued that factual issues overlapped and a stay would prevent interference).

In suggesting that there will not be "*any* efficiency gains" from *Rahimi*, Allen misses the obvious judicial economy reasons for staying this case. Pl.'s Opp'n at 6 (internal quotation marks omitted) (quoting *Nat'l Indus. for the Blind*, 296 F. Supp. 3d at 143). Consider what happens if a stay is denied. As it stands, summary judgment briefing ends in early June—just about when a decision in *Rahimi* can be expected. Sched. Order [35] at 1. The Parties will no doubt want to file briefs addressing how or if *Rahimi* affects this case. More likely, the Parties will want to redo summary judgment briefing. Double briefing is inefficient and adds time to this case and paper to this Court's desk, thus pushing off the moment when the Court can decide summary judgment. *Cf.* Order [29] at 2, *Woodward Health Sys., LLC v. Becerra*, No. 20-cv-3098 (D.D.C. Feb. 23, 2022) ("*Woodward* Order") ("As [the other court] will very likely have ruled during briefing, it seems highly inefficient to then incorporate that ruling into the parties'

arguments.").  If there is no opportunity for further briefing, then the Court will be forced to decide the case with outdated briefs, which is likewise inefficient.

Still further, a Party may want to reopen discovery in light of *Rahimi*.  For example, a modified legal standard will likely change what facts are relevant.  Either Party may want further factual exploration based on what *Rahimi* identifies as relevant.  Or a Party may want to retain different experts to explore historical issues the Court may identify.  Or Allen may want to depose District policymakers again to probe their rationale for the law he challenges based on what *Rahimi* identifies as considerations for review of policy judgments about dangerousness. *See* U.S. Reply at 13 (arguing that the Court could hold that "courts may properly review a legislature's judgment that a category of persons would pose a danger if armed" and identifying considerations for review).  A second round of discovery will surely add to the timeline of this case.  Thus, getting ahead of *Rahimi* means a longer and more complicated case timeline.  It is far simpler and more efficient for everyone—including Allen—to pause for just six months and pick back up with a stable legal standard.

Nonetheless, Allen nitpicks differences between *Rahimi* and this case.  Pl.'s Opp'n at 6–11.  None of his nitpicking can change the bottom line that *Rahimi* will be the first precedential interpretation of the legal standard applicable here.  Still, Allen errs in urging that *Rahimi* must be near identical to this case for this Court to issue a stay.  *Id.* at 6.  As the Supreme Court explained, a stay is permitted even where proceedings in another court "may not settle every question of fact and law."  *Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936).  There is no need for "perfect overlap."  *Game Plan, Inc. v. ESPN, Inc.*, No. 20-cv-455, 2020 WL 5995123, at *2 (D.D.C. Oct. 9, 2020).  The other case need only be "at the very least, persuasive and helpful." *Id.*  Factual differences between the cases, *see* Pl.'s Opp'n at 8–10, do not preclude a stay,

*Bridgeport Hosp. v. Sebelius*, No. 09-cv-1344, 2011 WL 862250, at *1 (D.D.C. Mar. 10, 2011). What matters is that *Rahimi* will at least "give this Court guidance." *Peled v. Netanyahu*, No. 17-cv-260, 2017 WL 7047931, at *2 (D.D.C. Oct. 16, 2017); *see also Woodward* Order at 2 (granting stay when it "would [ ] seem imprudent for this Court not to wait to hear what the D.C. Circuit has to say"). There is even less need for perfect similarity when a stay involves a Supreme Court case. *See Sikhs for Just. v. Nath*, 893 F. Supp. 2d 598, 622 (S.D.N.Y. 2012) (collecting cases showing that it is common practice to grant stays when the other case is a Supreme Court case). That makes sense because even Supreme Court dictum "must be treated as authoritative." *Illinois v. Ferriero*, 60 F.4th 704, 718–19 (D.C. Cir. 2023) (internal quotation marks omitted) (quoting *Sierra Club v. EPA*, 322 F.3d 718, 724 (D.C. Cir. 2003)).

