## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| LINWOOD ALLEN, |
| Plaintiff, |
| v. |
| DISTRICT OF COLUMBIA, |
| Defendant. |

Civil Action No. 20-cv-02453 (TSC)

## <u>MEMORANDUM OPINION</u>

Plaintiff Linwood Allen sued the District of Columbia ("the District"), Metropolitan Police Department ("MPD"), and others for revoking his firearm registration and concealed pistol license ("CPL") in violation of the Second and Fifth Amendments and the D.C. Administrative Procedure Act.  He alleges that he has a right to carry a concealed pistol in public despite his previous six arrests.  Defendants moved to dismiss, and the court dismissed all defendants except the District and all claims except Allen's Second Amendment challenge to the revocation of his CPL.  Mem. Op. ("MTD Op."), ECF No. 29.  The District now moves to stay this case pending the United States Supreme Court's decision in *United States v. Rahimi*, No. 22-915.  Mot. to Stay ("Mot. to Stay"), ECF No. 41.  Allen contends it is "entirely speculative" whether the Supreme Court's decision in *Rahimi* will affect the legal question presented here and opposes a stay.  Opp'n to Mot. to Stay at 1 ("Opp'n"), ECF No. 44.  For the reasons stated below, the court finds that a temporary stay is warranted, and will therefore GRANT the District's motion to stay.

# I.   BACKGROUND

The Court described the background of this case at length in its March 31, 2023 Memorandum Opinion.  MTD Op. at 2–8.  As relevant here, applicants for a firearm registration certificate in the District of Columbia must satisfy a variety of age, criminal history, personal history, mental health, and physical requirements.  D.C. Code § 7-2502.03.  They must be "suitable" to be licensed, meaning they must not have "exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another."  D.C. Mun. Regs. ("DCMR") tit. 24, § 2335.1(d) (2015).  In 2019, MPD revised its interpretation of DCMR § 2335.1(d)'s "propensity for violence or instability" to include "conduct that is violent or criminal demonstrating low self-control, regardless of whether it results in a criminal conviction" and concluded that such conduct "may be grounds for . . . revocation . . . of a CPL."  Compl. ¶ 182, ECF No. 1.  Beginning in August 2019, MPD gave equal weight to incidents regardless of when they occurred, and greater weight to the total number of incidents in a person's background.  *See* Mot. to Dismiss at 8, ECF No. 22.

Following this change, MPD audited all CPLs granted in 2019, including Allen's, to determine whether they satisfied the revised interpretation.  *Id.*  In reviewing Allen's application, license, and criminal history, MPD determined that he demonstrated a propensity for violence or instability based on his six prior criminal charges (none of which resulted in conviction), and recommended revocation of his CPL.  *Id.* at 8–9.  Allen does not dispute that he has been arrested multiple times, but argues that MPD could not rely on "years-old disproven allegations, non-violent juvenile drug charges handled outside the adult criminal system, and non-violent gambling charges in erroneously determining that Mr. Allen has a 'propensity for violence or instability.'"  Compl. ¶ 267.  His Second Amendment challenge argues that these arrests and

charges, "by themselves, do not establish that [Allen] was not a responsible, law abiding citizen when he applied for and obtained his concealed pistol license." *Id.* ¶ 268.

The Supreme Court heard arguments in *Rahimi* on November 7, 2023, and a decision is expected by the end of the Supreme Court's term in June.  On appeal is the Fifth Circuit's decision holding that an individual subject to a domestic violence restraining order entered in a civil proceeding remains within the political community to whom the Second Amendment guarantees the right to bear arms.  *See United States v. Rahimi*, 61 F.4th 443, 452 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023).  Rahimi was suspected of other criminal conduct, but like Allen he was not a convicted felon or subject to another "longstanding prohibition[] on the possession of firearms." *Id.* (quoting *D.C. v. Heller*, 554 U.S. 570, 626 (2008)).  After finding that Rahimi, "while hardly a model citizen," was "nonetheless among 'the people' entitled to the Second Amendment's guarantees," *id.* at 453, the Fifth Circuit panel surveyed the proposed historical analogues and found the government failed to demonstrate that the challenged restriction on Rahimi's Second Amendment right "fits within our Nation's historical tradition of firearm regulation," *id.* at 460.