As such, other courts have stayed cases pending *Rahimi*, even though those cases involve different laws and facts from *Rahimi*. Order, *Epps v. United States*, No. 2020-CF2-003105 (D.C. Oct. 27, 2023) (District laws prohibiting carrying a pistol without a license, possessing unregistered firearms, and possessing unregistered ammunition); *Fooks v. State*, No. 24, 2023 WL 5211064 (Md. Aug. 15, 2023) (felon-in-possession ban). Allen bats away the stays issued in these cases by noting that the challengers there did not oppose them. Pl.'s Opp'n at 10. But that just shows how Allen is being unreasonable. Other Second Amendment challengers see the obvious import of *Rahimi*. Allen refuses to see what other Second Amendment challengers— and this Court—can.

Regardless, Allen fails to distinguish *Rahimi* in a way that justifies denying a stay. He first says that *Rahimi*'s issue of whether restrictions on dangerous individuals' access to guns are constitutional will have no effect here because he "is not challenging the District's ability to

place restrictions on dangerous individuals' access to guns." Pl.'s Opp'n at 6. And he does not

see how resolution of that "broader question" has relevance here. *Id.* at 7.

He misunderstands the frontline issue in this case and *Rahimi*. The first step in *Bruen* is

to determine whether an individual and his conduct come within the scope of the Second

Amendment. *Allen* 2023 U.S. Dist. LEXIS 60950, at \*21–22. The District maintains that

Allen's claim fails at *Bruen* step one because (1) the Second Amendment right is held by law-

abiding and responsible citizens, *e.g.*, *Bruen*, 142 S. Ct. at 2122, 2134; and (2) licensing—

including with standards that consider dangerous, even if not convicted for, conduct—is a

constitutional means to ensure that individuals who want a gun are indeed law-abiding and

responsible, *see* 142 S. Ct. at 2138 n.9. *See generally* Mem. of P. & A. in Supp. of Def.'s Mot.

to Stay the Case or, Alternatively, Dismiss Pls.' 2d Am. Compl. [31] at 19–26, *Millard v.

District of Columbia*, No. 22-cv-2672 (D.D.C. Aug. 30, 2023) ("*Millard* Br.").

At the motion-to-dismiss stage, this Court disagreed with the District that Allen had

failed to allege that he is a law-abiding and responsible citizen, relying on *Rahimi*: "As in

*Rahimi*, the fact that Allen may have been suspected of criminal conduct in the past (but not

charged) does not permit Defendants to restrict his Second Amendment rights." *Allen* 2023 U.S.

Dist. LEXIS 60950, at \*26. Before the Supreme Court, the issues of what "law-abiding and

responsible" means and how governments may decide who is "law-abiding and responsible"

have taken center stage. Def.'s Mot. at 6–7 (citing *Rahimi* briefing); *see also, e.g.*, *Rahimi* Tr. at

5 (first question at argument: "General, would you just briefly define what you mean by 'law-

abiding and responsible'?"). Allen's contention that those issues are "not the question on which

the Supreme Court granted certiorari" is a distraction. Pl.'s Opp'n at 7. The Parties and Justices

believe those issues are implicated by the question presented.  Thus, the *threshold* issues in this case will be decided by or at least gain guidance from *Rahimi*.

Allen further argues that this case is different from *Rahimi* because the statute in *Rahimi* requires "procedural safeguards" in the underlying civil protective order process, but the District's process for licensing is "bereft of safeguards like those in § 922(g)(8)."  Pl.'s Opp'n at 9–10.  But Allen overlooks that the bigger issue in *Rahimi* is whether governments can use civil procedures *at all* before disarming someone, or whether disarmament can only occur following a criminal process.  And that is an issue this Court has identified in this case: whether the District can disarm someone following a civil process (licensing) and without "criminal proceedings and conviction."  *Allen* 2023 U.S. Dist. LEXIS 60950, at *24 (internal quotation marks omitted) (quoting *United States v. Rahimi*, 61 F.4th 443, 448, 458 (5th Cir. 2023)).[1]

Next, Allen points to one statement at oral argument by the Solicitor General that a case involving an "executive branch or an administrative determination" of dangerousness may include an additional consideration of whether executive officials have too much discretion.  Pl.'s Opp'n at 9 (quoting *Rahimi* Tr. at 34–35).  What Allen leaves out is that Justice Alito asked, as a follow-up, how the United States' position on who is a "responsible" citizen would affect "a