The Supreme Court granted certiorari to consider whether the federal statute that barred Rahimi from possessing a firearm violates the Second Amendment on its face.  Br. for the United States at I, *United States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023).  Implicit in that analysis is whether and how governments may disarm individuals who are not law-abiding, responsible citizens.  Oral Arg. Tr. at 31:18–32:14, *United States v. Rahimi*, No. 22-915 (U.S. Nov. 7, 2023) ("Oral Arg. Tr.")  (Chief Justice Roberts' question to the Solicitor General, summarizing the United States' position: "[Y]our argument today is that [the Second Amendment] doesn't apply to people who present a threat of dangerousness?  Whether you want to characterize them as

responsible or irresponsible, whatever, the test that you're asking us to adopt turns on dangerousness?"); *id.* at 81:25–83:7 (Chief Justice Roberts' question to Respondent Rahimi's counsel: "I understand your answer to say that there will be circumstances where someone could be shown to be sufficiently dangerous that the firearm can be taken from him . . . And why isn't that the end of the case?"). The Supreme Court also stands to provide "useful guidance" about the "methodology that *Bruen* requires" in light of the "fair bit of division and a fair bit of confusion . . . in the lower courts" regarding its historical test. *Id.* at 38:5–13; *see New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

## II.  LEGAL STANDARD

Courts have the "inherent" power to stay proceedings due to "economy of time and effort for itself, for counsel, and for litigants." *Bledsoe v. Crowley*, 849 F.2d 639, 645 (D.C. Cir. 1988) (internal quotation marks omitted) (quoting *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936)). This power is "appropriately exercised where a separate proceeding bearing upon the case is pending." *Hulley Enters. Ltd. v. Russian Fed'n*, 211 F. Supp. 3d 269, 276 (D.D.C. 2016). A stay may be warranted where resolution of the separate proceeding "will likely 'narrow the issues in the pending cases and assist in the determination of the questions of law involved.'" *Id.* (quoting *Landis*, 299 U.S. at 253). A stay is justifiable even where the "parallel proceedings 'may not settle every question of fact and law,' but would settle some outstanding issues and simplify others." *Bridgeport Hosp. v. Sebelius*, 09-cv-1344-RWR, 2011 WL 862250, at *1 (D.D.C. Mar. 10, 2011) (quoting *Landis*, 299 U.S. at 256). But a stay is "immoderate and hence unlawful" unless it has "reasonable limits." *Landis*, 299 U.S. at 257.

When a party requests a stay pending other proceedings, the court considers: "(i) What effect, if any, will the completion of the [Supreme Court's] proceedings have on the proceedings before this Court?; and (ii) How, if at all, will [Plaintiff] be burdened if a stay is granted, and

how, if at all, will Defendant[ ] be burdened if a stay is denied?" *U.S. ex rel. Vt. Nat'l Tel. Co. v. Northstar Wireless, L.L.C.*, 288 F. Supp. 3d 28, 31 (D.D.C. 2017).  To determine whether the balance of hardships favors a stay, the court considers three factors: "(1) harm to the nonmoving party if a stay does issue; (2) the moving party's need for a stay — that is, the harm to the moving party if a stay does not issue; and (3) whether a stay would promote efficient use of the court's resources." *Campaign Legal Ctr. v. Correct the Rec.*, 23-cv-75-JEB, 2023 WL 2838131, at *2 (D.D.C. Apr. 7, 2023).  If there is a "'fair possibility' that a stay would adversely affect another party, the movant for the stay must demonstrate a 'clear case of hardship or inequity in being required to go forward.'" *Nat'l Indus. for the Blind v. Dep't of Veterans Affs.*, 296 F. Supp. 3d 131, 137–38 (D.D.C. 2017) (quoting *Landis*, 299 U.S. at 255).  The court's determination whether a stay is warranted "is inextricably intertwined with the nature of the specific case." *Wrenn v. District of Columbia*, 179 F. Supp. 3d 135, 137 (D.D.C. 2016).