---

[1]     Allen repeatedly misconstrues how the licensing system works.  The Chief does not deny or revoke licenses just because someone has a history of arrests and without procedural safeguards.  *See, e.g.*, Pl.'s Opp'n at 1, 3, 6–7.  Rather, she considers all relevant facts to determine whether someone meets the regulatory standard for dangerousness and that may include arrest records.  *See* Defs.' Ex. 1 [22-2] at 4–5 (explaining that the "conduct" revealed by Allen's arrests lead to the Chief's conclusion that he met the dangerousness standard).  The Chief does not deny licenses based on the mere fact of arrest—that is not the regulatory standard.  1 DCMR § 2335.1.  Importantly, her fact findings and reliance on arrest records are subject to two levels of review—including judicial—and must stand up under long accepted administrative-law standards, like the "substantial evidence" and "arbitrary and capricious" standards.  *See* 1 DCMR § 2822.2(a); *id.* § 1218.2 (2019); D.C. Code § 2-510(a)(3); Def.'s Mot. at 2.  This case is past the point where Allen's allegations suffice, so in considering whether to stay, the Court should not accept Allen's arguments that rest on misrepresentations of the licensing system.

concealed carry permitting regulation . . . that [ ] requires an applicant to show—to show that he or she is sufficiently responsible." *Rahimi* Tr. at 35. Thus, the Justices themselves perceive how the issues in *Rahimi* implicate and may affect licensing schemes with dangerousness standards.

Allen also says that *Rahimi* differs because "there was at least a substantiated factual basis for restricting [Rahimi's] gun rights based on dangerousness" but not for Allen. Pl.'s Opp'n at 9. Of course, the District disagrees that there was no factual basis to revoke Allen's license. In any event, Rahimi, like Allen, disputes whether he is in fact dangerous. *Rahimi* Tr. at 60–61, 64–65, 79. The Supreme Court, then, will likely pass on that dispute, and how the Court characterizes dangerousness will provide guidance in the Parties' dispute here.

In the end, "courts 'have broad discretion' in deciding whether to stay proceedings 'pending the resolution of independent legal proceedings.'" *9REN Holding*, 2020 WL 5816012, at *2 (quoting *Marsh v. Johnson*, 263 F. Supp. 2d 49, 52 (D.D.C. 2003)). If the Court thinks that *Rahimi* will be helpful in any way, it enjoys the power to stay this case. *See id.*

## II.    The Balance of Hardships Weighs Decidedly in Favor of a Stay.

On one side of the balance of harms, there are Allen's misplaced, incorrect, and incredible assertions of irreparable harm from a stay. On the other side, there are concrete, needless, and accruing litigation costs to both Parties and the Court absent a stay. The scale tips in favor of a stay. In fact, there are so few downsides to a stay (if any), that it makes little sense to deny one—especially when *Rahimi* will be so impactful.

### A.    Allen Overstates the Harm to Him From a Stay.

Allen offers only one reason why a stay would harm him: He per se suffers irreparable harm until this case is resolved because he has alleged a violation of his Second Amendment rights. Pl.'s Opp'n at 11–16. But it is not true that a stay will prolong Allen's alleged harm, that a stay must be denied when there is a constitutional claim, that allegations of a constitutional

violation suffice to show irreparable harm, or that Allen's assertions of irreparable harm are entitled to weight.

To start, Allen wrongly assumes that a stay will "prolong" the time until he can get injunctive relief to remedy his alleged irreparable harm. Pl.'s Opp'n at 11.[2] As a threshold matter, he errs in thinking that relief from this Court will automatically get him a license. If the Court orders injunctive relief reversing the 2019 revocation of Allen's license, Compl. [1] ¶ 318(b), that does not mean Allen will suddenly have a valid license. A license is only valid for two years. D.C. Code § 7-2509.03(a). So his license, even if it had not been revoked, would have expired. As a result, he will still need to apply for a new one if he wins his case. No one can say with any certainty that he will qualify for a license because he has not yet provided the District or the Court any information about his history since 2019. For similar reasons, Allen has not shown that the Court can order the District to "reinstate" his license because there are currently no facts in the record from Allen about whether he is qualified *today*. Compl. ¶ 318(c). Thus, Allen misfires by urging that a stay will delay the time until he can fully exercise his Second Amendment right because there is no guarantee that this case, if successful for him, will result in him becoming licensed.