### III.    ANALYSIS

#### A.    *Rahimi's* Effect on These Proceedings

Both *Rahimi* and this case require the deciding court to apply *Bruen*'s new historical test, which instructs lower courts to uphold gun restrictions only when there is a tradition of such regulation in U.S. history. *Bruen*, 597 U.S. at 24.  *Bruen* "radically redrew the landscape" surrounding Second Amendment challenges, and neither the Supreme Court nor the D.C. Circuit has applied its standard. *United States v. Shaw*, 22-cr-001-JEB, 2023 WL 3619416, at *1 (D.D.C. May 24, 2023).  The court finds that *Rahimi* will narrow the issues it must decide in this case and assist it in "determin[ing] the questions of law involved" for at least three reasons. *Hulley*, 211 F. Supp. 3d at 276.

*First*, the court has already explained that "*Rahimi* is analogous to this case."  MTD Op. at 16.  A central issue in both cases is whether and to what extent the government can regulate

potentially dangerous individuals' access to guns consistent with the Second Amendment.  In

each case, the government argues that it may disarm individuals found to be dangerous in civil

(Rahimi) or administrative (Allen) proceedings.   Br. for the United States at 42–43, *United

States v. Rahimi*, No. 22-915 (U.S. Aug. 14, 2023) ("U.S. Br.") ("The Fifth Circuit suggested

that [the statute disarming Rahimi] differs from historical laws by disarming persons based on

civil orders rather than criminal convictions. . . . But legal sources from the 17th, 18th, and 19th

centuries recognize the government's power to disarm irresponsible individuals regardless of

their criminal records."); Mot. to Stay at 7 ("The District and United States respectfully disagree

with the idea that criminal convictions are the only way to disqualify a dangerous person from

getting guns.").  The overlap in the government's arguments here and at the Supreme Court

demonstrates that the Court's opinion in *Rahimi* will shed light on whether the nation's historical

traditions allow the government to consider behavior that does not end in a criminal conviction

in determining who is a "law-abiding, responsible" citizen. *Bruen*, 597 U.S. at 70.  Although

Allen's suit brings an as-applied challenge (in addition to a facial challenge)[1] to the District's

regulations to determine whether an applicant for a CPL is "a suitable person to be so licensed,"

24 DCMR § 2332.1(h), the court must first decide whether *any* set of facts short of criminal

conviction can be considered in conducting that inquiry.  That question is squarely presented in

*Rahimi*.

      *Second*, this court may not need to reach certain of the parties' arguments—or may need

to address new arguments—if the Supreme Court distinguishes administrative proceedings from

judicial or legislative determinations to determine dangerousness.  At least two Justices appeared

---

[1] *See* Opp'n at 7 n.1 ("Although Mr. Allen's primary claim is an as-applied challenge, his
  complaint also raised a facial challenge to the District's apparent policy of restricting Second
  Amendment rights based on unproven conduct and the fact of arrests alone.").

skeptical of administrative determinations at oral argument:  Justice Thomas asked the Solicitor

General whether the government would be able to make the same arguments if Rahimi had been

disarmed in an administrative determination, rather than a civil adjudication.  Oral Arg. Tr. at

34:15–19.  And Justice Alito referenced a regulatory scheme similar to the District's in asking

whether "a concealed carry permitting regulation that is almost identical to the one we

invalidated in *Bruen*, except that it requires an applicant to show . . . that he or she is sufficiently

responsible" would be constitutional.  *Id.* at 35:13–18.  Solicitor General Prelogar acknowledged

that "it would be far more difficult to defend an executive branch or an administrative

determination," Oral Arg. Tr. at 34:20–35:1, but noted that to the extent those determinations

were intended to implement permissible legislative judgments regarding dangerousness, *Bruen*

suggests that such "objective standards could be deployed as part of a background check

system," *id.* at 36:2–11.  While there is no guarantee the Supreme Court will reach this issue, and

its decision "may not settle every question of fact and law," its ruling is likely to "settle some

outstanding issues and simplify others" by guiding this court's analysis of the standard to which

the District is held in defending its administrative determination.  *Bridgeport Hosp.*, 2011 WL

862250, at *1.