Even if injunctive relief ensured that Allen got a license, Allen would not get relief until, at the earliest, the Court grants him summary judgment. Denying a stay and sticking to the

---

[2]    Allen says that the District "maintains that [he] has disavowed his claim for injunctive relief. Pl.'s Opp'n at 13. The District never said that Allen had "withdrawn his claims" for injunctive relief from his Complaint. *Id.* The District noted that "Allen has previously indicated to the District that he is now only pursuing monetary—not injunctive—relief." Def.'s Mot. at 9 n.3. That is true: In discussions with Allen's prior counsel, that counsel indicated that Allen was more interested in monetary relief than receiving his license. And that this is consistent with the fact that Allen has never tried reapplying for a license. In any event, for the reasons that follow above, a stay will not harm Allen even if he is truly interested in obtaining his license through this litigation.

current schedule, however, will push the summary judgment decision point back thanks to double briefing or reopened discovery, as explained above. A stay will *save* Allen time because it prevents the Parties from having two phases of briefing or discovery. A stay, then, is more efficient "in the long run." *Novenergia II - Energy & Env't (SCA) v. Kingdom of Spain*, No. 18-cv-1148, 2020 WL 417794, at *4 (D.D.C. Jan. 27, 2020) (Chutkan, J.) (internal quotation marks and citation omitted).

Relatedly, Allen never grapples with the important consideration that a stay will be of a definite and short (six months maximum) duration. Def.'s Mot. at 9. Even if his complaints of irreparable constitutional harm were credited, a stay will at most add six months to this case (although it will more likely save time in the long run). In contrast, cases he cites that emphasized harm to the nonmovant involved *indefinite* and possibly lengthy stays. *E.g.*, *Dellinger*, 442 F.2d at 786; *Nat'l Indus. for the Blind*, 296 F. Supp. 3d at 140; *En Fuego Tobacco Shop LLC v. FDA*, 356 F. Supp. 3d 1, 12 (D.D.C. 2019).

Moreover, there is just no rule that a stay should be denied in any case that "involve[s] a constitutional claim." Pl.'s Opp'n at 11. To the contrary, the Supreme Court's seminal decision affirming a district court's power to stay involved a constitutional claim. *Landis*, 299 U.S. at 249. As another court explained when staying a Second Amendment challenge to a licensing statute, concerns over constitutional harm are not a per se reason to deny a stay and "must be weighed against the particular posture of this case." *Livingston v. Ballard*, No. 19-cv-157, 2019 WL 2419455, at *3 (D. Haw. June 10, 2019). And when an appellate court is set to weigh in on the Second Amendment issues, "the hardship from such a delay does not outweigh" the judicial economy gains. *Id.* Allen's position cannot be squared with numerous other examples of courts staying Second Amendment challenges. *E.g.*, *id.*; Def.'s Mot. at 8 (collecting cases); Order

[138], *Sullivan v. Ferguson*, No. 22-cv-5403 (W.D. Wash. Nov. 21, 2023) ("*Sullivan* Order");

*Nuccio v. Duve*, No. 13-cv-1556, 2015 WL 1189617, at *6 (N.D.N.Y. Mar. 16, 2015).

Neglecting such cases, Allen spends much of his brief trying to distinguish cases cited in

the District's Motion on the facts.  Pl.'s Opp'n at 12–15.  He wastes his ink because "the

question of whether to stay a particular case is inextricably intertwined with the nature of the

specific case."  *Wrenn v. District of Columbia*, 179 F. Supp. 3d 135, 137 (D.D.C. 2016).  Thus,

"a lengthy discussion of other cases where courts have granted or refused stays" is unhelpful.  *Id.*

In any event, as the above cases show, courts indeed stay Second Amendment claims like

Allen's—including pending *Rahimi*.