    *Third*, *Rahimi* presents the first chance for the Supreme Court to apply and clarify the

historical test announced in *Bruen*.  The Court in *Rahimi* is presented with the question of

whether the Fifth Circuit correctly performed *Bruen's* historical inquiry.  U.S. Br. at 41–44.  To

determine whether the challenged restriction on Rahimi's Second Amendment rights comports

with the nation's tradition and history, the Court will necessarily articulate the historical sources

it relies upon, identify those given particular weight, explain what those sources mean and how

they should be interpreted, and analogize them to modern firearms regulations.  The District

states that it intends to rely on "similar historical sources." Mot. to Stay at 6, 11–12. The Supreme Court's appraisal and the weight given to those sources will necessarily guide this court's evaluation of the same sources. *See Peled v. Netanyahu*, No. 17-cv-260-RBW, 2017 WL 7047931, at *2 (D.D.C. Oct. 16, 2017). Further, the District correctly notes that a decision in *Rahimi* will likely simplify and clarify the issues for discovery: "Either Party may want further factual exploration based on what *Rahimi* identifies as relevant. Or a Party may want to retain different experts to explore historical issues the Court may identify." Reply in Further Supp. of Mot. to Stay at 4 ("Reply"), ECF No. 45. For all these reasons, the court finds that the Supreme Court's ruling in *Rahimi* will "narrow the issues" and assist it in "determin[ing] the questions of law involved" in Allen's case. *Hulley*, 211 F. Supp. 3d at 276.

Allen argues that a stay would not serve the interests of judicial economy because the question presented in *Rahimi* is "fundamentally distinct" from the legal issues in his case. Opp'n at 6. He highlights the differences between this case and *Rahimi*, including that he is not subject to a restraining order "or any other judicial determination about his potential dangerousness," that the District has not put forward "any record evidence of any violent conduct by Mr. Allen at all," and that the similarities between this case and Rahimi end at their respective reference to the Second Amendment. *Id.* He argues that even if *Rahimi* sheds light on whether restrictions on dangerous individuals' access to guns are constitutional, he is not challenging the District's "ability to place restrictions on dangerous individuals' access to guns." *Id.* Instead, Allen describes his suit as limited to challenging the District's revocation of his CPL based on its new interpretation of 24 DCMR § 2335.1(d)'s "propensity for violence or instability" factor, which "apparently resulted in treating Mr. Allen's history of unproven and expunged charges as though they were criminal convictions." *Id.* at 6–7.

Allen is incorrect to the extent he suggests that to necessitate a stay the Court's opinion in *Rahimi* must "resolve Mr. Allen's claims."  Opp'n at 6.  The standard is whether the separate proceeding is likely to narrow or settle some outstanding issues, simplify others, or otherwise assist in the determination of the questions of law involved.  *Hulley*, 211 F. Supp. 3d at 276; *see also Bridgeport Hosp.*, 2011 WL 862250, at *1.  For the reasons explained above, the court finds that it will.  Nor is the court persuaded by Allen's revision of his Second Amendment claim, especially given that he has reserved his facial challenge to the District's licensing scheme.  Opp'n at 7 n.1.  Allen challenges the decision to revoke his CPL and claims that decision was the "result of a deliberate and principled change in the Chief of Police's position on what it means to have 'exhibited a propensity for violence or instability that may reasonably render the person's possession of a concealed pistol a danger to the person or another.'"  Compl. ¶¶ 265–71, 175 (quoting 24 DCMR § 2335.1(d)); *see also id.* ¶ 273.  Allen's Complaint does not allege that the District treated his arrest history or charges as if they were criminal convictions.  It alleges that he is a responsible, law-abiding citizen, and the "mere fact of prior charges" against him "cannot change that."  Compl. ¶ 263.  For the reasons explained above, the court cannot determine whether the District's new interpretation of the factors used to determine an individual's "propensity for violence" violates Allen's Second Amendment rights without deciding whether and how the District may impose restrictions on "unsuitable," or dangerous, individuals' access to guns in the absence of a criminal conviction.  24 DCMR § 2335.1(d).  Whether described as "unsuitable," "dangerous," or not "responsible [or] law-abiding," the inquiry is the same.  *See* Oral Arg. Tr. 31:18–32:14.