Allen also wrongly assumes that he has made a showing of a Second Amendment

violation or irreparable harm.  Neither the Supreme Court nor the D.C. Circuit has held that

*allegations* of a constitutional violation suffice to prove irreparable harm.  To the contrary, the

D.C. Circuit "require[s] movants to do more than merely allege a [constitutional] violation" to

make a showing of irreparable harm.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d

290, 301 (D.C. Cir. 2006); *see Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)

(requiring affirmative "proof" of irreparable harm not "[b]are allegations").  Allen has only

alleged a violation of his Second Amendment rights.  This Court has not concluded that he in

fact has been "deprived of his constitutional right to bear arms."  Pl.'s Opp'n at 11.

And his odds of proving a constitutional violation are slim.  *See generally Millard* Br. at

19–63.  Respectfully, no other court has ever held that it is a Second Amendment violation to

consider documented dangerous conduct and facts contained in arrest reports when making

licensing decisions.  Nor has a court held that the Second Amendment mandates a "convictions

only" rule that licensing authorities can only deny licenses based on convictions.  Quite the

11

opposite, most states have long used any documented dangerous conduct to make licensing decisions, even if that conduct is documented in arrest reports, charges, or the like.[3] *Bruen* did not alter that longstanding practice, as courts continue to affirm licensing authorities' consideration of arrest reports, charges, and other documentation of dangerous conduct—even if that conduct did not result in a conviction.[4] In fact, the Second Circuit just held that "the *review of public social media posts by a licensing officer poses no constitutional difficulties.*" *Antonyuk*

---

[3]     *E.g.*, Colo. Rev. Stat. § 18-12-203(2) (providing that licensing authority can rely on any "documented previous behavior"); *Kuck v. Danaher*, 822 F. Supp. 2d 109, 129 (D. Conn. 2011) (rejecting Second Amendment challenge to suitability standard and collecting cases where permits were revoked based on arrest reports); *In re Lee*, 77 A.3d 325, 327 (Del. Super. Ct. 2013) (revoking license based on police report); *Jankovich v. Ill. State Police*, 78 N.E.3d 548, 563 (Ill. Ct. App. 2017) (affirming license denial based on arrest records); *McIntyre v. Page Cnty. Sheriff's Off.*, 538 N.W.2d 305, 308 (Iowa Ct. App. 1995) (affirming revocation of permit from individual who had never been convicted of a crime but had "numerous domestic disputes"); *Hider v. Chief of Police*, 628 A.2d 158, 161 (Me. 1993) (affirming permit denial based on charges); *R.F. v. Owen*, 596 S.W.3d 221, 226 (Mo. Ct. App. 2020) (holding that licensing authority can rely on "facts and circumstances underlying" expunged offenses); *Smith v. Cnty. of Missoula*, 992 P.2d 834, 838 (Mont. 1999) (affirming permit denial based on police reports and charges that were dismissed); N.D. Cent. Code § 62.1-04-03 (providing that licensing authority may rely on "past pattern of behavior involving unlawful violence or threats of unlawful violence, "past participation in incidents involving unlawful violence or threats of unlawful violence," and "expunged or sealed records of arrests"); *Commonwealth v. Miller*, 288 A.3d 939, 943 (Pa. Commw. Ct. 2023) (affirming revocation of license based on arrests and charges that were dismissed or nolle prossed); *Paiva v. Parella*, 176 A.3d 480, 484 (R.I. 2018) (remanding licensing decision for authority to consider police reports because "we cannot, in good faith, ignore what [police reports] disclose."); Utah Code § 53-5-704(3)(c) (providing that permitting authority may consider "expunged records of arrests"); Va. Code Ann. § 18.2-308.09(13) (providing that dangerousness determination can be based on sworn statements by law enforcement). All these authorities come from states that *Bruen* signaled had permissible licensing schemes. *Bruen*, 142 S. Ct. at 2123 n.1, 2138 n.9.