**B.     Balance of Hardships**

The damage Allen asserts he will incur if the court grants the District's stay request does not outweigh the court's judicial economy interest.

*First*, with respect to the harm he will suffer, Allen cannot credibly claim that he will suffer more hardship if his case is stayed for less than six months than if the case is allowed to proceed to summary judgment before a ruling in *Rahimi*.  Crucially, the stay is time-limited; the Supreme Court has already heard arguments in *Rahimi*, and its decision is anticipated before the end of the current term in June.  *See Landis*, 299 U.S. at 257.  The close of discovery in this case is only three months prior to the Court's expected decision, and summary judgment briefing will not be completed until July, after the decision in *Rahimi* issues.  January 11, 2024 Minute Order. The court is therefore unpersuaded by Allen's argument that a stay is improper because he "suffers irreparable harm each day that he is deprived of his constitutional right to bear arms." Opp'n at 11.  If discovery and briefing proceed on the current schedule, only for the Supreme Court to clarify or change existing legal standards, reopening discovery and re-briefing summary judgment will undoubtedly take longer than the handful of months this case will be stayed between the existing close of discovery and a decision in *Rahimi*.  On these facts, the court finds that Allen will not be harmed by a stay.  *Cf. Nat'l Indus. for the Blind*, 296 F. Supp. 3d at 137–38.  A brief stay to allow the parties and the court the benefit of the Supreme Court's ruling clarifying the law in this muddied field will ultimately take less time than the alternative.  *See Novenergia II - Energy & Env't (SCA) v. Kingdom of Spain*, No. 18-cv-1148, 2020 WL 417794, at *4 (D.D.C. Jan. 27, 2020) ("[W]hile a stay may well delay the resolution of the dispute, in the long run, a stay will still likely be shorter than the possible delay that would occur" in its absence).

*Second*, the moving party's need for a stay is clear.  The District articulates its burdens in the absence of a stay, including litigation costs based on engaging in potentially duplicative or unnecessary discovery "which may later be obviated" by the Supreme Court's decision.  *See*

*Campaign Legal Ctr.*, 2023 WL 2838131, at *3; Mot. to Stay at 11–12 (outlining costly and potentially wasteful expert discovery given the District's experts "will explore many of the same issues and sources as in *Rahimi*"); *see also* Reply at 17–18 (noting that taxpayer dollars will be wasted if the Supreme Court interprets the same sources the District's experts plan to address). Allen cites only out-of-circuit case law to argue that litigation burdens are "never sufficient to justify a stay." Opp'n at 17. But courts in this district consider the burdens of litigation, especially where, as here, the other party has not shown substantial harm from delay. *See* Reply at 17 (collecting cases).

  *Third*, a stay will promote efficient use of the court's resources. It would be "highly inefficient" to allow the parties to proceed through discovery and opening briefs on summary judgment, only to have to incorporate the Supreme Court's ruling into their oppositions or replies. *See* Order at 2, *Woodward Health Sys., LLC v. Becerra*, 20-cv-3098-JEB (D.D.C. Feb. 23, 2022), ECF No. 29. The court's limited resources are not well spent adjudicating discovery disputes that may be obviated post-*Rahimi*, with the benefit of guidance on *Bruen's* historical test. For each of the reasons described above, the court also stands to receive binding and necessary guidance on those issues. *See supra* Part III.A. In sum, Allen has not shown he will be harmed by a stay, and any harm he may suffer is outweighed by the harm to the District in the absence of a stay and this court's judicial economy gains in waiting less than six months for binding guidance from the Supreme Court.

## IV. CONCLUSION

  For the reasons above, the court will GRANT Defendant's Motion to Stay, ECF No. 41. Proceedings in this matter are STAYED pending further order of the court. The parties are directed to meet, confer, and file a joint status report within 30 days of the Supreme Court's decision in *United States v. Rahimi*, No. 22-915. The status report shall propose an amended

Scheduling Order for moving forward with the case, and shall be accompanied by a proposed order.  A corresponding Order will accompany this Memorandum Opinion.

Date: February 1, 2024

*Tanya S. Chutkan*
TANYA S. CHUTKAN
United States District Judge