[4]     *E.g.*, *Miller*, 288 A.3d at 943; *Awkerman v. Ill. State Police*, --- N.E.3d ----, ----, No. 2-22-0434, 2023 WL 8227406, at *13 (Ill. Ct. App. Nov. 28, 2023); *Ward v. N.Y. Police Dep't Headquarters License Div.*, --- N.Y.S.3d ----, No. 2022-04125, 2023 WL 6467091 (N.Y. App. Div. Oct. 5, 2023); *Matter of M.U.'s Application for a Handgun Purchase Permit*, 291 A.3d 827, 855 (N.J. Super. Ct. App. Div. 2023); *Matter of the Revocation of Emanuel Brice's Firearms Purchaser Id. Card*, No. A-0820-21, 2023 WL 4993453, at *5 (N.J. Super. Ct. App. Div. Aug. 4, 2023); *Dupras v. Deputy Chief of Police of Fall River*, No. 22-P-971, 2023 WL 7870521, at *1 (Mass. App. Ct. Nov. 16, 2023); *Sanicola v. City of New York*, No. 153446/2020, 2022 WL 17404666, at *1 (N.Y. Sup. Ct. Nov. 29, 2022).

*v. Chiumento*, --- F.4th ----, ----, No. 22-2908(L), slip op. at 61–62 (2d Cir. Dec. 8, 2023); *see also id.* at 121.  If social media posts can constitutionally be used as evidence of dangerous conduct, certainly a long arrest record like Allen's can.  On top of that, courts post-*Bruen* have rejected constitutional challenges to licensing schemes like the District's that allow consideration of dangerous conduct.  *See, e.g.*, *id.* at 57–110; *Koons v. Platkin*, No. 22-cv-7463, 2023 WL 3478604, at *22–23 (D.N.J. May 16, 2023), *argued*, Nos. 23-1900, 23-2043 (3d Cir. Oct. 25, 2023); *Or. Firearms Fed'n v. Kotek Or. All. for Gun Safety*, No. 22-cv-1815, 2023 WL 4541027, at *47 (D. Or. July 14, 2023), *appeal docketed*, Nos. 23-35478 & 23-35479 (9th Cir. July 17, 2023).  As a result, the serious questions about the correctness of Allen's constitutional theory lessen the weight of his alleged constitutional injury in the balance of harms.

Even a proven Second Amendment violation would not qualify as irreparable harm. Although Allen assumes that *any* constitutional violation per se qualifies as irreparable harm, Pl.'s Opp'n at 11, that is not the law.  The D.C. Circuit has explained that whether constitutional violations qualify as irreparable harm depends on the constitutional right at issue and requires particularized analysis of the harms that typically attend the particular constitutional violation. *England*, 454 F.3d at 300–03; *see also Ayele v. District of Columbia*, No. 23-cv-1785, 2023 WL 8354883, at *5–7 (D.D.C. Dec. 1, 2023) (rejecting similar argument to Allen's and explaining why plaintiffs misconstrued the same cases Allen cites).  Yet, Allen cites no cases—let alone precedential ones—holding that a Second Amendment violation qualifies as irreparable harm. *See Or. Firearms Fed'n, Inc. v. Brown*, 644 F. Supp. 3d 782, 810 (D. Or. 2022) (holding that Second Amendment violation was not per se irreparable harm).

The actual harms Allen says are associated with his alleged constitutional deprivation, even if believed, are not so great or irreparable that they require the Court to rush this case.  The

only harms associated with his Second Amendment right that he attests to ("physical and mental repercussions") can be compensated by damages if he prevails.  Pl.'s Opp'n at 14; *see Sullivan* Order at 6 (staying Second Amendment challenge by considering that plaintiffs could recover, at the end of litigation, money damages for harms during the pendency of the litigation).  Although, it seems a stretch to claim that a years-ago license revocation is continuing to cause physical and mental distress.  Indeed, Allen provides nothing to back up his claims of harm, which further lessens their weight.  *See Vallejo Ent. LLC v. Small Bus. Admin.*, No. 22-cv-1548, 2023 WL 3275634, at *2 n.2 (D.D.C. May 5, 2023) (granting stay when, among other things, plaintiff failed to provide evidence supporting its assertion of harms).

Moreover, it is not as if Allen's Second Amendment right is completely infringed until he obtains relief from this Court.  *See Sullivan* Order at 5 (staying challenge to ban on large capacity magazines by considering that plaintiffs could still possess some such magazines).  Thanks to his registration certificate, he can still possess a gun in his home—a core of the Second Amendment right.  *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008).  And nothing prevents him from reapplying for a license today.  Four years have passed since his license was revoked.  He can reapply and explain—if true—that, since his revocation, he has not demonstrated any dangerous conduct and that the passage of time and rehabilitation of his character show that he does not have a propensity for violence or instability.  If Allen is interested in getting a license, pausing this case would allow him to focus on reapplying.

Allen's complaints of irreparable harm further lose weight when one considers that Allen has done nothing thus far to remedy them.  Allen has never moved for a preliminary injunction— the obvious remedy for his claims of irreparable harm.  Further, Allen never explains "why the ongoing deprivation of [his] constitutional rights is hardship only during a stay period and not

during the entire pendency of this litigation.  [He] present[s] no explanation as to why the addition of a less than six month stay period would materially change [his] current position." *Sullivan* Order at 5 (granting stay and rejecting same argument as Allen's).  If delaying a motion for a preliminary injunction undercuts an assertion of irreparable harm, *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975), then never bringing a motion must eviscerate an assertion of irreparable harm.

In addition, if Allen were interested in a reversal of his license revocation, then the faster route would have been to appeal directly to the D.C. Court of Appeals—in 2020.  Unlike this case, that case would not have involved a motion to dismiss, discovery, motions for summary judgment, or a trial.  That case would have only required briefing and oral argument (maybe) and probably taken less than a year.  *See* D.C. Courts, *Statistical Summary: 2022*, at 3, https://tinyurl.com/mrxnyhzf (documenting that the median time for an appeal before the D.C. Court of Appeals is less than a year).  Put plainly, the Court should not deny a stay here by citing Allen's supposed irreparable harm if this case is not rushed when there were other proceedings available to remedy Allen's harm—yet he never used them.

In insisting that this case must move forward without regard for the Supreme Court, Allen papers over the fact that discovery has been moving slowly, so there is little harm in pausing it.  To otherwise show that he has been moving quickly, he points only to the facts that he timely sought an appeal with the Chief and the Concealed Pistol Licensing Review Board (Board)—as required by law, *see* D.C. Code § 7-2509.02(g)—and filed this suit a few months after (bypassing the judicial review mechanism central to the licensing system).  Pl.'s Opp'n at 15.  He further accuses the District of "repeated delays and obfuscation."  *Id.* at 15.  All he cites

for that bold accusation are the facts that the Chief and Board took less than six months total to decide two complex appeals.  *Id.*; *see also id.* at 2–3.

Allen misses the District's point, which was that he has not been moving quickly in *discovery* (at least not until he was prompted by the District's Motion).  Def.'s Mot. at 9.  Although Allen says he has been moving "diligently," Pl.'s Opp'n at 15, his actions speak louder than his words.  That is, Allen took or will take 25 weeks to serve his first set of interrogatories and requests for admission, 9 weeks to serve his first requests for production, over 7 weeks to respond to the District's discovery requests, and over 7 weeks to acknowledge the District's responses to his requests.  This is not an attack on Allen's commitment to his cause or his counsel's strategy; there are many factors that weigh on a party's determinations about what discovery to take and when.  The point is that a stay will not derail a discovery train that has been chugging along at top speed.  The train has hardly left the station.

At the end of the day, a stay is a balancing act and appropriate "so long as the gains outweigh the harm."  *Vallejo Ent.*, 2023 WL 3275634, at *3.  Even if there is some harm to the non-movant, the Court can grant a stay.  *E.g.*, *Livingston*, 2019 WL 2419455, at *3 (staying challenge to licensing scheme even when the plaintiff raised the same claims of harm as Allen); *Woodward* Order at 2 ("While cognizant of the possibility of some insubstantial prejudice, the Court cannot find that this outweighs the major efficiencies that exist.").  Here, "the harm to plaintiff is unclear" because Allen's sole theory of harm is unlikely to materialize given the time-savings of a stay, contrary to D.C. Circuit law, disputed by the District, and belied by his own conduct.  *Vallejo Ent.*, 2023 WL 3275634, at *3.  On the other hand, "the efficiency gains are clear, certain, and definite," so a stay is warranted.  *Id.*

16

B.   **Allen Understates the Harms to the District Absent a Stay.**

Allen spends just two pages on the District's harms, and he fails to undermine them.

Pl.'s Opp'n at 16–18.  Allen says that the burdens of litigating a case are "never sufficient to

justify a stay," citing only out-of-circuit cases.  *Id.* at 17.  But this Court has granted stays by

citing litigation burdens.  *9REN Holdings*, 2020 WL 5816012, at *3; *Novenergia II - Energy &

Env't (SCA) v. Kingdom of Spain*, No. 18-cv-1148, 2020 WL 417794, at *4 (D.D.C. Jan. 27,

2020) (Chutkan, J.).  And so have others in this district.  *E.g.*, *Campaign Legal Ctr. v. Correct

the Rec.*, No. 23-cv-75, 2023 WL 2838131, at *3 (D.D.C. Apr. 7, 2023).

Allen misinterprets the District's argument, which is not just that the District will incur

costs but that those costs will be *wasted* absent a stay.  Hardship to a moving party weighs in

favor a stay when the other case could "obviate[ ]" "litigation costs," *id.*, or "make discovery

unnecessary," *Gov't of Guam v. United States*, No. 17-cv-2487, 2019 WL 1003606, at *9

(D.D.C. Feb. 28, 2019) (Brown Jackson, J.).  The District explained a few examples of how

discovery would be wasted here.  Def.'s Mot. at 11–12.  Allen does not engage with this

explanation much and just says that "the District's fears of wasted discovery and briefing are

unlikely to materialize."  Pl.'s Opp'n at 17.  The District has already explained above how

*Rahimi* will inevitably result in additional briefing.  But here is an illustration of how fears of

wasted discovery will "materialize":  In *Rahimi*, the United States puts forward the same core

historical sources on which the District intends to rely.  *Compare* Brief for the United States at

13–27, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023), *with* Millard Br. at 20–26, 33–

41.  The District is currently trying to retain experts who can analyze and opine on those sources.

But how the Supreme Court analyzes those sources will matter most.  And because *Bruen* is a

historical test, the Court will no doubt take up those sources.  Any expert costs (at taxpayer

expense, which Allen disregards) will be wasted once the Supreme Court interprets those

sources.[5]  Issuing a stay now will prevent any taxpayer dollars from being spent that could have been saved.

In opposing a stay, Allen fails to acknowledge that "fears of wasted discovery and briefing" also apply to him.  Pl.'s Opp'n at 17.  It is not just the District who will need to double brief this case or could move to reopen discovery.  The same goes for Allen.  Again, a stay will benefit *both* Parties, so there is no reason to deny it.[6]

The need for a stay has become all the more pressing because recent conferences between the Parties reveal that substantial discovery disputes—which will cost both Parties and the Court time and resources—are soon to come.  For example, although working together in good faith, the Parties still have disagreements over who can or should be deposed in this case.  Those disputes implicate important doctrines, immunities, and privileges and may require motions practice.  Neither the Court nor the Parties should have to spend time and resources on these disputes when there is ample reason to stay the case.

**CONCLUSION**

The Court should stay the case pending *Rahimi*.

Date: December 8, 2023.                             Respectfully submitted,

                                                    BRIAN L. SCHWALB
                                                    Attorney General for the District of Columbia

                                                    STEPHANIE E. LITOS
                                                    Deputy Attorney General

---

[5]      The reverse is also true.  In making decisions on experts, the District is considering what issues do not need expert treatment.  But the Supreme Court in *Rahimi*, as it did in *Bruen*, may identify gaps in the history or what types of history are more important than others.  Post-*Rahimi*, then, either Party may want to retain additional experts to address historical gaps that the *Rahimi* Court identifies.

[6]      Contrary to Allen's new position discounting settlement, Pl.'s Opp'n at 16, his counsel had expressed to the District what it would take to settle this case and even provided an accounting of attorney's fees, and the District is considering responses.

Civil Litigation Division

*/s/ Matthew R. Blecher*

MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*

HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*

ADAM J. TUETKEN [242215]
RICHARD P. SOBIECKI [500163]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*